# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

"Purchaser"
as set forth in <u>Schedule 2</u>

and

"Seller"
as set forth on <u>Schedule 1</u>

DATED AS OF: November 22, 2021

140109.00416/126156287v.12

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

THIS PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>") is executed and delivered as of this 22nd day of November, 2021 (the "<u>Effective Date</u>"), between the entities listed as Seller on <u>Schedule A-1</u> attached hereto and made a part hereof (collectively, "<u>Seller</u>"), and the entities listed as Purchaser on <u>Schedule A-2</u> attached hereto and made a part hereof (collectively, "<u>Purchaser</u>").

The circumstances underlying the execution and delivery of this Agreement are as follows:

A.     Capitalized terms used but not otherwise defined herein have the respective meanings given them in Article I below.

B.     Purchaser desires to purchase, and Seller desires to sell, the Seller's Assets on the terms and conditions set forth in this Agreement.

C.     Upon the consummation of the transactions contemplated by this Agreement, Purchaser shall lease the Seller's Assets to Coronado Operator, LLC, as the master tenant, who will then sublease each Facility to each of the entities listed as Operator on <u>Schedule A-3</u> attached hereto and made a part hereof (collectively, "<u>Operator</u>"), pursuant to the terms of the Agreement to Lease.

NOW, THEREFORE, Seller and Purchaser agree as follows:

ARTICLE I - DEFINITIONS

The following terms shall have the respective meanings given them below:

"<u>Acquisition Proposal</u>" means any offer or proposal to acquire any Facility or an equity interest in a Seller or otherwise to provide financing with respect to or affecting any Facility.

"<u>Additional Deposit</u>" has the meaning set forth in Section 2.4.

"<u>Admission Agreements</u>" means the admission agreements entered into by an Operator with the current residents/patients of each Facility.

"<u>Affiliate</u>" of a party means any entity or person that controls, is controlled by, or is under common control with, such party.

"<u>Agreement to Lease</u>" means that certain Agreement to Lease dated as of the date of this Agreement by and among Master Tenant, Operator and certain of Affiliates of Seller, and Purchaser.

"<u>Charter Documents</u>" means the articles of incorporation, articles of organization, certificate of formation, operating agreement, bylaws, resolutions, minutes and other documents that govern the organizations of a party to this Agreement, as the case may be.

1

"<u>Claim</u>" means a claim for indemnification pursuant to Section 10.1 of this Agreement.

"<u>Closing</u>" means the consummation of the transactions contemplated by this Agreement.

"<u>Closing Date</u>" means the date on which the Closing occurs.

"<u>Deposit</u>" means the sum of the Initial Deposit, the Additional Deposit, and the Extension Deposit.

"<u>Earn Out Date</u>" shall mean the date upon which an Earn Out Trigger Event occurs.

"<u>Earn Out Payment</u>" has the meaning set forth in Section 2.3(b).

"<u>Earn Out Trigger Event</u>" shall mean the earliest to occur of the following after the Closing Date: (a) the sale of the Seller's Assets by Purchaser, (b) a recapitalization or refinance of Seller's Assets by Purchaser, or (c) the third anniversary of the Closing Date.

"<u>EBITDAR</u>" means the net income generated by the Master Tenant and all of the Operators attributable to the operations at the Facilities plus (a) interest expense with respect to all outstanding indebtedness of the Master Tenant and Operators, including capitalized interest, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, and (e) the amount of rent then being paid pursuant to the Master Lease agreement executed by Master Tenant as of the Closing Date, all of the foregoing determined in accordance with GAAP, <u>minus</u> gains from any sale of assets, other than sales in the ordinary course of business.

"<u>Effective Date</u>" means the date set forth in the Preamble of this Agreement.

"<u>Effective Time</u>" has the meaning set forth in Section 9.2.

"<u>Extension Deposit</u>" means a sum equal to One Million Dollars ($1,000,000).

"<u>Encumbrances</u>" means liens, security interests (whether purchase money security interests or otherwise), claims, restrictions, easements, options and other encumbrances.

"<u>Environmental Laws</u>" means any and all federal, state, county and local statutes, laws, regulations and rules in effect on the date of this Agreement relating to the protection of the environment or to the use, transportation and disposal of Hazardous Materials.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any rule or regulation issued thereunder.

"<u>Excluded Liabilities</u>" means any obligation or liabilities relating to, or arising out of, the ownership of Seller's Assets and the operation of each Facility that exist as of the Effective Time. For purposes of this definition, an obligation shall be deemed to "exist" as of the Effective Time if it relates to events, omissions or conditions that occurred prior to, or existed as of, the Effective

Time, even if it is not asserted until after the Effective Time. The term Excluded Liabilities shall include, but not be limited to: (i) any liabilities or obligations of Seller relating to employee benefits or compensation arrangements of any nature; (ii) any liability or obligation of Seller for breach of contract, personal injury or property damage (whether based on negligence, breach of warranty, strict liability or any other theory) caused by, arising out of or resulting from, directly or indirectly, any alleged or actual acts or omissions, including, but not limited to, malpractice or other tort claims to the extent based on acts or omissions of Seller occurring on or before the Effective Time, or claims for breach of contract to the extent based on acts or omissions of Seller occurring on or before the Effective Time; (iii) any liability or obligation of Seller for money borrowed; (iv) any amounts due, claimed or becoming due to Medicare, Medicaid or any other health care reimbursement or payment intermediary, including, but not limited to, any recapture, adjustment, overpayment, penalty assessment or any other financial obligation or charge whatsoever with respect to any period prior to the Effective Time, including but not limited to those arising from any adjustments or reductions in Medicare or Medicaid reimbursement, it is understood that all prior Medicaid and Medicaid obligations are the responsibility of Seller and that all Medicare and Medicaid obligations for recovery, offset or repayment for services rendered prior to the Effective Time are Seller's responsibility to the extent that Medicare or Medicaid claims repayment or offset for any services rendered prior to the Effective Time; (v) any liabilities under any contracts; (vi) any accounts payable, taxes, or other obligation or liability of Seller to pay money incurred by Seller on or prior to the Effective Time; (vii) any claims, lawsuits, liabilities or obligations regarding any resident trust funds; (viii) any and all other liabilities and obligations of every kind of Seller incurred in connection with, or arising by reason of, their ownership or operation of the Seller's Assets prior to the Effective Time and events, occurrences or transactions with respect to each Facility occurring before the Effective Time, including, without limitation, Losses arising out of alleged or actual overpayments or false claims submitted or originating before the Effective Time and investigations and audits related thereto; and (ix) any other liabilities and obligations of every kind of Seller existing as of, or relating to the period prior to, the Effective Time.

"Facility" or "Facilities" means, as applicable, the Real Property and Personal Property constituting each skilled nursing facility and/or all such skilled nursing facilities identified on attached Schedule 1(a), as applicable.

"Financial Statement Date" means August 31, 2021.

"First Extension" has the meaning set forth in Section 9.2.

"GAAP" means generally accepted accounting principles as in effect in the United States of America, in effect at the time in question; provided however, that Operator's financial statements currently contain (and may prospectively contain) an exception to GAAP as the financial statements depart from the GAAP requirement that rent expenses from operating leases be amortized on a straight-line basis for any incremental increases over the term of such operating lease.

"Hazardous Substances" means (A) those substances included within the definitions of any one or more of the terms "hazardous substances," "toxic pollutants", "hazardous materials", "toxic substances", and "hazardous waste" in the Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* (as amended), the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Sections 1801 *et seq.*, the Resource Conservation and Recovery Act of 1976 as amended, 42 U.S.C. Section 6901 *et seq.*, Section 311 of the Clean Water Act, 15 U.S.C. § 2601 *et seq.*, 33 U.S.C. § 1251 *et seq.*, 42 U.S.C. 7401 *et seq.* and the regulations and publications issued under any such laws, (B) petroleum, radon gas, lead based paint, asbestos or asbestos containing material and polychlorinated biphenyls and (C) mold or water conditions which may exist at the Real Property or in connection with the Personal Property or other matters governed by any applicable federal, state or local law or statute.

"<u>Healthcare Licenses</u>" means all licenses, permits, provider agreements, and authorizations necessary for Operator to (a) lawfully operate all beds contained in each Facility as nursing home beds; (b) provide licensed nursing services at each Facility; and (c) receive payment under the Medicare and applicable state Medicaid programs for goods and services provided at each Facility.

"<u>Indemnified Person</u>" means a person entitled to indemnification pursuant to ARTICLE X of this Agreement.

"<u>Indemnitor</u>" means a person responsible for indemnifying an Indemnified Person pursuant to ARTICLE X of this Agreement.

"<u>Initial Deposit</u>" has the meaning set forth in Section 2.4.

"<u>Intangible Property</u>" means (a) all transferable consents, authorizations, variances or waivers, licenses, permits, and approvals given or issued by any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality having jurisdiction over any Facility (excluding Healthcare Licenses); (b) all rights to use the names of each Facility set forth on attached <u>Schedule 1(b)</u>; and (c) all unexpired warranties, guarantees, sureties, and similar contracts or agreements issued to or for the benefit of Seller (or its predecessors in interest) from manufacturers, contractors, suppliers, installers, and similar parties in connection with the operation, construction, improvement, alteration or repair of any Facility or any improvements located on the Real Property.

"<u>Lease Documents</u>" means the "Lease Documents" as defined in the Agreement to Lease.

"<u>Losses</u>" has the meaning set forth in Section 10.1.

"<u>Master Lease</u>" means the master lease executed pursuant and by the parties to the Agreement to Lease.

"<u>Master Tenant</u>" has the meaning set forth in the Agreement to Lease.

"<u>Material Adverse Change</u>" means the occurrence of one of more of the following which have been done by, against or with respect to Seller and which remain(s) in effect as of the Closing: (i) the commencement of a case under Title 11 of the U.S. Code (as now constituted or hereafter amended) or under any other applicable bankruptcy or other similar law; (ii) the appointment of a trustee or receiver of any property interest; (iii) an assignment for the benefit of creditors; (iv) an attachment, execution or other judicial seizure of a substantial property interest; (v) the taking of,

failure to take or submission to any action indicating an inability to meet its financial obligations as they accrue; (vi) a dissolution or liquidation; or (vii) any material deterioration of the operations, financial condition or performance of any Facility, which is defined as (A) a final and non-appealable loss of licensure or certification status, (B) a material diminution in the insurability of any Facility, (C) operating under a denial of admissions or payment for new admissions, (D) any proceeding to revoke or materially limit any license or certification, (E) any ongoing or accruing civil monetary penalty in excess of $500,000, (F) operating under an immediate jeopardy or Special Focus Facility designation by CMS or inclusion of a Facility on the CMS Special Focus watchlist; (G) receipt of any notice of an investigation by the Department of Justice, state attorney general's office, or other similar governmental authority that is likely to lead to any such investigation, (H) notice or disclosure of a *qui tam* or the federal False Claims Act case or proceeding, or a subpoena by the Department of Justice relating to the investigation of claims alleged under the False Claims Act and (I) a decrease in the average census of the Facilities measured for the ten (10) days prior to Closing of more than ten percent (10%) from the average census of the Facilities as at the Effective Date.

"Outside Date" means March 31, 2022.

"Out of Compliance" means: (A) a finding by a governmental authority of one or more deficiencies at any Facility at a "Level J" that has not been corrected and cleared by the applicable governmental authority; (B) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursement for existing patients or for new admissions at a Facility; (C) a Facility loses its license or certificate to operate; (D) a Facility has any provider agreement suspended, revoked or terminated; (E) a Facility is declared a Special Focus Facility by CMS or is placed on the SFF watch list; and (F) a Facility has its number of licensed beds materially reduced after the Effective Date.

"Parties" or a "Party" means the Seller and Purchaser.

"Permitted Encumbrances" has the meaning set forth in Section 4.6.

"Personal Property" means all equipment, furniture, fixtures, inventory (including linens, dietary supplies and housekeeping supplies, but specifically excluding food and other consumable inventories) and other tangible personal property owned (but not leased) by Operator and located on the Real Property and each Facility, including, but not limited to, motor vehicles, entitlements, and telephone numbers.

"Plan" means an employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Internal Revenue Code as to which Seller may have any liability.

"Purchase Documents" means this Agreement and all documents executed in connection with or pursuant to this Agreement, including the deeds and other documents listed in Sections 9.2 and 9.4 of this Agreement, as such documents may be amended, renewed or replaced.

"Purchase Price" means the sum of Fifty-Two Million and No/100 Dollars ($52,000,000.00).

"Real Property" means each parcel of real property described on attached Schedule 1(c), together with (a) any buildings and other improvements located thereon; (b) all rights of a Seller in and to all air, mineral and riparian rights and all tenements, hereditaments, privileges and appurtenances belonging or in any way appertaining thereto, if any; (c) any land lying in the bed of any street, road or avenue adjoining the real property described on attached Schedule 1(c) to the center line thereof, but only to the extent of a Seller's interest, if any, therein; and (d) all easements, whether or not recorded, strips and rights-of-way abutting, adjacent to, contiguous with or adjoining the real property described on attached Schedule 1(c), but only to the extent of a Seller's interest, if any, therein.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration of any Hazardous Substance into the environment, including the movement of any Hazardous Substance or other substance through or in the air, soil, surface water, groundwater, or property.

"Remedial Action" means any action required under any Environmental Laws to (i) clean up, remove, treat, or in any other way address any Hazardous Substance or other substance in the environment, (ii) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Substance or other substance so it does not migrate or endanger or threaten to endanger public health or welfare or the environment, or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued under such section, with respect to a Plan.

"Second Extension" has the meaning set forth in Section 9.2.

"Seller Financial Statements" means the financial statements for each Facility relating to the operations of each Facility for October 1, 2019, through December 31, 2019, reviewed financial statements for the calendar year 2020, internally prepared financial statements for calendar year 2021 (as Closing will occur before audited financial statements are completed), and interim financial statements from January 1, 2022 for the month occurring thirty (30) days prior to the Closing Date (e.g., if Closing occurs on February 28, 2022, then financial statement will be available for the month of January 2022).

"Seller's Assets" means the Real Property, Personal Property and the Intangible Property.[1]

"Survival Period" has the meaning set forth in Section 13.20.

"Title Commitment" has the meaning set forth in Section 4.6.

"Title Company" means Riverside Abstract, LLC, having an address at 212 Second Street, Suite 502, Lakewood, New Jersey 08701, attention: Azi Mindrick.

---

[1] Facility is defined to mean the Real Property and Personal Property.

140109.00416/126156287v.12

"Title Insurance Policy" means each title insurance policy issued by the Title Company pursuant to each Title Commitment concurrently with the Closing that insures the applicable Purchaser's fee simple title to the Real Property, in compliance with the provisions of Section 4.6(g).

"Unfunded Liabilities" means the amount (if any) by which the present value of all vested and unvested accrued benefits under all Plans exceeds the fair market value of all such Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plans using Pension Benefit Guaranty Corporation (or any successor thereto) actuarial assumptions for single employer plan terminations.

## ARTICLE II - PURCHASE AND SALE

2.1    Agreement to Sell and Buy.  On the terms and subject to the conditions set forth herein, Seller agrees to sell to Purchaser, and Purchaser agrees to acquire from Seller, Seller's Assets.

2.2    No Assumption of Liabilities. No Purchaser is acquiring or assuming any liabilities whatsoever, including, without limitation, any Excluded Liabilities.  This Section 2.2 and the Seller's obligation with respect to Excluded Liabilities shall survive the Closing indefinitely.

2.3    Purchase Price; Earn Out Payment.

(a)    The purchase price for the Seller's Assets will be the Purchase Price.  The Purchase Price shall be payable in cash or other immediately available funds at the Closing and shall be subject to the adjustments set forth in this Agreement.  Seller and Purchaser agree that, for purposes of this Agreement, no portion of the Purchase Price shall be allocated to the Personal Property or the Intangible Property; provided, however, that for purposes of title insurance and transfer taxes, the Parties shall agree to an allocation of the Purchase Price on a Facility by Facility basis prior to the expiration of the Due Diligence Period.

(b)    (i)    In addition to the Purchase Price, Seller will be entitled to receive an earn out payment upon satisfaction of certain conditions.  If the Earn Out Trigger Event occurs prior to the third anniversary of the Closing Date through the sale of the Seller's Assets, a recapitalization of Seller's Assets (i.e., a replacement of equity through a debt refinance, infusion of new and/or additional equity or other method), and/or a refinance of Seller's Assets, then the earn out payment shall be Six Million Dollars ($6,000,000).  If the Earn Out Trigger Event occurs because no sale of the Seller's Assets, recapitalization of Seller's Assets and/or refinance of Seller's Assets occurs prior to the third anniversary of the Closing Date, then the earn out payment shall either be: (1) Six Million Dollars ($6,000,000) if the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000), or (2) Three Million Dollars ($3,000,000) if the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Seven Million Five Hundred Thousand Dollars ($7,500,000) but is less than Eight Million Five Hundred Thousand Dollars ($8,500,000) (the applicable amount payable to Seller as provided for above being hereinafter referred to as the "Earn Out Payment").

(ii)     Within ten (10) Business Days of Seller's receipt of notice from Purchaser or knowledge of the occurrence of an Earn Out Trigger Event, Seller shall deliver to Purchaser a certificate from its chief financial officer or manager, or other authorized representative as appropriate, a calculation of EBITDAR, in the form attached as Schedule 2.3(b). Within five (5) Business Days, Purchaser may request in writing the delivery to Purchaser by Seller of Seller's work papers and other materials establishing the calculations included in the certificate ("Work Papers").  Purchaser shall have ten (10) Business Days from the delivery of Work Papers, if requested by Purchaser, or if not requested then ten (10) Business Days from delivery of the certificate, to review Seller's calculation of EBITDAR, and Purchaser shall notify Seller prior to the expiration of such ten (10) Business Day period if Purchaser disputes the same.  The failure of Purchaser to notify Seller within such ten (10) Business Day period shall be deemed to constitute Purchaser's agreement with Seller's calculation of EBITDAR.  To the extent that Purchaser notifies Seller in a timely manner, the Parties shall attempt to resolve any dispute in good faith negotiations, and if the Parties cannot resolve such dispute within ten (10) Business Days thereafter, either Party shall be permitted to submit the determination to binding arbitration in Wilmington, Delaware.  Unless the Parties shall agree in writing to different rules of arbitration, the arbitration shall be before a panel of three (3) arbitrators and otherwise in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**").  Unless the Parties otherwise agree to the identity of the three (3) arbitrators, such arbitrators shall be appointed by AAA and shall be certified public accountants and not associated with any firm which has done work for or been engaged by any Party to the arbitration in the past.  The prevailing Party in any such arbitration or other proceeding, in addition to any other relief to which such Party may be entitled, shall be entitled to recover from the non-prevailing Party (as determined by the arbitrators) reasonable legal fees and other costs and expenses incurred by the prevailing party in connection with the proceeding.

(iii)     The provisions of this Section 2.3(b) shall survive Closing.

2.4     Deposit.  On or prior to the Effective, Purchaser has deposited with the Title Company an amount equal to Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Initial Deposit") by wire transfer of immediately available funds into an escrow account with the Title Company, which the Title Company shall hold pursuant to the terms of this Agreement and that certain escrow agreement entered into by Seller, Purchaser and Title Company dated on or about even date herewith (the "Escrow Agreement").  Within one (1) Business Day after the expiration of the Due Diligence Period if Purchaser has not terminated this Agreement, Purchaser shall deposit an amount equal to Seven Hundred Fifty Thousand and No/100 Dollars (750,000.00) (the "Additional Deposit") by wire transfer of immediately available funds into an escrow account with the Title Company.  The Deposit shall serve as a portion of the Purchase Price at Closing or be paid or refunded in accordance with this Agreement and the Escrow Agreement.

ARTICLE III - COSTS AND PRORATIONS

The costs of the transaction and the expenses related to the ownership and operation of the Seller's Assets shall be allocated between Seller and Purchaser as follows:

3.1     Transfer Taxes.  All state, county and local sales, transfer or excise taxes due on the transfer to Purchaser of title to the Real Property, if any, shall be paid by Seller.

3.2     Escrow Fees.  Any escrow fee charged by the Title Company shall be paid one-half (1/2) by Seller, on the one hand, and one-half (1/2) by Purchaser, on the other hand.

3.3     Title Policy; Survey; Searches.  Purchaser shall pay the cost of the Title Insurance Policy, the Survey and the Searches.

3.4     Due Diligence Costs.  Purchaser shall pay for the cost of its due diligence investigations.

3.5     Attorneys' Fees.  Each Party shall be responsible for the payment of its own attorneys' fees and consultant costs incurred in connection with the transaction which is the subject of this Agreement.

3.6     Recording Costs.  Purchaser shall pay all recording fees related to the recording of the deeds.

3.7     Releases.  Seller shall pay the cost of obtaining and recording any releases necessary to deliver title to Seller's Assets in accordance with the terms of this Agreement.

3.8     Other Items.  Purchaser and Seller acknowledge and agree that Master Tenant and Operator shall enter into the Master Lease with the Purchaser or its affiliate from and after Closing and shall be and remain responsible for, among other things: (a) all revenues and expenses attributable to each Facility, whether attributable to the period before or after the Closing; (b) real and personal property taxes, assessments, water and sewer and similar charges that are levied against each Facility, whether attributable to the period before or after the Closing Date; (c) all utilities provided to each Facility, whether before or after the Closing Date; and (d) any amounts or deposits that have been prepaid, or that remain to be paid, under any of the Admission Agreements or any other contracts affecting the Seller's Assets.  Therefore, none of the foregoing items or any other items require proration at or after Closing.

ARTICLE IV – DUE DILIGENCE; PRE-CLOSING COVENANTS

4.1     Due Diligence. Purchaser may conduct an investigation of the Seller's Assets, the Facilities, and the Seller as set forth in this Section 4.1.

(a)     Seller Deliverables.  Seller shall, promptly but in any event, within five (5) days after written request, deliver to the Purchaser, such documents, records and other information regarding the Seller's Assets as reasonably requested by Purchaser and as are within Seller's, Master Tenant's or any Operator's possession or control.  In any event, Seller shall deliver the following to Purchaser within five (5) days of the Effective Date to the extent the same are within Seller's, Master Tenant's or any Operator's possession or control:

(i)     copies of the Seller Financial Statements;

(ii)    all environmental reports; structural reports and geological reports; appraisals, governmental licenses, permits and approvals; service and maintenance contracts; existing surveys of the Real Property, including any as-built surveys; wetland reports; soils reports;

9

architectural drawings, plans and specifications; engineering tests and reports; title policies; and property condition assessments in the possession and control of Seller;

        (iii)    copies of insurance policies and certificates held by Seller or provided by Master Tenant or any Operator;

        (iv)    [reserved];

        (v)    copies of the most recent Real Estate Assessment Center audits/surveys for each Facility, if any;

        (vi)    healthcare regulatory compliance and survey history for each Operator;

        (vii)    copies of any and all Medicare and Medicaid survey reports, complaint history (whether or not posted to CMS's Nursing Home Compare Web site), subpoenas from any government agency or regulatory body, and waivers of deficiencies, waivers of physical plant deficiencies or life safety code deficiencies, plans of correction and any other material governmental investigation reports issued with respect to each Facility for the last two (2) fiscal years prior to the date of this Agreement;

        (viii)    reimbursement history, if any, of Operator with Medicare, Medicaid and other third-party payors;

        (ix)    summary of all litigation presently pending or threatened in writing against Seller, Master Tenant, or any Operator, and copies of any complaints or proceedings if requested by Purchaser; and

        (x)    copies of any material contracts affecting any Facility, Seller, Master Tenant or any Operator that will survive Closing.

        (b)    <u>Due Diligence Period</u>. Purchaser and its agents and employees shall have until and including January 14, 2022, at 5:00 P.M., Eastern Time (the "<u>Due Diligence Period</u>") to conduct such investigations with respect to Seller, Master Tenant, each Operator, the Facilities, the Personal Property and Seller's Assets as Purchaser shall desire in order to satisfy itself that it wishes to proceed with the transactions contemplated by this Agreement. If Purchaser is not satisfied with the results of the due diligence investigations in its sole and absolute discretion, Purchaser may, at its option by written notice given to Seller on or before the expiration of the Due Diligence Period, terminate this Agreement. Purchaser shall notify Seller of any material adverse issue or condition which is disclosed by any of the third party reports required by Purchaser's lender consisting exclusively of zoning, surveys, title, property condition reports and environmental reports ("<u>Third Party Reports</u>")with specificity (including providing a copy of the applicable report), and, if curable or resolvable, Seller shall notify Purchaser whether it wishes to cure or resolve with an estimate of the time required in which event Seller shall have such period to correct the issue or condition. If Seller is unable or unwilling to cure or resolve any material adverse issue or condition identified by Purchaser, then Seller shall notify Purchaser in writing within ten (10) days after receipt of notice from Purchaser, and Purchaser may elect to terminate this Agreement by notice to Seller within ten (10) days after receipt of Seller's response (with the

understanding that Seller's failure to respond within the foregoing ten (10) day period shall be deemed to constitute Seller's unwillingness or inability to cure), and if Purchaser so terminates on a timely basis the Deposit shall be returned to Purchaser, and the Parties shall have no further responsibility or obligations to each other under this Agreement except for those obligations that expressly survive termination of this Agreement.

(c)     Access. Purchaser and its authorized agents, contractors, consultants and representatives (the "Purchaser Parties") shall have reasonable access to the Seller's Assets at agreed upon times during the pendency of this Agreement for agreed upon purposes on at least twenty-four (24) hours prior notice to the Seller. Purchaser Parties shall not enter the Facility without notice at least twenty-four (24) hours before the intention to enter (and Purchaser agrees not to require access to the same facility more than two (2) times in any seven (7) day period) which may be consecutive days. During such times, the Purchaser Parties shall have access to each Facility and all of the Seller's Assets, and to Personal Property and other Operators' assets, for the purpose of evaluating the condition and status of the same. Seller shall at no cost to Seller assist Purchaser in arranging such tests and inspections, provided that all such Purchaser Parties requiring access shall follow current COVID-19 protocols in place as imposed by Operator and/or as required by any applicable federal, state or local law. Purchaser shall not unreasonably disturb or annoy any Residents in the course of making such tests and inspections and/or interviews. Purchaser shall maintain or cause its consultants to maintain commercial general liability insurance, including contractual liability and personal injury liability coverage, with limits of not less than One Million Dollars ($1,000,000) for any one occurrence and One Million Dollars ($1,000,000) in the aggregate. Seller shall be covered as an additional insured on the policy. Purchaser's or Purchaser representative's insurance shall be primary and any insurance maintained by Seller shall be excess and non-contributory. Prior to making any entry upon the Property, Seller shall be provided with a certificate of insurance evidencing the foregoing coverage. If any environmental assessment report indicates that a Phase II assessment is advisable, then Purchaser shall provide written notice to Seller and Seller shall permit Purchaser's third party environmental provider to conduct such assessment, subject to Seller's review and approval of the proposed scope of work; and the requirement that Purchaser and its advisors restore any portion of the Real Property or improvements on the Real Property to its original condition after the completion of any Phase II assessment. Nothing in Section 11 shall be construed as a limitation of Purchaser's liability. In the course of its investigation of the Property, neither Purchaser nor any of Purchaser's representatives shall (a) materially interfere with, or communicate with, any residents at the Facility, (b) materially interfere with any staff at the Facility or (c) cause any material damage to the Property. To the extent that Purchaser or its representatives cause any damage to the Property, Purchaser shall promptly repair or restore any damage to the Property caused by any tests or inspections by or on behalf of Purchaser. Purchaser hereby agrees to indemnify, defend and hold harmless Seller from any loss, damage, costs or expenses (including, without limitation, attorneys' fees) incurred by Seller by reason of any actual physical damage to the Facility or injury to persons caused by Purchaser or its agents or contractors in exercising its rights hereunder. Such indemnity shall in no event extend to any costs or damages with respect to any claims of diminution in the value of the Facility. Such indemnity shall survive the Closing or earlier termination of this Agreement for a period of six (6) months. If Purchaser terminates this Agreement prior to the expiration of the Due Diligence Period, or otherwise fails to complete Closing hereunder, Purchaser shall provide Seller with copies of all third party reports; provided, however, that Seller hereby acknowledges that it is not an intended beneficiary of any such

11

diligence reports and that if Seller elects to rely on the same, it does so at its own risk. If required by the provider, Seller will execute a non-reliance agreement. Any such reports provided to Seller shall be without representation or warranty of any kind by or on behalf of Purchaser and Purchaser shall have no liability to Seller or any other person with respect to said diligence reports or information contained therein, or its/their accuracy, completeness, sufficiency or fitness for any purpose whatsoever.

    4.2   <u>Pre-Closing Covenants</u>. From the Effective Date and until the Closing, except as expressly waived in writing by Purchaser, Seller shall:

    (a)   Cause each Operator and, if applicable, the Master Tenant, to continue to conduct the business at each Facility only in the ordinary course;

    (b)   Not sell, exchange, or otherwise dispose of any Facility or any of the Seller's Assets (other than disposition of worn-out assets in the ordinary course of business);

    (c)   Not cause any of the Seller's Assets to be encumbered by any Encumbrance which is not in existence as of the Effective Date that will not be satisfied as of the Closing Date;

    (d)   Use commercially reasonable efforts to maintain or cause each applicable Operator to maintain (i) all licenses, permits, approvals, qualifications, certifications and authorizations related to the ownership or operation of each Facility; (ii) all requisite staff (including, without limitation, a duly licensed administrator and the requisite number of licensed health professionals) to operate each Facility consistent with normal operations and in compliance with all applicable laws; and (iii) all operations and coordination with referral sources consistent with managing and maintaining the business and a stable census;

    (e)   Maintain and keep (or cause the Operator to maintain and keep) the Seller's Assets, and cause each Operator to maintain and keep its Personal Property and its other assets, in good repair, working order and condition, ordinary wear and tear and damage by insured casualty excepted, and repair or replace (or cause the Operator to repair or replace) damaged Seller's Assets, and cause the Operator to repair or replace the Personal Property and its other assets, as is/are required to permit the continued operation of each Facility after Closing consistent with normal operational practices or as required by any applicable laws;

    (f)   Maintain or cause to be maintained in full force and effect all policies of insurance with respect to each Facility and the operation thereof;

    (g)   Deliver to Purchaser after the end of each month, promptly after their preparation and upon Purchaser's request, copies of: (i) monthly income statements for each Facility prepared in accordance with GAAP, consistent with the financial statements provided to Purchaser prior to the Effective Date, (ii) the list of payables for each Facility, (iii) the monthly census and payor mix report for each Facility, and (iv) any other documentation reasonably requested by Purchaser;

    (h)   Obtain all consents necessary for the consummation of the transactions contemplated in this Agreement;

(i)     Provide Purchaser with copies any survey reports, waivers of deficiencies, waivers of physical plant deficiencies or life safety code deficiencies, and plans of correction issued with respect to each Facility from and after the Effective Date through the Closing Date, within five (5) business days of the receipt thereof by Seller or any Operator;

(j)     Timely file all tax returns (or alternatively extensions, as applicable, so long as same are followed by timely filing such of tax returns when required), and pay all taxes shown as due on such returns as and when due), and timely file all cost reports, census reports, case mix reports and all other reports required under applicable laws for the period beginning on the Effective Date and ending on the Closing with all applicable authorities;

(k)     Pay or cause Operator to pay the accounts payable related to each Facility that arise in the ordinary course of business, except to the extent that the amount owing is being duly contested and such contest does not materially affect Seller, Master Tenant, any Operator or any Facility;

(l)     Use commercially reasonable efforts to satisfy prior to the Closing Date all conditions to Closing that are within Seller's reasonable control, and not take any willful action that is inconsistent with Seller's obligations under this Agreement or that is intended to hinder or delay the consummation of the transactions contemplated by this Agreement or that causes any representation, warranty or covenant made by Seller in this Agreement or in any certificate, list, exhibit, or other instrument furnished or to be furnished pursuant hereto, or in connection with the transaction contemplated hereby, to be untrue in any material respect as of the Closing Date; and

(m)     Provide to Purchaser a description of any litigation that is filed against Seller, Master Tenant, any Operator or any Facility as of the Effective Date, or that is filed against Seller, Master Tenant, any Operator or any Facility after the Effective Date, and copies of any material documents that Purchaser may request, subject to any confidentiality issues and to the requirements of Seller's, Master Tenant's and/or Operator's insurance underwriter.

The liability of Seller for a breach of any covenant shall not be merged into any instrument of conveyance delivered at the Closing and shall survive the Closing as provided for in Section 13.20; provided, however, that if Purchaser notifies Seller on or before the expiration of the Survival Period of any alleged breach of a covenant occurring prior to the expiration of the Survival Period (a "Notice of Breach of Covenant"), and Purchaser thereafter files a lawsuit in connection therewith against Seller within sixty (60) days following the furnishing of said Notice of Breach of Covenant, then the applicable Survival Period shall be extended with respect to said covenant only until the matter is resolved or a date on which a final judgment is obtained in said lawsuit, beyond any possibility of appeal.

4.3     Acquisition Proposals.  During the term of this Agreement, Seller and any officer, director, employee, advisor or others authorized to act on any of its behalf (i) will not, directly or indirectly, initiate, solicit, authorize or encourage discussions relating to any Acquisition Proposal from any third party unrelated to Purchaser; (ii) will not participate in negotiations in connection with or in furtherance of any Acquisition Proposal from any third party unrelated to Purchaser or permit any potential purchaser other than the Purchaser and their respective representatives to have any access to any Facility, or furnish to any person other than Purchaser and its respective representatives any non-public information with respect to Seller's Assets; and (iii) will

immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties, other than the Purchaser, conducted on or before the date of this Agreement with respect to any Acquisition Proposal. If Purchaser learns of any activity prohibited by this Section 4.3, Purchaser may seek temporary and permanent injunctive relief to preclude the activity and shall not be required to post a bond or other security in connection with Purchaser's application.

4.4     Supplements to Disclosure Schedules. From time to time prior to the Closing, Seller will promptly supplement or amend the respective disclosure Schedules which they have delivered pursuant to this Agreement with respect to any matter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in any such disclosure Schedule or which is necessary to correct any information in any such disclosure Schedule which has been rendered inaccurate. The delivery of any supplement or amendment to the respective disclosure Schedules of the parties pursuant to this Section shall not in any matter constitute a waiver, modification or amendment by any party of any of the representations, warranties, conditions, covenants, indemnities or agreements contained in this Agreement.

4.5     Survey and Certification Deficiencies. On or before the Closing Date, Seller shall endeavor to cure, clear and remove, or cause Operator to endeavor to cure, clear and remove, all life safety code violations, survey and certification deficiencies and non-compliance items for each Facility identified by any governmental authority of competent jurisdiction, with the intention that that each Facility be found by such governmental authority to be in substantial compliance with the conditions of participation in the Medicare and Medicaid Programs and hold a current, regular license and certification in the Medicare and Medicaid Programs.

4.6     Title Commitment and Survey.

(a)     Within five (5) business days after the Effective Date, Purchaser shall order from Title Company one or more preliminary title reports or commitments for each Facility (collectively, the "Title Commitment"), together with legible copies of all documents relating to the title exceptions referred to in the Title Commitment.

(b)     Within ten (10) business days after the Effective Date, Purchaser shall order, at Purchaser's sole cost and expense, either updates to existing surveys or new surveys of the Facility in Georgia, and for each Facility in Kansas. Each such survey shall be or shall have been prepared in accordance with the ALTA/NSPS standards (each a "Survey" and collectively the "Surveys").

(c)     On or before the end of the Due Diligence Period, including any extension as provided in Section 4.1(b)), Purchaser shall notify Seller of any disapproved title exceptions (the "Disapproved Title Matters") and any disapproved matters relating to the Survey (the "Disapproved Survey Matters" and collectively with the Disapproved Title Matters, the "Disapproved Title Matters") by written notice to Seller (each, a "Title Objection Letter"). All title exceptions set forth in the Title Commitment other than the Disapproved Title Matters, together with all survey matters set forth in the Survey other than the Disapproved Survey Matters, shall collectively constitute the "Permitted Encumbrances." For the avoidance of doubt, but subject to Purchaser's right to terminate this Agreement pursuant to Section 4.1(b), the matters set

14

forth on Schedule 4.6(c) attached hereto and made a part hereof shall constitute Permitted Encumbrances.

(d)    If, within the time period described above, Purchaser delivers one or more Title Objection Letters, then Seller shall have three (3) business days after its receipt of a Title Objection Letter to notify Purchaser whether Seller is willing to remove, or cause to be removed, the Disapproved Title Matters set forth in such Title Objection Letter, or, in the alternative, obtain the necessary title endorsements (the "Disapproved Title Matter Endorsements"), to insure against the effects of such Disapproved Title Matters.  Excluded from Disapproved Title Matters shall be any monetary liens and encumbrances (e.g., liens for mortgages, mechanic's, taxes and/or judgments), which Seller agrees to have removed no later than at Closing.  Seller shall remove other liens that are identified as Disapproved Title Matter Endorsements and have a liquidated monetary cure amount up to an amount not to exceed $250,000 in the aggregate to cure or remove. If Seller notifies Purchaser that Seller is willing to cure a Disapproved Title Matter (whether by removal or endorsement), Seller shall be unconditionally obligated to so cure such Disapproved Title Matter prior to or concurrently with the Closing at its sole cost and expense.  Notwithstanding anything to the contrary herein, Seller agrees that it shall cure, discharge, satisfy or bond over the following items from the proceeds at Closing without the need for Purchaser to object thereto: (i) any mortgages, deeds or encumbrances to secure debt; (ii) a tax lien or real estate taxes that are due and payable; (iii) mechanic's liens, and (iv) broker's lien.  In the event Seller has agreed to cure such Disapproved Title Matter or is required under this Section 4.6(d) to cure such Disapproved Title Matter or Matters and fails to cure the same prior to Closing, then Purchaser shall have the right to (i) waive such failure and proceed to closing, (ii) cause Seller to deposit in escrow with the Title Company amounts reasonably determined to be sufficient to cure or remove such Disapproved Title Matter or Matters, or (iii) terminate this Agreement with such termination being deemed to be a Seller Breach Termination, provided that such Seller Breach Termination shall not be subject to the cure periods set forth in Section 11.2.  For the avoidance of doubt, the parties acknowledge and agree that: (x) with respect to the facility in El Dorado, Kansas, Seller shall be permitted to convey by quitclaim deed to the City of El Dorado the portion of the property constituting part of the frontage road known as County Club Lane in connection with said accessway becoming a publicly dedicated roadway providing access to Country Club Road, and (xi) with respect to the Facility in Lansing, Kansas, legal access to such Facility shall not constitute a Disapproved Title Matter as the Title Company must agree to issue a title insurance endorsement insuring legal access (based upon Seller's existing title coverage).

(e)    If Seller timely notifies Purchaser that Seller is not willing to cure a Disapproved Title Matter (or fails to respond to Purchaser within such three (3) business day period, which failure shall be deemed to be Seller's election not to cure such Disapproved Title Matter), then Purchaser may, within five (5) business days thereafter, elect, by giving written notice to Seller and Escrow Holder, (A) to terminate this Agreement, or (B) to waive its objection to such Disapproved Title Matter (and such Disapproved Title Matter shall then be deemed to be a Permitted Exception).  Purchaser's failure to give such notice to Seller within such three (3) business day period shall be deemed an election by Purchaser to terminate this Agreement.

(f)    Purchaser may order an updated title report prior to Closing.  If the Title Company, prior to Closing, discloses on its own or with respect to any update a new exception, or materially amends any exception previously approved by Purchaser, or if any Survey is materially

amended, then Purchaser shall have five (5) business days from its receipt of notice of such disclosure (and if necessary, the Closing shall be extended to provide for such five (5) business day period), to disapprove of the same by delivering a Title Objection Letter related thereto. Such disapproved disclosures shall be treated as Disapproved Title Matters pursuant to Sections 4.6(c) through 4.6(e) above.

### ARTICLE V  - SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser, as of the Effective Date and the Closing Date, that:

5.1    <u>Status of Seller</u>.  Each Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the state of Florida.  Each Seller is duly qualified to do business as a foreign entity in the state in which the applicable Facility is located.

5.2    <u>Validity and Conflicts</u>.  This Agreement and all Purchase Documents executed by Seller are valid and binding obligations, enforceable against each of them in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The execution of this Agreement and the consummation of the transactions contemplated in this Agreement in accordance with its terms have been approved by all necessary action of Seller under its Charter Documents and do not and will not result in a breach of the terms and conditions of, nor constitute a default under or violation of, Seller's Charter Documents or any law, regulation, court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Seller is now a party or by which any of Seller's Assets may be bound or affected.

5.3    <u>Authority</u>.  Each Seller has full power and authority to enter into this Agreement and all other Purchase Documents executed by Seller and to carry out the transactions contemplated herein and therein.

5.4    <u>Seller Financial Statements</u>. Seller had delivered to Purchaser true and correct copies of the Seller Financial Statements, which fairly represent the financial condition, and accurately set forth in all material respects, the results of the operations, of the Seller Entities and each Facility for such periods covered thereby, subject to customary year-end adjustments consistent with prior years.

5.5    <u>Intentionally Omitted</u>.

5.6    <u>Licenses</u>.  There is not currently pending, or to Seller's knowledge threatened in writing, (a) any action or proceeding to revoke, withdraw or suspend any of the Seller Licenses, any of the Healthcare Licenses or to terminate the participation of any Facility in either the Medicare or Medicaid Programs or (b) any judicial or administrative agency judgment or decision not to renew any of the Seller Licenses or Healthcare Licenses applicable to any Facility or (c) any licensure or certification action of any other type applicable to any Facility.

16

5.7    <u>Compliance with Law</u>.

(a)    To Seller's knowledge, each Facility and its current operation and use comply in all material respects with all applicable municipal, county, state and federal laws, regulations, ordinances and orders and with all applicable municipal health, zoning and building laws and regulations (including, without limitation, the building and life safety codes), except to the extent that the failure to comply therewith would not be reasonably expected to cause a material adverse effect on the business, property, condition (financial or otherwise) or operation thereof.

(b)    Within the twelve (12) month period preceding the Effective Date, no governmental authority having jurisdiction over any Facility has issued any citations with respect to any deficiencies or other matters that fail to conform to any applicable statute, regulation, ordinance or bylaw, that have not been corrected on or prior to the Closing, except to the extent that a waiver has been issued by the appropriate authority, in which case a copy of such waiver is included in <u>Schedule 5.7(b)</u> including but not limited to any life safety code waivers, or Operator has commenced and is diligently pursuing a cure but the same cannot be accomplished prior to Closing.

(c)    Within the twelve (12) month period preceding the Effective Date, Seller has not received written notice from any licensing or certifying agency supervising or having authority over any Facility, requiring any Facility to be reworked or redesigned or additional furniture, fixtures, equipment or inventory to be provided at any Facility so as to conform to or comply with any existing and applicable law, code or standard, except where the requirement either (i) has been fully satisfied prior to the Closing Date, (ii) will, as of the Closing Date, be in the process of being satisfied in the ordinary course of Seller's business pursuant to the terms of a plan of correction or other documentation submitted to and approved by the appropriate authority or (iii) will, as of the Closing Date, be the subject of a valid written waiver issued by the applicable licensing or certifying agency.

5.8    <u>Certificates of Occupancy</u>.  Each Facility has a certificate of occupancy which covers and relates to its current use.

5.9    <u>Intentionally Omitted</u>.

5.10    <u>Taxes and Tax Returns</u>.  Each Seller has (i) timely filed all federal, state, local and foreign tax returns, reports, statements and other similar filings (including extensions for filing) (the "Tax Returns") which are required to be filed by such Seller, as applicable, with respect to any federal, state, local or foreign income, payroll, withholding, excise, sales, use, personal property, occupancy, business, mercantile, real estate, capital stock, franchise or other taxes (the "Taxes"); and (ii) paid all Taxes, interest, penalties, assessments and deficiencies due or assessed pursuant to the Tax Returns.  All Tax Returns of each Seller properly reflect the liabilities of such Seller, as applicable, for Taxes for the periods, properties or events covered thereby.  No extensions of time in which to file any Tax Returns have been executed or filed with any taxing authority by any Seller.  Seller has not received any notice of assessment of additional Taxes or has executed or filed with any taxing authority any agreement extending the period of assessment of any Taxes.  There are no claims, examinations, proceedings or proposed deficiencies for Taxes pending or, to the knowledge of Seller, threatened in writing against any Seller.  Each Seller is current in the payment of all withholding and other employee Taxes that are due and payable.  The accruals for

17

Taxes contained in the Seller Financial Statements are, to Seller's knowledge, adequate to cover all liabilities for Taxes of Seller, for all periods ending on or before the date of such financial statements, and include adequate provisions for all deferred Taxes.

5.11    <u>Environmental Issues</u>.  Except as specifically provided in the environmental reports set forth on <u>Schedule 5.11</u>, copies of which Seller has heretofore made or shall hereafter make available to Purchaser (collectively, the "<u>Environmental Reports</u>") or in any environmental reports obtained by Purchaser in connection with its due diligence activities, Seller does not now use any Facility or permit any Facility to be used by Master Tenant, any Operator or any other party in a manner which to Seller's knowledge violates any applicable Environmental Laws, nor has Seller ever done so in the past.  Seller has no knowledge of any violation of an Environmental Laws at any the Facility by any prior owner of such Facility, Seller has no knowledge of any discharge, seepage or release of Hazardous Substances onto a Facility from adjoining property; and neither Seller nor, to Seller's knowledge, any prior owner has used a Facility or allowed a Facility to be used in a way which would require notice or reporting to a governmental agency of such use under any Environmental Law.  Without limiting the foregoing, no asbestos, polychlorinated biphenyls, radon, urea or formaldehyde are contained in or stored on or under the Facility, there are no Hazardous Materials on or under the Facility in violation of any Environmental Enactments, and there are no storage tanks containing or previously containing Hazardous Materials located in or under the Facility.

5.12    <u>Necessary Action</u>.  Each Seller has duly and properly taken or obtained or caused to be taken or obtained all action necessary for it (a) to enter into and to deliver this Agreement and any and all documents and agreements executed by such Seller in connection herewith and (b) to carry out the terms of this Agreement and the transaction contemplated by it.  No other action by or on behalf of Seller is or will be necessary to authorize the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Seller in connection herewith or to authorize the transactions contemplated by this Agreement.  No consent of any third party is or will be necessary in connection with the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Seller in connection herewith or in connection with the consummation of the transactions contemplated by this Agreement.

5.13    <u>Litigation</u>.  Except as set forth in <u>Schedule 5.13</u>, there is no pending or, to Seller's knowledge, threatened in writing litigation, claim, administrative investigation or other proceeding with respect to or affecting Seller or any Facility.  No Seller is a party to, and no Seller or Facility is bound by, any orders, judgments, injunctions, decrees or settlement agreements under which it or they may have continuing obligations as of the Effective Date or as of the Closing Date and that are likely to materially restrict or adversely affect the present business operations of a Facility.  The right or ability of Seller to consummate the transactions contemplated in this Agreement has not been challenged by any governmental agency or any other person.

5.14    <u>ERISA</u>.  No Seller has any Unfunded Liabilities under any Plans.  No Seller has incurred, or is reasonably expected to incur, any withdrawal liability to any Plans (whether single employer or multi-employer).  Any Plan of Seller complies in all material respects with all applicable requirements of law and regulations, no Reportable Event has occurred with respect to any Plan, no Seller has withdrawn from any Plan or initiated steps to do so, and no Seller has taken any steps to reorganize or terminate any Plan.

5.15    <u>Sensitive Payments</u>.  No Seller has (a) made any contributions, payments or gifts to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States or the jurisdiction in which made, (b) established or maintained any unrecorded fund or asset for any purpose or made any false or artificial entries on its books, (c) given or received any payments or other forms of remuneration in connection with the referral of patients that would violate the Medicare/Medicaid Anti-kickback Law, Section 1128(b) of the Social Security Act, 42 USC Section 1320a-7b(b), or any analogous state statute, or (d) made any payments to any person with the intention or understanding that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment.

5.16    <u>Health Care Compliance</u>. No Seller: (a) is a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services; (b) has reporting obligations pursuant to any Settlement Agreement entered into with any governmental entity; (c) is not the subject of any government payor program investigation conducted by any federal or state enforcement agency; (d) is not a defendant in any qui tam or False Claims Act litigation; or (e) has not been served with or received any currently effective search warrant or subpoena (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by any Seller).

5.17    <u>Condemnation</u>.  No condemnation proceeding or eminent domain proceeding of any kind is pending against any Facility and, to the knowledge of Seller, no such proceeding is threatened in writing against any Facility.

5.18    <u>Intentionally Omitted</u>.

5.19    <u>Inventories</u>.  At Closing, each Facility shall have in place an inventory of perishable and non-perishable food, central supplies, linens, housekeeping supplies, kitchen supplies and nursing supplies sufficient in condition and quantity as may be required under all applicable laws and, to the extent there exists no applicable laws that specifically identify the condition and/or required quantity for any such supplies or inventory, then such inventory and supplies shall be in such condition and quantity as customarily are maintained by such Operator.

5.20    <u>Insurance</u>.  Seller has maintained, or caused Operator to maintain, insurance policies that insure each Facility and Seller's Assets continuously since the later to occur of date the Seller Entities or any of their Affiliates first owned or operated a Facility or January 1, 2017. Such insurance policies are written on a claims-made basis, against physical damage, general liability, professional liability and worker's compensation.  Attached as Schedule 5.20 are descriptions of such insurance evidencing such coverage.

5.21    <u>OSHA</u>.  Seller has maintained and operated each Facility (directly or indirectly) in compliance with the Occupational Safety and Health Act of 1970 ("<u>OSHA</u>") and any similar state statute and the rules and regulations promulgated thereunder.  Seller is not subject to an investigation by the U. S. Department of Labor, litigation over compliance with such rules and regulations or any fine, penalty or citation relating to or arising out of a violation or alleged violation of OSHA and any similar state statute and such rules and regulations.

19

5.22    United States Person. Seller is a "United States Person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

Purchaser hereby agrees and acknowledges that, except for and solely to the extent of the representations, warranties and covenants of Seller contained in this Agreement (including, without limitation, this Article V), upon which Purchaser is entitled to rely, (i) it is buying the Property on an "AS-IS, WHERE-IS AND WITH ALL FAULTS" basis, latent and patent, known and unknown, undiscovered and undiscoverable; (ii) it has made or will have made its own investigations and inspections of the Property, including, without limitation, the physical aspects of the Property and the Property's compliance with all laws applicable to the Property's current or intended use; (iii) in connection with its investigations and inspections of the Property it has contracted or had the opportunity to contract with certain advisors and consultants as Purchaser deemed to be necessary; (iv) it has or will have approved the reports of such advisors and consultants; (v) in addition to the representations and warranties of Seller set forth in this Agreement, it is relying solely on such reports and its own investigations as to the Property, its condition and other characteristics and compliance with laws; (vi) except for and solely to the extent of the representations and warranties set forth in this Agreement (including, without limitation, Article V), it is not making the purchase of the Property in reliance upon any statements or representations, express or implied, made by Seller or its agents or brokers, as to the condition of or characteristics of the Property or its fitness for use for any particular purpose. Without limiting the generality of the foregoing, other than with respect to those representations, warranties and covenants of Seller contained in this Agreement (including, without limitation, this Article V), upon which Purchaser is entitled to rely, Seller makes, and shall make, no express or implied warranty with respect to the Property, including any of the following: (i) title, zoning, acreage, tax consequences, physical or environmental condition, valuation, governmental approvals, governmental regulations or any other matter or thing relating to or affecting the Property; (ii) the roofs, structural components, heating, ventilating, air conditioning, mechanical, plumbing, and electrical systems, fire and life safety and all other parts of the Improvements constituting a portion of the Property; (iii) the merchantability of the Property, the fitness of the Property for a particular purpose, or the value of the Property; (iv) the past, present or future condition or compliance of the Property with regard to any land use or Environmental Laws; and (v) the computer system or records, including the transferability of the software or the confidentiality, accuracy, or completeness of the computer data.

ARTICLE VI - PURCHASER REPRESENTATIONS AND WARRANTIES

Each Purchaser represents and warrants to Seller, as of the Effective Date and the Closing Date, that:

6.1    Status of Purchaser. Each Purchaser is a limited liability company duly organized and validly existing under the laws of the State of Delaware and, to the extent required by applicable law, is or will be authorized to transact business in the state in which the Facility such Purchaser will own is located.

6.2    Validity and Conflicts. This Agreement and all Purchase Documents executed by each Purchaser are the valid and binding obligations of each Purchaser, enforceable in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to the enforcement of

140109.00416/126156287v.12

creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The execution of this Agreement and the consummation of the transactions contemplated herein have been approved by the sole member of a Purchaser and do not and will not result in a breach of the terms and conditions of, nor constitute a default under or violation of, the Charter Documents of a Purchaser or any law, regulation, court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Purchaser is now a party or by which its assets may be bound or affected.

    6.3    <u>Authority</u>. Each Purchaser has full corporate power and authority to execute and to deliver this Agreement and all Purchase Documents executed by Purchaser and to carry out the transactions contemplated herein and therein.

    6.4    <u>Necessary Action</u>. Each Purchaser has duly and properly taken or obtained or caused to be taken or obtained all action necessary for such Purchaser (a) to enter into and deliver this Agreement and any and all Purchase Documents executed and to be executed by Purchaser in connection herewith and (b) to carry out the terms of this Agreement and the transactions contemplated by it. No consent of any third party is or will be necessary, and no other action by or on behalf of a Purchaser is or will be necessary, to authorize the execution, delivery and performance of this Agreement and any documents and agreements executed and to be executed by such Purchaser in connection herewith or to authorize the consummation of the transactions contemplated herein.

    6.5    <u>Bankruptcy Matters</u>. Purchaser has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by its creditors, suffered the appointment of a receiver to take possession of all or substantially all of its assets, suffered the attachment or other judicial seizure of all or substantially all of its assets, admitted its inability to pay its debts as they come due, or made an offer of settlement, extension or composition to its creditors generally.

    6.6    <u>Not Foreign Person</u>. Purchaser is not a "foreign person" as that term is defined in Section 1445-F of the Internal Revenue Code.

    6.7    <u>PATRIOT Act</u>. Purchaser is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "<u>Order</u>") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("<u>OFAC</u>") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "<u>Orders</u>"). Further, Purchaser agrees to make its policies, procedures and practices regarding compliance with the Orders, if any, available to Seller for its review and inspection during normal business hours and upon reasonable prior notice. Neither Purchaser nor any beneficial owner of Purchaser: (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "<u>Lists</u>"); (ii) is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (iii) is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders. Purchaser hereby agrees that if Purchaser

21

obtains knowledge that Purchaser or any of its beneficial owners becomes listed on the Lists or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Purchaser shall immediately notify Seller and, in such event, Seller shall have the right to terminate this Agreement without penalty or liability to Seller immediately upon delivery of notice thereof to Purchaser.

ARTICLE VII - BROKER; INVESTMENT BANKER

Each party represents, covenants and warrants to the other that it has employed no broker, finder or investment banker in connection with the transaction contemplated in this Agreement. Each party agrees to pay any commission, finder's fee or investment banker's fee that may be due on account of the transaction contemplated in this Agreement to any broker, finder or investment banker employed by it, and to indemnify the other party hereto against any claim for any commission, finder's fee or investment banker's fee made by any broker, finder or investment banker allegedly employed by it and from and against any and all costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' fees and costs. Purchaser and Seller each agree to indemnify, defend and hold harmless the other from and against any and all losses, claims, damages, costs or expenses (including attorneys' fees) which the other may incur as a result of any claim made by any person to a right to a sales or brokerage commission or finder's fee in connection with this transaction to the extent such claim is based, or purportedly based, on the acts or omissions of Seller or Purchaser, as the case may be. The obligations of Purchaser and Seller under this Article VII shall survive the Closing.

ARTICLE VIII – CONDITIONS TO OBLIGATIONS TO CLOSE

8.1     <u>Conditions Precedent to Seller's Obligations</u>. Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment of the following conditions precedent unless (but only to the extent) waived in writing by Seller:

(a)     The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date;

(b)     Purchaser shall have performed all of its material obligations under this Agreement that are to be performed by Purchaser prior to or as of the Closing Date, including, without limitation, funding the balance of the Purchase Price into escrow with the Title Company and executing and delivering all closing documents; and

8.2     <u>Conditions Precedent to Purchaser's Obligations</u>. Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment of the following conditions precedent unless (but only to the extent) waived in writing by the Purchaser:

(a)     The representations and warranties of Seller contained in this Agreement or in any certificate or document delivered in connection with this Agreement shall be true and correct in all material respects at and as of the Closing Date;

22

(b)     Seller shall have performed all of their material obligations under this Agreement that are to be performed by them prior to or as of the Closing Date;

(c)     Operator continues to hold all required Healthcare Licenses;

(d)     Seller is not in default, where said default cannot be cured by the Closing Date, under any mortgage, contract, lease or other agreement to which Seller is a party or by which Seller is bound;

(e)     The Title Company is prepared to issue the Title Insurance Policy on and as of the Closing Date, in the same form that Purchaser had negotiated and approved prior to the end of the Due Diligence Period;

(f)     No "Event of Default" would then exist under the Lease Documents if such documents were in full force and effect as of the Closing Date;

(g)     No Material Adverse Change has occurred since the Financial Statement Date;

(h)     The Due Diligence Period has expired and Purchaser did not terminate this Agreement pursuant to its rights under Section 4.1(b); and

(i)     The Closing under the Agreement to Lease shall take place simultaneously with the Closing under this Agreement and the Lease Documents shall be executed contemporaneously therewith.

(i)     Each Facility and its current operation and use are operating in accordance with applicable law, and there is not currently pending, or to Seller's knowledge threatened in writing any action or proceeding to revoke, withdraw or suspend any of the Seller Licenses, any of the Healthcare Licenses or to terminate the participation of any Facility in either the Medicare or Medicaid Programs.

## ARTICLE IX – CLOSING DATE

9.1     <u>Closing</u>.  The purchase and sale contemplated herein shall be consummated at a closing (the "<u>Closing</u>") to take place through the Title Company, or in such other manner as may be agreed to by the Parties.

9.2     <u>Closing Date</u>.

(a)     The Parties agree that the target date of Closing for the purchase and sale of the Facilities is February 28, 2022 ("<u>Target Date</u>"), or on such other a date as is agreed upon by the Parties, but in no event later than the later to occur of five (5) business days following the satisfaction of all of those closing conditions expressly provided in this Agreement that can be satisfied prior to the Closing, other than those that have been waived in a written waiver signed by the appropriate Party or the Outside Date (the "<u>Closing Date</u>").  Purchaser may extend the date of Closing beyond the Target Date to March 31, 2022 (the "<u>Extension</u>") by (i) providing written notice to the Seller (x) on or before February 20, 2022, for the Extension, and (ii) paying the Extension Deposit to the Seller by federal wire transfer of funds with such notice for the Extension.

The Extension Deposit shall be fully earned by Seller but shall be offset against the Purchase Price if, as and when Closing occurs.  The Extension Deposit shall not be refundable to Purchaser unless a Seller Breach Termination occurs. The Closing shall be effective as of 12:00:01 am of the day on which the Closing Date occurs, or at such other time as may be agreed in writing by the Parties (the "Effective Time").

(b)     Purchaser will pay Seller the difference in the amount of capital gains taxes, if any, which are to be paid by Seller (or the applicable tax reporting entity above Seller as Seller is a pass-through entity) with respect to purchase price paid at Closing for the sale of Seller's Assets that occurs in 2022 rather than in 2021 ("Tax Differential").  The Tax Differential will be paid as mutually agreed by the Parties. Purchaser shall have ten (10) Business Days from the delivery of Seller's calculation of the Tax Differential to review Seller's calculation of the Tax Differential, and Purchaser shall notify Seller prior to the expiration of such ten (10) Business Day period if Purchaser disputes the same.  The failure of Purchaser to notify Seller within such ten (10) Business Day period shall be deemed to constitute Purchaser's agreement with Seller's calculation of the Tax Differential.  To the extent that Purchaser notifies Seller in a timely manner, the Parties shall attempt to resolve any dispute in good faith negotiations, and if the Parties cannot resolve such dispute within ten (10) Business Days thereafter, either Party shall be permitted to submit the determination to binding arbitration in Wilmington, Delaware.  Unless the Parties shall agree in writing to different rules of arbitration, the arbitration shall be before a panel of three (3) arbitrators and otherwise in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  Unless the Parties otherwise agree to the identity of the three (3) arbitrators, such arbitrators shall be appointed by AAA and shall be certified public accountants who have at least ten (10) years' experience in tax preparation and are not associated with any firm which has done work for or been engaged by any Party to the arbitration in the past.  The prevailing Party in any such arbitration or other proceeding, in addition to any other relief to which such Party may be entitled, shall be entitled to recover from the non-prevailing Party (as determined by the arbitrators) reasonable legal fees and other costs and expenses incurred by the prevailing party in connection with the proceeding. The obligation of Purchaser to pay the Tax Differential shall survive for the Survival Period.  If Purchaser fails to pay the Tax Differential to Seller prior to the expiration of the Survival Period, the Seller shall have a period of sixty (60) days thereafter to commence an action to protect its rights to receive such payment (with the prevailing party rights to reimbursement to continue during any such proceeding).

9.3     Seller Deliveries.  On the Closing Date, Seller will pay the closing costs that Seller is obligated to pay pursuant to this Agreement and deliver to Purchaser the following:

(a)     Charter Documents.  Articles of organization and certificates of good standing/existence issued within the thirty (30) days prior to the Closing Date by the Secretary of State (or other authorized official) of the state in which such Seller was formed and, if different, its state of operation;

(b)     Resolutions.  Resolutions of Seller's shareholders, board of directors, members or managers, as applicable, certified by an appropriate officer, authorizing and approving the transactions contemplated by this Agreement;

(c)    <u>Deeds</u>.  Special warranty deeds, in recordable form, executed by the applicable Seller and conveying to each applicable Purchaser fee simple title to the Real Property, free and clear of all liens and encumbrances other than the Permitted Encumbrances:

(d)    <u>Bill of Sale</u>.  A Bill of Sale executed by each Seller conveying to Purchaser each such Seller's right, title and interest in and to any personal property owned by Seller located at any Facility;

(e)    <u>Insurance for Facility</u>.  Each applicable Purchaser shall have received from the evidence of insurance from the Master Tenant and/or the Operator in the form of one or more certificates which names such party as an additional insured on the existing general liability and professional liability insurance policies for all relevant periods from and after the Closing;

(f)    <u>Termination of Leases & Subleases</u>.  Terminations, in recordable form, if recorded and/or other evidence thereof appears in the chain of title, of all leases, subleases and other possessory interests with respect to each Facility other than the Lease Documents;

(g)    <u>Lease Documents</u>. The Lease Documents required to be delivered by Master Tenant, Operator and their respective applicable affiliates pursuant to the Agreement to Lease.

(h)    <u>Title Requirements</u>. If required by the Title Company, one or more affidavits of title executed by Seller and in form and substance acceptable to the Title Company and Seller, and negotiated prior to the expiration of the Due Diligence Period;

(i)    <u>Closing Statement</u>.  A settlement statement conforming to the proration and other relevant provisions of this Agreement;

(j)    <u>Certificate of Non-Foreign Status</u>.  Certificate of Non-Foreign Status confirming that Seller is a "United States Person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

(k)    <u>Discharges and Releases</u>.  Such discharges, releases and termination statements necessary to discharge, release and terminate all Encumbrances to the Seller's Assets other than the Permitted Encumbrances;

(l)    <u>Transfer and Recordation Forms</u>.  Such documents, forms, and agreements required by any Governmental Authority, if any, in connection with the transfer of the Seller's Assets to Purchaser and the recordation of any of the documents to be delivered pursuant to this Agreement;

(m)    <u>Possession</u>. Possession of Seller's Assets, subject only to (i) the rights of the patients and residents of each Facility, (ii) any possessory rights granted to any person under the Permitted Encumbrances, and (iii) the rights of the Master Tenant and any Operator under the Lease Documents; and

(n)    <u>Other</u>.  Such other documents and instruments as may reasonably be required by the Title Company and that may reasonably be necessary or appropriate to

consummate the transactions contemplated in this Agreement and to otherwise effect the agreements of the Parties pursuant to this Agreement.

9.4     Purchaser Deliveries.  On the Closing Date, Purchaser will deliver or cause to be delivered the following:

(a)     Purchase Price. The Purchase Price, as adjusted in accordance with this Agreement;

(b)     Lease Documents.  The Lease Documents required to be delivered by the Purchaser pursuant to the Agreement to Lease;

(c)     Closing Statement. A settlement statement conforming to the proration and other relevant provisions of this Agreement; and

(d)     Loan Documents.  All financing documents that may be required by any lender providing financing in connection with Purchaser's acquisition hereunder.

(e)     Title Requirements. If required by the Title Company in connection with insuring the Loan Documents, one or more affidavits of title executed by Purchaser and in form and substance acceptable to Purchaser and the Title Company;

(f)     Other. Such other documents and instruments as may reasonably be required by the Title Company and that may reasonably be necessary or appropriate to consummate the transactions contemplated in this Agreement and to otherwise effect the agreements of the Parties pursuant to this Agreement.

9.5     Further Assurances.  After the Closing Date, the Parties will take such actions and properly execute and deliver such further instruments as may reasonably be requested to assure, complete and evidence the transaction provided for in this Agreement.

## ARTICLE X - INDEMNIFICATION

10.1     Survival.  Notwithstanding any provision of this Agreement to the contrary, (i) the obligations of the Parties under this Agreement shall survive the Closing and the delivery of any conveyance documentation until the expiration of the Survival Period, , and (ii) the representations and warranties of the Parties under this Agreement and the other Purchase Documents shall survive the Closing and the delivery of any conveyance documentation until the expiration of Survival Period.

10.2     Seller's Indemnification. Seller shall indemnify, defend and hold the Purchaser, its permitted assigns under this Agreement, and their respective shareholders, members, directors, managers, officers, employees, agents, affiliates and representatives (collectively, the "Purchaser Indemnitees") harmless from and against any and all damages, losses, diminution in value, liabilities, costs, actions, suits, proceedings, demands, assessments, and judgments, including, but not limited to, reasonable attorney's fees and reasonable costs and expenses of litigation (collectively, "Losses"), arising out of or in any manner related to any of the following: (a) any misrepresentation of a material fact, breach of warranty, breach of a covenant or nonfulfillment of

any agreement on the part of Seller under this Agreement; (b) any material breach of any representation or warranty made by Seller in this Agreement or in any certificate delivered with this Agreement; (c) any of the Excluded Liabilities whether known or unknown to the Seller and the Facilities, or whether or not asserted by any third party or governmental authority, at the Effective Date; and (d) the use, operation or ownership of any of the Seller's Assets and the Facilities prior to the Effective Time. Seller's obligations under this Section 10.2 shall survive the Closing until the expiration of the Survival Period.

10.3    Purchaser's Indemnification. Purchaser shall indemnify, defend and hold Seller, its permitted assigns under this Agreement, and their respective shareholders, members, directors, managers, officers, employees, agents, affiliates and representatives (collectively, the "Seller Indemnitees") harmless from and against any and all Losses arising out of or in any manner related to any misrepresentation of a material fact, breach of warranty, breach of a covenant or nonfulfillment of any agreement on the part of Purchaser under this Agreement. Purchaser's obligations under this ARTICLE X shall survive the Closing until the expiration of the Survival Period.

10.4    Procedure.

(a)    If a Purchaser Indemnitee asserts that the Indemnitor is subject to a Claim for indemnification pursuant to Section 10.2, Purchaser promptly shall notify the Indemnitor in writing of the Claim and shall describe in the notice the Claim in sufficient detail in order to permit the Indemnitor to evaluate the nature and cause of the Claim. If the asserted Claim arises or is in connection with a claim, suit or demand filed by a third party, the Indemnitor shall be entitled to defend against the Claim with counsel reasonably satisfactory to Purchaser. Purchaser may continue to employ counsel of their own, but such costs shall be borne by Purchaser as long as the Indemnitor continues to so defend. If the Indemnitor fails to respond or does not admit responsibility for indemnification, Purchaser may take such necessary steps to defend themselves and any reasonable costs associated therewith may be included as part of the asserted Claim for indemnification. For all Claims that are not Claims arising from a third party, Indemnitor shall notify Purchaser as to its assertion of whether the Claim is covered by this Article, including specific reasons for non-coverage, within thirty (30) days of receipt of written notice from Purchaser describing the Claim in reasonable detail. Any investigations made by or on behalf of Purchaser shall not affect or limit Seller's representations and warranties and indemnification obligations under this Agreement and the other Purchase Documents.

(b)    If a Seller Indemnitee asserts that the Indemnitor is subject to a Claim for indemnification pursuant to Section 10.3, Seller promptly shall notify the Indemnitor in writing of the Claim and shall describe in the notice the Claim in sufficient detail in order to permit the Indemnitor to evaluate the nature and cause of the Claim. If the asserted Claim arises or is in connection with a claim, suit or demand filed by a third party, the Indemnitor shall be entitled to defend against the Claim with counsel reasonably satisfactory to Seller. Seller may continue to employ counsel of their own, but such costs shall be borne by Seller as long as the Indemnitor continues to so defend. If the Indemnitor fails to respond or does not admit responsibility for indemnification, Seller may take such necessary steps to defend themselves and any reasonable costs associated therewith may be included as part of the asserted Claim for indemnification. For all Claims that are not Claims arising from a third party, Indemnitor shall notify Seller as to its

assertion of whether the Claim is covered by this Article, including specific reasons for non-coverage, within thirty (30) days of receipt of written notice from Seller describing the Claim in reasonable detail. Any investigations made by or on behalf of Seller shall not affect or limit Purchaser's representations and warranties and indemnification obligations under this Agreement and the other Purchase Documents.

## ARTICLE XI – TERMINATION

11.1    <u>Termination Events</u>. This Agreement may be terminated as follows:

(a)    By mutual consent of the Parties;

(b)    By Purchaser if the conditions to Closing set forth in Section 8.2 have not been satisfied or waived by the close of business on the Outside Date;

(c)    By Seller if the conditions to Closing set forth in Section 8.1 have not been satisfied or waived by the Outside Date;

(d)    By Purchaser on or before the expiration of the Due Diligence Period pursuant to the terms and conditions of Section 4.1(b);

(e)    By Purchaser pursuant to the terms and conditions of Section 4.6;

(f)    By Purchaser pursuant to ARTICLE XII below;

(g)    By Purchaser if a suit, action or other proceeding shall be pending as of the Closing Date before any court or governmental or regulatory official, body or authority or any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, stay or charge has been or could reasonably be expected to restrain, prohibit or delay for a period longer than ninety (90) days the consummation of the transactions contemplated by this Agreement;

(h)    By Purchaser, in the event of a breach by Seller of this Agreement which breach is not cured after the notice and cure period provided for in Section 11.2 and which results in the Parties failing to complete Closing under this Agreement (a "<u>Seller Breach Termination</u>"); or

(i)    By Seller, in the event of a breach of this Agreement by Purchaser which breach is not cured after the notice and cure period provided for in Section 11.2 and which results in the Parties failing to complete Closing under this Agreement (a "<u>Purchaser Breach Termination</u>").

11.2    <u>Opportunity to Cure</u>. No Party to this Agreement may claim termination or pursue any other remedy referred to in this Section on account of a breach of a condition, covenant or warranty by the other Party, without first giving the other Party written notice of such breach and not less than ten (10) business days within which to cure such breach. The Closing Date shall be postponed if necessary to afford such opportunity to cure.

11.3    Effect of Termination.

(a)    In the event of a termination of this Agreement by Purchaser or Seller under Section 11.1, written notice thereof shall forthwith be given to the other Parties, and this Agreement shall forthwith become void and of no further force or effect, other than this ARTICLE XI, ARTICLE X, and ARTICLE XIII, which shall survive the termination of this Agreement and shall be enforceable by the parties hereto and there shall be no liability or obligation on the part of any Party hereto, except for breaches of this Agreement by such Party prior to the time of such termination which result in the termination of this Agreement.

(b)    If a Seller Breach Termination occurs, then Purchaser shall be entitled either: (i) to terminate this Agreement, and receive a return of the Deposit and reimbursement from Seller for Purchaser's actual third-party cost and expenses of the transaction, including charges incurred for reports, its lender's fees and attorneys' fees subject to the provisions of Section 13.20, or (ii) to seek specific performance of Seller's obligations under this Agreement in which event Purchaser shall not have to post a bond or other security in connection with any temporary or preliminary injunctive relief in advance of a final decree; provided, however, that if specific performance is not an available remedy (e.g., because Seller has already sold the Real Property to another purchaser), then Purchaser shall be entitled to pursue all available remedies at law or in equity including to recover its actual and consequential damages against the Seller including damages as a result of loss of the benefit of its bargain.

(c)    If a Purchaser Breach Termination occurs, Seller shall be entitled to receive the Deposit, and no Party shall have any further rights or obligations under this Agreement except for those matters which specifically survive such a termination.  The receipt of the Deposit as provided for in this Section shall be the exclusive remedy of Seller for breach of this Agreement by Purchaser.

## ARTICLE XII – CASUALTY AND CONDEMNATION

12.1    Casualty. If prior to the Closing the Seller's Assets shall be damaged by fire or other casualty, then (a) if such casualty can reasonably be repaired within sixty (60) days after the date of such damage, then Purchaser shall proceed to Closing and receive an assignment of all insurance proceeds (including casualty and business interruption insurance), or the right to receive the same, and the rights to any other claims arising as a result of the damage, and receive a credit against the Purchase Price due at Closing in the amount of any deductible with respect to such insurance and the amount by which the casualty or damage is not covered by the available insurance, or (b) if such casualty cannot reasonably be repaired within sixty (60) days after the date of such damage, Purchaser may terminate this Agreement and receive a return of the Deposit or waive such repair requirement and receive an assignment of all applicable insurance proceeds (subject to the right of the Master Tenant and/or Operator to use all such proceeds pursuant to the terms of the Lease Documents).

12.2    Condemnation.

(a)    If prior to the Closing (1) all or substantially all of any Facility shall be taken by condemnation or eminent domain, (2) there is any material taking of land lying in the bed of any street or highway, open or proposed, in front of or adjoining all or any part of the Real

29

Property underlying any Facility, or (3) there is any change of grade or closing of any such street or highway abutting or adjacent to the Real Property underlying any Facility, that in any such case would materially impair access to and from any Facility or otherwise materially interfere with its occupancy and use as a skilled nursing facility, then Purchaser shall have the right to terminate this Agreement and receive a return of the Deposit by giving written notice of such termination to Seller within thirty (30) days after the date of the taking, change of grade, or closing, or within thirty (30) days of the Purchaser's receipt of notice thereof, if later, and thereupon no party shall have any further liability or obligation to the other under this Agreement, except for those obligations and liabilities, if any, specifically stated to survive the Closing or the termination of this Agreement.

(b)    If Purchaser does not terminate this Agreement pursuant to and in accordance with the preceding provisions, then this Agreement shall remain in full force and effect, Purchaser shall not be entitled to an abatement of the Purchase Price by reason of such taking, change of grade, or closing, and the proceeds of any award or payment in respect of such taking, change of grade, or closing shall be paid over to, or assigned to, the Purchaser, as applicable, at the Closing.

## ARTICLE XIII - MISCELLANEOUS

13.1    <u>Joint and Several</u>.  Except as otherwise expressly provided in this Agreement, the obligations (a) Seller under this Agreement are joint and several with each other, and (b) Purchaser under this Agreement are joint and several with each other.

13.2    <u>Public Announcements</u>.  Each of the Parties shall consult with the other regarding, and shall use reasonable best efforts to agree upon, the form and content of any press release, public announcement or statement with respect to this Agreement or the transactions contemplated by it.

13.3    <u>Notices</u>.  Any and all notices, requests or other communications to be given by any party hereunder shall be in writing and shall be (a)(i) delivered by hand or (ii) reliable overnight delivery service, or (b) sent by email (provided that any email transmission shall be followed promptly by notice in one of the other authorized means unless waived by the other Party) to the following address:

| | |
|---|---|
| To Seller: | c/o SHR Curis LLC<br>2909 West Bay to Bay Boulevard, Suite 300<br>Tampa, FL  33629<br>Attention: Scott Feuer and Bryan Crino<br>Email: sfeuer@scpandco.com and<br>bcrino@scpandco.com |
| With a copy to: | Blank Rome LLP<br>One Logan Square<br>Philadelphia, PA 19103-6998<br>Attention: Matthew J. Comisky, Esquire<br>Email: matthew.comisky@blankrome.com |

To Purchaser:                   KSGA 16 LLC
                                c/o Black Stag LLC
                                46 Washington Avenue
                                Suffern, New York 10901
                                Attention: Eliyahu Konovitch, CFO
                                Email:

With a copy to:                 NBC Law
                                675 Third Avenue, 8th Floor
                                New York, New York 10017
                                Attention: Edward H. Burnbaum, Esq.
                                Email: eburnbaum@nbclaw.com

Notices shall be deemed given upon delivery of electronic mail provided that the same is sent during normal business hours (otherwise the same shall be deemed to have been received on the next business day) or when delivered (whether or not the recipient accepts delivery).

13.4     Assignment. Neither party shall have the right to assign, directly or indirectly, its rights or obligations under this Agreement without the prior written consent of the other party. Notwithstanding the foregoing, following delivery of written notice to Seller, Purchaser may, at least ten (10) business days' prior to the Closing, assign all or any of its right, title and interest under this Agreement to a corporate or partnership entity that is an Affiliate of, or otherwise related to, Purchaser (any such entity, an "Permitted Assignee"), or to any corporate or partnership entity in which Purchaser or a Permitted Assignee is a partner, co-venturer, shareholder or member.  No such assignee shall accrue any obligations or liabilities hereunder until the effective date of such assignment. In the event of an assignment of this Agreement by Purchaser, its Permitted Assignee shall be deemed to be the Purchaser hereunder for all purposes hereof, and shall have all rights of Purchaser hereunder, provided the assignor shall not be released from any liability hereunder. Without limiting the generality of the foregoing, Purchaser may nominate any entity in whom the title of the Property is to vest; provided that entity is a Permitted Assignee and provided further, that no such nomination by Purchaser shall in any manner release Purchaser from any of its obligations under this Agreement.

13.5     Sole Agreement. This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed by the parties hereto.  This Agreement, the disclosure schedules for each of the parties and the documents executed and delivered pursuant hereto constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all prior negotiations, discussions, writings and agreements between them.

13.6     Captions. The captions of this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

13.7     Severability. Should any one or more of the provisions of this Agreement be determined to be invalid, unlawful or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

13.8    Counterparts; Electronic Versions of Documents.    This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Agreement (and any amendment thereto) and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf" format), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement (and any amendment thereto) as to the parties and may be used in lieu of an original Agreement (and any amendment thereto) for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes. Notwithstanding the Electronic Signatures in Global and National Commerce Act (15 U.S.C. Sec. 7001 et seq.), the Uniform Electronic Transactions Act, or any other applicable law, rule or regulation relating to or enabling the creation, execution, delivery, or recordation of any contract or signature by electronic means, and notwithstanding any course of conduct engaged in by the parties, no party shall be deemed to have executed this Agreement (or any amendment thereto) or any other document contemplated by this Agreement unless and until such party shall have executed this Agreement or such document on paper by a handwritten original signature or any other symbol executed or adopted by a party with current intention to authenticate this Agreement or such other document contemplated.  Notwithstanding anything to the contrary contained in this Section 14.8, Seller shall provide Seller's handwritten original signature to this Agreement (and any amendment hereto) concurrently with or as soon as reasonably practicable following the effective date of this Agreement (or any applicable amendment hereto).

13.9    Knowledge Defined. As used in this Agreement, the terms "to Seller's knowledge", "to the knowledge of Seller", "known to Seller" or any similar phrase, shall mean the knowledge of each of Scott Feuer, Bryan Crino, and Joseph Passero.  Seller hereby represents and warrants that the foregoing individuals are the representatives of Seller most likely to have actual knowledge of the accuracy of the representations and warranties contained in this Agreement.

13.10    Third Party Beneficiary; No Personal Liability.    Except for the Purchaser Indemnitees, nothing in this Agreement is intended to or shall be construed to confer upon or create in any person (other than the parties hereto) any rights or remedies under or by reason of this Agreement, including without limitation, any right to enforce this Agreement.  In addition to any limitation on liability provided by law or any other agreement or instrument, no advisor, trustee, director, officer, employee, accountant, attorney, beneficiary, shareholder, partner, participant or agent of or in Purchaser or Seller shall have any personal liability, directly or indirectly, under or in connection with this Agreement or the transaction contemplated hereunder.  The parties, their respective successors and assigns and all third parties shall look solely to the applicable party's assets for the payment of any claim or any performance, and the parties hereby waive all such personal liability.  Furthermore, in no event shall any party be liable for any indirect, punitive or consequential damages suffered by Master Tenant and/or Operator from whatever cause.

13.11    Attorneys' Fees.  In the event of a dispute between the parties hereto with respect to the interpretation or enforcement of the terms hereof, the prevailing party in any action resulting therefrom shall be entitled to collect from the other its reasonable costs and attorneys' fees, including its costs and fees on appeal.

140109.00416/126156287v.12

13.12  <u>Construction</u>.  The parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including without limitation."

13.13  <u>Time is of the Essence</u>. Time is of the essence for this Agreement.

13.14  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and to their respective transferees, successors and permitted assigns.

13.15  <u>Governing Law</u>.   THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE. SELLER'S CONSENT TO IN PERSONAM JURISDICTION BEFORE THE STATE AND FEDERAL COURTS OF THE STATE OF DELAWARE AND AGREES THAT ALL DISPUTES CONCERNING THIS AGREEMENT MAY BE HEARD, AT PURCHASER'S OPTION, IN THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE OR THE STATE WHERE ANY FACILITY IS LOCATED.  SELLER AGREES THAT SERVICE OF PROCESS MAY BE EFFECTED UPON A SELLER UNDER ANY METHOD PERMISSIBLE UNDER THE LAWS OF THE STATE OF DELAWARE OR THE STATE WHERE ANY FACILITY IS LOCATED AND IRREVOCABLY WAIVES ANY OBJECTION TO VENUE IN THE STATE AND FEDERAL COURTS OF THE STATE OF DELAWARE OR THE STATE WHERE ANY FACILITY IS LOCATED.

13.16  **WAIVER OF JURY TRIAL**.  THE PARTIES TO THIS AGREEMENT EACH HEREBY KNOWINGLY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

13.17  <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.  Executed copies hereof may be delivered by facsimile, email or other electronic means and upon receipt will be deemed originals and binding upon the parties hereto, regardless of whether originals are delivered thereafter.

140109.00416/126156287v.12

13.18   Business Days.  As used in this Agreement, a "business day" shall mean a day other than Saturday, Sunday or any day on which federal banking institutions are authorized by law or other governmental action to close.  All other references to "days" or "calendar days" in this Agreement shall refer to calendar days.  If any period expires or delivery date falls on a date that is not a business day under this Agreement, such period shall be deemed to expire and such delivery date shall be deemed to fall on the immediately succeeding business day.

13.19   Confidentiality.  Neither Purchaser, Seller, nor any broker employed or engaged by any of them shall issue (or cause to be issued) any press releases concerning the subject matter hereof, structure of the transaction or the status of negotiations conducted hereunder except as may be jointly agreed to by Seller and Purchaser or as any of them may reasonably consider necessary in order to satisfy the requirements of applicable law; provided, however, that notwithstanding anything herein to the contrary: (i) Purchaser may, free from the restrictions of this Section 13.19, report on the transaction completed by this Agreement in connection with: (A) any press release or investor call concerning Purchaser's earnings or financial performance, (B) any filings or disclosures required to be made to the Securities and Exchange Commission or state securities' commission in accordance with applicable law, or (iii) any meetings or conference calls with, or disclosures made to, Purchaser's consultants, contractors, investors, principals, employees, agents, attorneys, accountants and other advisors, and (ii) Seller may after Closing, free from the restrictions of this Section 13.19, issue a press release that it has sold and conveyed the property to Seller and include a similar description in its marketing materials without specific references to the structure of the transaction.  The foregoing restrictions shall survive the Closing, but shall not apply to anything disclosed by documents required or otherwise agreed by the parties to be filed in the public record in order to facilitate the transactions contemplated herein.

13.20   Limitation on Liability.  The representations and warranties of Seller set forth in Article V, as updated by any certificate of Seller delivered to Purchaser at Closing shall survive Closing for a period of three hundred sixty-five (365) days (the "Survival Period").  No claim for a breach of any representation, warranty or covenant of Seller under this Agreement or any documents executed pursuant hereto or in connection herewith shall be actionable or payable unless the claims for all such breaches, if any, for the Property collectively aggregate more than Fifty Thousand Dollars ($50,000.00) (the "Basket"), in which event, subject to the Cap (defined below), the entire amount shall be actionable, and (c) written notice containing a description of the specific nature of such breach shall have been given by Purchaser to Seller prior to the expiration of said sixty-five (365) day period and an action shall have been commenced by Purchaser against Seller within sixty (60) days after the termination of the Survival Period.  To the extent applicable, Purchaser shall use commercially reasonable efforts to seek recovery under any insurance policy, Purchaser's insurance policy, or policy of title insurance prior to seeking recovery from Seller, and Seller shall not be liable to Purchaser if Purchaser's claim is satisfied from the same, subject to payment of any deductible amounts.  During the period that Purchaser may be pursuing a resolution with the insurance company, the sixty (60) day period in which to commence an action or proceeding shall remain deferred until resolved.  As used herein, the term "Cap" shall mean the total aggregate amount equal to Two Hundred Fifty Thousand Dollars ($250,000).  Notwithstanding any provision in this Agreement to the contrary: (i) Seller's aggregate liability to Purchaser under this Agreement, the conveyance documents and any other documents or instruments executed by Seller in connection with the sale of the Property shall not exceed the Cap, (ii) Seller shall not be liable to Purchaser for any consequential damages except as provided

for in Section 11.3(b), (iii) any attorneys' fees and costs expended by either Party to resolve any claim for damages as contemplated in this Agreement and reimbursable if such Party is the prevailing party in a dispute, shall not be subject to the limits of the Basket or the Cap; and (iv) any claim for fraud or willful misrepresentation by Seller shall not be subject to the Basket or the Cap. The provisions of this <u>Section 13.20</u> shall survive the Closing.

<strong>(SIGNATURES ON FOLLOWING PAGES)</strong>

*Signature Page to*
PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

IN WITNESS WHEREOF, Seller hereby executes this Purchase and Sale Agreement as of the day and year first set forth therein.

SELLER:

**ARROWHEAD PROPERTY, LLC,**
**CHASE COUNTY PROPERTY LLC,**
**DOWNS PROPERTY LLC,**
**EDWARDSVILLE PROPERTY LLC,**
**SHR EL DORADO PROPERTY LLC,**
**ESKRIDGE PROPERTY LLC,**
**KAW RIVER PROPERTY LLC,**
**LANSING PROPERTY LLC,**
**NEODESHA PROPERTY LLC,**
**PARKWAY PROPERTY LLC,**
**PITTSBURG PROPERTY LLC,**
**SPRING HILL PROPERTY LLC,**
**WAKEFIELD PROPERTY LLC,**
**WELLINGTON PROPERTY LLC,**
**WICHITA PROPERTY LLC,**
**WILSON PROPERTY LLC,**
each a Florida limited liability company

By: _____
Name: Scott Feuer
Title:  Chief Executive Officer

Signature Page - 1 of 2

*Signature Page to*
PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

IN WITNESS WHEREOF, Purchaser hereby executes this Purchase and Sale Agreement as of the day and year first set forth therein.

PURCHASER:

KSGA 16 LLC.
a Delaware limited liability company

By: _____
Name:  Eliyahu Konovitch
Title:   Chief Financial Officer

Signature Page - 2 of 2

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULES:

| | |
|---|---|
| SCHEDULE A-1 | Seller |
| SCHEDULE A-2 | Purchaser |
| SCHEDULE A-3 | Operator |
| SCHEDULE 1(a) | Descriptions of Facilities |
| SCHEDULE 1(b) | Trade Names of Facilities |
| SCHEDULE 1(c) | Legal Description of Real Property |
| SCHEDULE 2.3(a) | Allocation of Purchase Price |
| SCHEDULE 2.3(b) | Worksheet for Calculation of EBITDAR |
| SCHEDULE 4.6(c) | Schedule of Permitted Encumbrances |
| SCHEDULE 5.7(b) | Waivers of Citations |
| SCHEDULE 5.13 | Litigation |
| SCHEDULE 5.20 | Insurance Policies |

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE A-1

**Sellers**

| Entity | Facility |
|---|---|
| Arrowhead Property, LLC | Arrowhead Health & Rehabilitation Center |
| Coronado 15, LLC | Chase County Care & Rehabilitation Center |
| Coronado 15, LLC | Downs Care & Rehabilitation Center |
| Coronado 15, LLC | Parkway Care & Rehabilitation |
| Coronado 15, LLC | Kaw River Care & Rehabilitation Center |
| Coronado 15, LLC | Edwardsville Care & Rehab Center |
| Coronado 15, LLC | El Dorado Care & Rehabilitation Center |
| Coronado 15, LLC | Eskridge Care & Rehabilitation Center |
| Coronado 15, LLC | Lansing Care & Rehabilitation Center |
| Coronado 15, LLC | Neodesha Care & Rehabilitation Center |
| Coronado 15, LLC | Pittsburg Care and Rehabilitation Center |
| Coronado 15, LLC | Spring Hill Care & Rehabilitation Center |
| Coronado 15, LLC | Wakefield Care & Rehabilitation Center |
| Coronado 15, LLC | Wellington Care & Rehabilitation Center |
| Coronado 15, LLC | Wichita Care & Rehabilitation Center |
| Coronado 15, LLC | Wilson Care & Rehabilitation Center |

140109.00416/126156287v.12

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE A-2

**Purchasers**

| Entity | Facility |
|---|---|
| KSGA 16 LLC | Arrowhead Health & Rehabilitation Center |
| KSGA 16 LLC | Chase County Care & Rehabilitation Center |
| KSGA 16 LLC | Downs Care & Rehabilitation Center |
| KSGA 16 LLC | Parkway Care & Rehabilitation |
| KSGA 16 LLC | Kaw River Care & Rehabilitation Center |
| KSGA 16 LLC | Edwardsville Care & Rehab Center |
| KSGA 16 LLC | El Dorado Care & Rehabilitation Center |
| KSGA 16 LLC | Eskridge Care & Rehabilitation Center |
| KSGA 16 LLC | Lansing Care & Rehabilitation Center |
| KSGA 16 LLC | Neodesha Care & Rehabilitation Center |
| KSGA 16 LLC | Pittsburg Care and Rehabilitation Center |
| KSGA 16 LLC | Spring Hill Care & Rehabilitation Center |
| KSGA 16 LLC | Wakefield Care & Rehabilitation Center |
| KSGA 16 LLC | Wellington Care & Rehabilitation Center |
| KSGA 16 LLC | Wichita Care & Rehabilitation Center |
| KSGA 16 LLC | Wilson Care & Rehabilitation Center |

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)


SCHEDULE A-3

**Operators**

| Entity | Facility |
|--------|----------|
| Arrowhead Operator, LLC | Arrowhead Health & Rehabilitation Center |
| Chase County Operator, LLC | Chase County Care & Rehabilitation Center |
| Downs Operator, LLC | Downs Care & Rehabilitation Center |
| Parkway Operator, LLC | Parkway Care & Rehabilitation |
| Kaw River Operator, LLC | Kaw River Care & Rehabilitation Center |
| Edwardsville Operator, LLC | Edwardsville Care & Rehab Center |
| El Dorado Operator, LLC | El Dorado Care & Rehabilitation Center |
| Eskridge Operator, LLC | Eskridge Care & Rehabilitation Center |
| Lansing Operator, LLC | Lansing Care & Rehabilitation Center |
| Neodesha Operator, LLC, | Neodesha Care & Rehabilitation Center |
| Pittsburg Operator, LLC | Pittsburg Care and Rehabilitation Center |
| Spring Hill Operator, LLC | Spring Hill Care & Rehabilitation Center |
| Wakefield Operator, LLC | Wakefield Care & Rehabilitation Center |
| Wellington Operator, LLC | Wellington Care & Rehabilitation Center |
| Wichita Operator, LLC | Wichita Care & Rehabilitation Center |
| Wilson Operator, LLC | Wilson Care & Rehabilitation Center |

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 1(a)

Description of Facilities

| Facility Name | Facility address | Type | # of Beds |
|---|---|---|---|
| Arrowhead Health & Rehabilitation Center | 239 Arrowhead Boulevard Jonesboro, GA 30236 | Skilled Nursing Facility | 115 |
| Chase County Care & Rehabilitation Center | 612 Walnut, Po Box 589 Cottonwood Falls, KS 66845 | Skilled Nursing Facility | 46 |
| Downs Care & Rehabilitation Center | 1218 Kansas Street Downs, KS 67437 | Skilled Nursing Facility | 45 |
| Parkway Care & Rehabilitation | 749 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 50 |
| Kaw River Care & Rehabilitation Center | 750 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 45 |
| Edwardsville Care & Rehab Center | 751 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 102 |
| El Dorado Care & Rehabilitation Center | 900 Country Club Lane El Dorado, KS 67042 | Skilled Nursing Facility | 50 |
| Eskridge Care & Rehabilitation Center | 505 N. Main Street Eskridge, KS 66423 | Skilled Nursing Facility | 60 |
| Lansing Care & Rehabilitation Center | 210 Plaza Drive, Po Box 250 Lansing, KS 66043 | Skilled Nursing Facility | 58 |
| Neodesha Care & Rehabilitation Center | 1626 N 8th Street Neodesha, KS 66757 | Skilled Nursing Facility | 45 |
| Pittsburg Care and Rehabilitation Center | 1005 E Centennial Drive Pittsburg, KS 66762 | Skilled Nursing Facility | 86 |
| Spring Hill Care & Rehabilitation Center | 251 E Wilson Avenue Spring Hill, KS 66083 | Skilled Nursing Facility | 45 |
| Wakefield Care & Rehabilitation Center | 509 Grove Street Wakefield, KS 67487 | Skilled Nursing Facility | 45 |
| Wellington Care & Rehabilitation Center | 102 W Botkin Street Wellington, KS 67152 | Skilled Nursing Facility | 45 |
| Wichita Care & Rehabilitation Center | 4007 E Lincoln Street Wichita, KS 67218 | Skilled Nursing Facility | 50 |
| Wilson Care & Rehabilitation Center | 611 31st Street, Po Box 160 Wilson, KS 67490 | Skilled Nursing Facility | 40 |

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 1(b)

Trade Names of Facilities

Arrowhead Health & Rehabilitation Center
Chase County Care & Rehabilitation Center
Downs Care & Rehabilitation Center
Parkway Care & Rehabilitation
Kaw River Care & Rehabilitation Center
Edwardsville Care & Rehab Center
El Dorado Care & Rehabilitation Center
Eskridge Care & Rehabilitation Center
Lansing Care & Rehabilitation Center
Neodesha Care & Rehabilitation Center
Pittsburg Care and Rehabilitation Center
Spring Hill Care & Rehabilitation Center
Wakefield Care & Rehabilitation Center
Wellington Care & Rehabilitation Center
Wichita Care & Rehabilitation Center
Wilson Care & Rehabilitation Center

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 1(c)

Legal Description of Real Property

(see attached)

140109.00416/126156287v.12

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 1(c)

Legal Description of Real Property

(see attached)

4823-5284-2431.v10

140109.00413/123409591v.12

## EXHIBIT "A"
Legal Description

Cottonwood Facility / Site 00194

A tract of land in the Southwest Quarter (SW1/4) of Section Twenty-Eight (28), Township Nineteen (19) South, Range Eight (8) East of the Sixth Principal Meridian, Chase County, Kansas, described as follows to wit: Commencing at a point 200 feet North of the Southwest corner of said SW1/4 of said Section 28, thence North 466 feet, thence East 660 feet, thence South 466 feet, thence West 660 feet, to the point of beginning.

Downs Facility / Site 00197

Lots 3 and 4, Block 5, in SHOOK'S FIRST ADDITION to the City of Downs, Osborne County, Kansas; and

A tract in the Northeast Quarter of Section 28, Township 6 South, Range 11, West of the 6th P.M., in Osborne County, Kansas, described as follows:  Beginning at the Southwest corner of Lot 4, Block 5, Shook's Addition to the City of Downs, Kansas, thence West 275 feet to a point, thence North 407.3 feet more or less to a point 275 feet West of the Northwest corner of Lot 3, Block 5, Shook's Addition to the City of Downs, Kansas, thence East 275 feet to the Northwest corner of said Lot 3, thence South along the West line of Lots 3 and 4, Block 5, Shook's Addition to the City of Downs, Kansas, 407.3 feet to the point of beginning.

Edwardsville Facility / Site 02217

A tract of land in the Northeast Quarter of Section 35, Township 11, Range 23, in the City of Edwardsville, Wyandotte County, Kansas, more particularly described as follows:

Beginning at the Northeast corner of the Northeast Quarter of said Section 35; thence South 00° 01'05" seconds West, on the East line of the said Northeast Quarter of Section 35, 420 feet to a point; thence West 425 feet to a point; thence North 00° 01'05" East, 420 feet to a point on the North line of the Northeast Quarter of said Section 35; thence East on the North line of the Northeast Quarter of said Section 35, 425 feet to the point of beginning.

El Dorado Facility / Site 1211

Tract 1:

Beginning at a point 48.7 feet North and 330 feet East of the Southwest Corner of Section 25, Township 25 South, Range 5 East of the 6th P.M., thence North 0° East parallel to the West line of said Southwest Quarter, a distance of 387.39 feet, thence North 89°45'12" East 320 feet, thence South 0° West parallel with the West line of the Southwest Quarter, a distance of 389.50 feet, thence North 89°52'6" West 320 feet to the point of beginning, all in Butler County, Kansas.

Tract 2:

Together with a non-exclusive easement and right-of-way for the purpose of ingress and egress of vehicular and pedestrian traffic along and across said existing East-West roadway lying generally along said section line and running from the West line of the Southwest Quarter of Section 25, Township 25 South, range 5 East, Butler County, Kansas, Eastwards 1163 feet, being the East line of Tract I, being the El Dorado Lodge #1698, Loyal Order of Moose Tract as described in Driveway and Easement Agreement filed August 11, 1983 in Misc. Book 392, Page 360.

Less and except the frontage roadway conveyed (or to be conveyed) to the City of El Dorado for public dedication.

Eskridge Facility / Site 02222

A tract of land in the Northwest Quarter (NW1/4) of Section 5, Township 14 South, Range 12 East OF the 6th P.M., Wabaunsee County, Kansas, described as follows: Beginning at a point 475 feet North of the Center of Section 5,

# EXHIBIT "A"
Legal Description

Township 14 South, Range 12 East; thence West 530 feet; thence North 350 feet; thence East 530 feet; thence South 350 feet to the point of beginning.

### Kaw River Facility / Site 2216

A tract of land in the Northeast Quarter of Section 35, Township 11 South, Range 23 East, in the City of Edwardsville, Wyandotte County, Kansas, more particularly described as follows:

Beginning at the Northeast corner of the Northeast Quarter of Section 35, Township 11 South, Range 23 East, City of Edwardsville, Wyandotte County, Kansas; thence South 00 degrees 01 minutes 05 seconds West, on the East line of the said Northeast Quarter of Section 35, Township 11 South, Range 23 East, 480 feet to the true point of beginning; thence continuing South 00 degrees, 01 minutes 05 seconds West, along the said East line of the Northeast Quarter of Section 35, Township 11 South, Range 23 East, 425 feet to a point; thence West along a line lying 905 feet Southerly from and parallel to the North line of said Northeast Quarter of Section 35, Township 11 South, Range 23 East, 329.97 feet to a point of curvature; thence Westerly, Northwesterly and Northerly along a curve to the right having a radius of 90 feet, a distance of 141.40 feet to a point of tangency; thence North 00 degrees 01 minutes 05 seconds East along a line lying 420 feet Westerly from and parallel to the said East line of the Northeast Quarter of Section 35, Township 11 South, Range 23 East, 334.97 feet to a point; thence East along a line lying 480 feet Southerly from and parallel to the said North line of the Northeast Quarter of Section 35, Township 11 South, Range 23 East, 420 feet to the true point of beginning.

### Lansing Facility / Site 00148

Part of Lots 34 and 35, Block 2, Holiday Hills, an addition to the City of Lansing, Kansas, described as follows:  Beginning 534.58 feet West and 197.33 feet South of the Northeast corner of Section 24, Township 9, Range 22; thence South 00° 09'30" West, 277.83 feet; thence South 89° 52'10" West, 372.5 feet; thence North 00° 09'30" East, 273.58 feet; thence North 88° 29'38" East, 177.04 feet; thence North 89° 52'10" East, 195.5 feet to the point of beginning, less a radius of 25 feet at each corner, in Leavenworth County, Kansas.

### Neodesha Facility / Site 01213

Lot Fifty-five (55), Revised Plat of Darts Subdivision, City of Neodesha, Wilson County, Kansas.

### Parkway Facility / Site 2215

A tract of land in the Northeast Quarter of Section 35, Township 11 South, Range 23 East of the Sixth Principal Meridian in the City of Edwardsville, Wyandotte County, Kansas, being more particularly described as follows:

Commencing at the Northeast corner of the Northeast Quarter of said Section 35; thence North 89° 58'42" West, 425 feet along the North line of the Northeast Quarter of said Section 35 to the true point of beginning; thence South 0° 01'05" West, 420.16 feet to a point on the North right-of-way line of Blake Street, as now established; thence West 395.00 feet along said North right-of-way line; thence North 0° 01'05" East 420.31 feet to a point on the North line of the Northeast Quarter of said Section 35; thence South 89° 58'42" East, 395.00 feet along said North line to the true point of beginning of the tract herein described.

# EXHIBIT "A"
Legal Description

Pittsburg Facility / Site 02357

Part of the Southeast Quarter (SE 1/4) of the Southeast Quarter (SE 1/4) of Section Thirty Two (32), Township Thirty (30) South, Range Twenty Five (25) East of the Sixth Principal Meridian, Crawford County, Kansas, according to the United States Government Survey thereof, bounded and described as follows:


Beginning at a point Four Hundred (400) feet West of the Southeast corner of said Section Thirty Two (32); Thence West Three Hundred Fifty (350) feet; Thence North and parallel with the East line of said Section Four Hundred Eighty Seven (487) feet; Thence East Three Hundred Fifty (350) feet; Thence South Four Hundred Eighty Seven (487) feet to point of beginning.

EXCEPT that part thereof deeded to The City of Pittsburg, Crawford County, Kansas as shown by "Tract 7-7" Deed for Highway Purposes" recorded in Miscellaneous Book 359 at page 725, in the office of the Register of Deeds of Crawford County, Kansas.


Spring Hill Facility / Site 01210

A tract of land in the Southeast Quarter of Section 14, Township 15, Range 23 in the City of Spring Hill, Johnson County, Kansas, said tract being more particularly described as follows:

Beginning at a point on the North line of Lot 20, Dwyers First Addition to the City of Spring Hill, Kansas, said point being 50.00 feet East from the Northwest corner of said Lot 20, Dwyers First Addition; thence North 300.00 feet to a point; thence East 400.00 feet to a point; thence South 300.00 feet to a point on the North line of Dwyers First Addition to the City of Spring Hill; thence West on the North line of Dwyers First Addition to the City of Spring Hill, 400.00 feet to the point of beginning, except that part in streets or roads.


Wakefield Facility / Site 02218

Tract 1:

A tract of land in Block Thirty-six (36) of the Original Town of Wakefield, Clay County, Kansas, described as follows: Beginning at the Northeast corner of Block 36 as a point of beginning; thence South on the East line of said Block 36 a distance of 185.5 feet; thence West, parallel with the North line of said Block 36 a distance of 200 feet; thence North parallel with the East line of said Block 36 a distance of 185.5 feet; thence East on the North line of said Block 36 a distance of 200 feet to the point of beginning.

Tract 2:

A part of Block Thirty Six (36) in the Original Townsite of the City of Wakefield, Clay County, Kansas, described as follows: Commencing at a point on the East line of said Block 36, 185.5 feet South of the Northeast corner of said Block; thence South on said East line extended to the center of vacated Fifth Street (abutting said Block 36 on the South); thence West along the center line of said Fifth Street to a point 75 feet East of the West line of said Block 36, extended; thence North to a point on the North line of said Block 36, 75 feet East of the Northwest corner of said Block; thence East on said North line to a point 200 feet west of the Northeast corner of said Block 36; thence South parallel with the East line of said Block 36, 185.5 feet; thence East to the point of beginning.

# EXHIBIT "A"
Legal Description

Wellington  Facility / Site 01216

Beginning at a point 871.9 feet West of the Northeast corner of the Southwest Quarter of Section 23, Township 32 South, Range 1 West of the 6th P.M., Sumner County, Kansas; thence West on the North line of said Southwest Quarter, 503.1 feet to an Iron Pin; thence South at right angles to the North line of said Southwest Quarter, 489.9 feet to an Iron Pin; thence East parallel to the North line of said Southwest Quarter, 487.91 feet to an Iron Pin on the East line of Washington Avenue extended; thence North 489.9 feet to the point of beginning.

Wichita Facility / Site 02555

Tract 1:

Lots 1, 2, 3 and 4, Mount St. Mary's Addition to Wichita, Sedgwick County, Kansas.

Tract 2:

That portion of Lot 5 lying Northwest of the 40 foot drainage easement, Mount St. Mary's Addition to Wichita, Sedgwick County, Kansas.

Tract 3:

A tract in the Southeast Quarter of Section 26, Township 27 South, Range 1 East of the 6th P.M., Sedgwick County, Kansas, described as follows: Beginning at the Northwest corner of Lot 4, Mount St. Mary's Addition to Wichita, Sedgwick County, Kansas; thence South along the West line of Mount St. Mary's Addition, a distance of 203.12 feet; thence West parallel to the North line of said Southeast Quarter of Section 26, a distance of 25 feet; thence North parallel with the West line of said Mount St. Mary's Addition, a distance of 203.13 feet; thence East parallel with the North line of said Southeast Quarter of Section 26, a distance of 25 feet to the point of beginning.

Tract 4:

A tract in the Southeast Quarter of Section 26, Township 27 South, Range 1 East of the 6th P.M., Sedgwick County, Kansas, described as follows: Beginning at a point on the West line of Mount St. Mary's Addition to Wichita, Sedgwick County, Kansas, 203.13 feet South of the Northwest corner of Lot 4; thence South along the West line of said Addition a distance of 53.80 feet; thence Southwesterly with a deflection of 43°32' a distance of 217.78 feet; thence North parallel to the West line of said Addition a distance of 211.29 feet; thence East parallel to the North line of said Southeast Quarter a distance of 150.0 feet to the point of beginning.

Wilson Facility / Site 2212

All of Block 18, in WALMER'S ADDITION to the City of Wilson, Ellsworth County, Kansas, together with vacated alley pursuant to Order recorded November 8, 1984 in Book 3, Page 643.

## ARROWHEAD LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 141 of the 13th District of Clayton County, Georgia, being more particularly described as follows:

BEGINNING at a pk nail in asphalt on the southwesterly right-of-way line of Arrowhead Boulevard (50 foot right-of-way), which pin is located 525 feet southeasterly from the corner formed by the intersection of the southeasterly side of Upper Riverdale Road (an 80 foot right-of- way) and the Southwesterly side of Arrowhead Boulevard (50 foot right-of-way); thence continuing southeasterly along the southwesterly side of Arrowhead Boulevard S 24° 01' 29" E, 450.00 feet to a 1/2 inch iron pin found; thence leaving said right-of-way line and running S 65° 56' 19" W, 290.19 feet to a one inch open top pipe; thence N 24° 00' 00" W, 448.63 feet to a half inch rebar found; thence N 65° 40' 08" E, 290.00 feet to a pk nail and THE POINT OF BEGINNING all The following matters as disclosed by survey for Arrowhead Property, LLC, et al., dated June 8, 2009, prepared by Delta Surveyors, Inc.

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 2.3(a)

Allocation of Purchase Price on a per Facility Basis

| Facility Name | Facility address | Purchase Price Allocation* |
|---|---|---|
| Arrowhead Health & Rehabilitation Center | 239 Arrowhead Boulevard Jonesboro, GA 30236 | $ |
| Chase County Care & Rehabilitation Center | 612 Walnut, Po Box 589 Cottonwood Falls, KS 66845 | $ |
| Downs Care & Rehabilitation Center | 1218 Kansas Street Downs, KS 67437 | $ |
| Parkway Care & Rehabilitation | 749 Blake Street Edwardsville, KS 66111 | $ |
| Kaw River Care & Rehabilitation Center | 750 Blake Street Edwardsville, KS 66111 | $ |
| Edwardsville Care & Rehab Center | 751 Blake Street Edwardsville, KS 66111 | $ |
| El Dorado Care & Rehabilitation Center | 900 Country Club Lane El Dorado, KS 67042 | $ |
| Eskridge Care & Rehabilitation Center | 505 N. Main Street Eskridge, KS 66423 | $ |
| Lansing Care & Rehabilitation Center | 210 Plaza Drive, Po Box 250 Lansing, KS 66043 | $ |
| Neodesha Care & Rehabilitation Center | 1626 N 8th Street Neodesha, KS 66757 | $ |
| Pittsburg Care and Rehabilitation Center | 1005 E Centennial Drive Pittsburg, KS 66762 | $ |
| Spring Hill Care & Rehabilitation Center | 251 E Wilson Avenue Spring Hill, KS 66083 | $ |
| Wakefield Care & Rehabilitation Center | 509 Grove Street Wakefield, KS 67487 | $ |
| Wellington Care & Rehabilitation Center | 102 W Botkin Street Wellington, KS 67152 | $ |
| Wichita Care & Rehabilitation Center | 4007 E Lincoln Street Wichita, KS 67218 | $ |
| Wilson Care & Rehabilitation Center | 611 31st Street, Po Box 160 Wilson, KS 67490 | $ |

* Purchase Price Allocation to be agreed upon by Buyer and Seller PRIOR to the expiration of the Due Diligence Period.

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 2.3(b)

WORKSHEET FOR CALCULATION

|  | xxx Month Period ended _____, 202__ |
|---|---|
| Net Income | $ |
|  |  |
| *Plus / (Less):* Interest expense / (income) | $ |
| *Plus / (Less):* Income tax expense / (income) | $ |
| *Plus:* Depreciation & amortization | $ |
| EBITDA | $ |
|  |  |
| *Plus:* Fees and expenses related to preparation of the Earn-Out Statement | $ |
| *Plus:* Legal and accounting fees in connection with the Transaction not being amortized | $ |
| *Plus:* Rent expense of the Facilities | $ |
| *Plus:* Additional costs incurred at the direction of Buyer | $ |
| *Plus/(Less):* Extraordinary losses / (gains) recorded | $ |
|  |  |
| Earn-Out EBITDAR | $ |

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 4.6(c)
Schedule of Permitted Encumbrances

General Exceptions:                General real estate taxes, association assessments, special assessments, special district taxes and related charges not yet due and payable

Zoning, building codes and other land use laws regulating the use or occupancy of the Real Property and Improvements or the activities conducted thereon provided such laws, codes and regulations permit all the current uses of the Real Property and the Facility.

Property Specific:                [SEE FOLLOWING PAGES]

Site:           Site 01 - Clayton County, Georgia
NCS No.:        CCHI2002630MS
Local No.:      200911GA
Drafted:        1/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1. Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I – Requirements are met.~~

2. Intentionally deleted. ~~Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the Public Records.~~

3. Intentionally deleted. ~~Any lien or right to a lien for services, labor or material not shown by the public records.~~

4. Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~    Taxes for the year 2020 and subsequent years, a lien not yet due and payable.

5. Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land and not shown by the Public Records.~~

6. Intentionally deleted. ~~Easements, or claims of easements, not shown by the public records.~~

7. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of tenants, as tenants only in possession of subject property.~~

8. Property taxes, including any assessments collected with taxes to be levied for the fiscal year 2020, which are a lien not yet due and payable. ~~Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2020.~~

9. Intentionally deleted. ~~Any additional taxes, interest and/or penalties which may be assessed for prior tax years by virtue of adjustment, re-appraisal, re-assessment, appeal or other amendment to the tax records of the city or county in which the subject property is located.~~

10. Intentionally deleted. ~~No insurance is afforded as to the exact amount of acreage contained in the property described herein.~~

11. Intentionally deleted. ~~Roads, ways, streams or easements, if any, not shown of record, riparian rights and the title to any filled-in lands.~~

12. Intentionally deleted. (Owner's affidavit with PACA language must be provided).~~Any right, interest or claim that may exist, arise or be asserted under or pursuant to the Perishable Agricultural Commodities Act of 1930, as amended, 7 USC 499a et seq., the Packers and Stockyard Act of 1921, as amended, 7 USC 181 et seq., or any similar state laws.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 01 - Clayton County, Georgia
NCS No.:      CCHI2002630MS
Local No.:     200911GA
Drafted:       1/05/2021

13. Right-of-Way Easement from R. Wayne Lowe Corporation to Southern Bell Telephone and Telegraph Company, dated July 5, 1988, recorded in Deed Book 1484, Page 348, Clayton County, Georgia Records and shown on ALTA/NSPS Land Title Survey prepared by Ronnie J. Joiner, GA RLS No. 2488 on behalf of Atlas Technical Consultants, for Bureau Veritas, dated July 14, 2020, last revised December 15, 2020, and designated as Job No. 143335.20R000-001.259 (the "Survey").

14. Easements in favor of Georgia Power Company as follows:

    a) From Arrowhead Shopping, Inc. to Georgia Power Company dated May 28, 1969, recorded in Deed Book 542, Page 328, aforesaid Records.

    b) From Alma H. Orr to Georgia Power Company dated January 11, 1960, recorded in Deed Book 209, Page 367, aforesaid Records.

    c) From Mrs. W.E. Orr to Georgia Power Company dated March 6, 1959, recorded April 29, 1959, recorded in Deed Book 193, Page 140, aforesaid Records.

    d) From Alma I. On to Georgia Power Company dated December 8, 1955, recorded December 27, 1955, recorded in Deed Book 138, Page 217, aforesaid Records.

    e) From Alma I. On to Georgia Power Company dated June 18, 1952, recorded June 27, 1952, recorded in Deed Book 95, Page 35, aforesaid Records.

    f) From W.E. Orr to Georgia Power Company dated January 16, 1939, recorded January 18, 1939, recorded in Deed Book 33, Page 218, aforesaid Records.

    g) From Arrowhead Shopping, Inc. to Georgia Power Company for construction and maintenance of power lines, recorded in Deed Book 593, Page 659, aforesaid Records.

15. Easement from Alma I. On to Clayton County Water Authority, dated March 11, 1958, recorded April 28, 1958, recorded in Deed Book 173, Page 242, aforesaid Records and shown on ALTA/NSPS Land Title Survey prepared by Ronnie J. Joiner, GA RLS No. 2488 on behalf of Atlas Technical Consultants, for Bureau Veritas, dated July 14, 2020, last revised December 15, 2020, and designated as Job No. 143335.20R000-001.259 (the "Survey").

16. Easement from W.E. On to Southern Bell Telephone & Telegraph Company, dated April 22, 1938, recorded June 24, 1938, recorded in Deed Book 32, Page 453, aforesaid records.

17. Intentionally deleted (Proof of termination of lease required). ~~Lease evidenced for record by Subordination Agreement by and among Arrowhead Operator, LLC, Arrowhead Property, LLC, and American Momentum Bank, dated June 18, 2009, recorded June 23, 2009, in Deed Book 9664, Page 660, aforesaid records.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 2 - 612 Walnut Street, Cottonwood Falls, KS 66845
NCS No.:       CCHI2002631MS
Local No.:     201002
Drafted:       01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1. Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I – Requirements are met.~~

2. Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3. Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4. Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5. Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6. Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7. Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~

   a) ~~General taxes for the year 2019, in the amount of $18,087.73, PAID~~

      ~~FOR INFORMATIONAL PURPOSES ONLY:~~
      ~~Tax Code No.: 00575.~~
      ~~Alt No.: 078-28-0-30-02-008-00.0~~
      ~~2019 Assessed Value: $88,503.00 (The assessed value is subject to change.)~~
      ~~2019 Mill Levy: 204.894~~
      ~~2019 General taxes include the following installments for special assessments, which are paid to date: $0.00 (special assessments are subject to change)~~

   b) ~~General taxes for the year 2018, in the amount of $3.03, PAID.~~

      ~~FOR INFORMATIONAL PURPOSES ONLY:~~
      ~~Tax Code No.: 00579.~~
      ~~Alt No.: 078-28-0-30-03-003-00.0~~
      ~~2019 Assessed Value: $23.00 (The assessed value is subject to change.)~~
      ~~2019 Mill Levy: 131.538~~
      ~~2019 General taxes include the following installments for special assessments, which are paid to date: $0.00 (special assessments are subject to change)~~

   ~~Special assessments, if any, levied by the City of Cottonwood Falls which are not due and payable~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 2 - 612 Walnut Street, Cottonwood Falls, KS 66845
NCS No.:         CCHI2002631MS
Local No.:       201002
Drafted:         01/05/2021

at the office of the County Treasurer.

The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None

8.  Reservation of easement by the City of Cottonwood Falls, Kansas in Municipal Warranty Deed recorded November 6, 1989 in Book L-91, Page 138.

9.  Easement recorded November 15, 2001 in Book L-132, Page 107.

10. Intentionally deleted (Proof of termination of lease required). Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.

11. Intentionally deleted (Proof of termination of lease required). Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Chase County Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.

12. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.

13. Intentionally deleted. Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.

14. Intentionally deleted. State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).

15. Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,
    Job No.:          001.220
    Dated:            August 12, 2020, last revised December 17, 2020
    Prepared by:      Gregory S. McVicar, PLS 1482, of Sherrill Associates, Inc. coordinated
    by Bureau Veritas
    Matters shown:    Overhead Electric Line crosses subject property without the benefit of a recorded easement

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site: Site 3 - 1218 Kansas Street, Downs, KS 67437
NCS No.: CCHI2002632MS
Local No.: 201003
Drafted: 01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1. Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2. Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3. Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4. Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5. Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6. Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7. Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~

   ~~General taxes for the year~~ ~~2019, in the amount of $9,903.92, PAID~~

   ~~FOR INFORMATIONAL PURPOSES ONLY:~~
   ~~Tax ID: 1-020040580~~
   ~~CAMA: 018-28-0-10-03-013.00-0~~
   ~~2019 Mill Levy: 206.998~~
   ~~2020 Assessed Value: $44,686.00~~
   ~~2019 General taxes include the following installments for special assessments:~~

   ~~Landfill $700.00~~

   ~~Special assessments, if any, levied by the City of Edwardsville which are not due and payable at the office of the County Treasurer.~~

   ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 3 - 1218 Kansas Street, Downs, KS 67437
NCS No.:         CCHI2002632MS
Local No.:       201003
Drafted:         01/05/2021

8.  Easement in favor of The Gas Service Company recorded November 18, 1957 in Book M23, Page 322; Agreement for Modification of Right of Way recorded February 26, 1975 in Book M36, Page 45; Assignment and  Assumption of Real Property Interests in favor of ONE Gas, Inc. recorded February 6, 2014 in Book RA41, Page 151; Assignment in favor of ONE Gas, Inc. recorded May 31, 2017 in Book RA43, Page 193.

9.  Right of Way Agreement in favor of The Gas Service Company recorded February 14, 1975 in Book M36, Page 41; Assignment in favor of Oneok, Inc. recorded January 26, 1998 in Book RA30, Page 54; Assignment and Assumption of Real Property Interests in favor of ONE Gas, Inc. recorded February 6, 2014 in Book RA41, Page 151.

10. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

11. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Downs Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

12. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

13. Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

14. Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 4 - 749 Blake Street, Edwardsville, KS 66111
NCS No.:         CCHI2002633MS
Local No.:       201005
Drafted:         01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1. Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2. Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3. Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4. Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5. Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6. Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7. Taxes for the year 2021 and subsequent years, a lien not yet due and payable. ~~General Taxes for the year 2020 and all subsequent years.~~

   ~~General taxes for the year 2019, in the amount of $13,988.36, PAID~~

   ~~FOR INFORMATIONAL PURPOSES ONLY:~~
   ~~Tax Code No.: 944102~~
   ~~2019 Mill Levy: .182691453~~
   ~~2019 Assessed Value: $76,820.00~~
   ~~2020 Assessed Value: $76,705.00~~
   ~~2019 General taxes include the following installments for special assessments: NONE~~

   ~~Assessments for 2019, in the amount of $0.00, included in 2019 general taxes.~~

   ~~Special assessments, if any, levied by the City of Edwardsville which are not due and payable at the office of the County Treasurer.~~

   ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: NONE~~

8. Easement granted to the City of Edwardsville, Kansas, filed in Book 3001, Page 112

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 4 - 749 Blake Street, Edwardsville, KS 66111
NCS No.:        CCHI2002633MS
Local No.:      201005
Drafted:        01/05/2021

9. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

10. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Parkway Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

11. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

12. Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

13. Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

14. Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

        Job No.:        003.220
        Dated:          July 8, 2020, last revised December 17, 2020
        Prepared by:    Chad R. Abbott, PS #1340, of Abbott Land Survey coordinated by Bureau Veritas
        Matters shown:
            a) Shed lies within 20' Utility Easement in Book 3001 Page 112 and over 15' Zoning Setback Line
            b) Intentionally deleted. ~~Intentionally deleted. OHE off adjoiner across subject property without benefit of a recorded easement~~
            c) Intentionally deleted. ~~Gas Meters and Sanitary Sewer Manholes along west and south property lines without benefit of recorded easements (unclear if these service property)~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 5 - 750 Blake Street, Edwardsville, KS 66111
NCS No.:       CCHI2002634MS
Local No.:     201006
Drafted:       01/05/2021

## SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1. Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I – Requirements are met.~~

2. Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3. Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4. Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5. Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6. Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7. Taxes for the year 2021 and subsequent years, a lien not yet due and payable. ~~General Taxes for the year 2020 and all subsequent years.~~

   ~~General taxes for the year 2019, in the amount of $13,988.36, PAID~~

   ~~FOR INFORMATIONAL PURPOSES ONLY:~~
   ~~Tax Code No.: 944101~~
   ~~2019 Mill Levy: 182.691~~
   ~~2020 Assessed Value: $76,205.00~~
   ~~2019 General taxes include the following installments for special assessments: None~~

   ~~Special assessments, if any, levied by the City of Edwardsville which are not due and payable at the office of the County Treasurer.~~

   ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None~~

8. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 5 - 750 Blake Street, Edwardsville, KS 66111
NCS No.:         CCHI2002634MS
Local No.:       201006
Drafted:         01/05/2021

9.  Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Edwardsville Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

10. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

11. Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

12. Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

13. Intentionally deleted. ~~Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,~~

     ~~Job No.:          004.220~~
     ~~Dated:           July 8, 2020~~
     ~~Prepared by:     Chad R. Abbott, PS #1340, of Abbott Land Survey coordinated by Bureau Veritas Matters shown:~~
         ~~a)   Business sign and lights over 15' zoning setback line~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 6 - 751 Blake Street, Edwardsville, KS 66111
NCS No.:         CCHI2002635MS
Local No.:       201007
Drafted:         01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.   Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.   Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.   Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.   Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.   Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.   Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.   Taxes for the year 2021 and subsequent years, a lien not yet due and payable. ~~General Taxes for the year 2020 and all subsequent years.~~

     ~~General taxes for the year 2019, in the amount of $27,087.88, PAID~~

     ~~FOR INFORMATIONAL PURPOSES ONLY:~~
     ~~Tax Code No.: 944104~~
     ~~2019 Mill Levy: 182.691~~
     ~~2020 Assessed Value: $148,304.00~~
     ~~2019 General taxes include the following installments for special assessments: None~~

     ~~Special assessments, if any, levied by the City of Edwardsville which are not due and payable at the office of the County Treasurer.~~

     ~~The following ordinance or resolution creating a district with the power to impose special assessments against the L~~and has been recorded in conformity with K.S.A. 40-1134: None

8.   Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:              Site 6 - 751 Blake Street, Edwardsville, KS 66111
NCS No.:           CCHI2002635MS
Local No.:         201007
Drafted:           01/05/2021

9. Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Edwardsville Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

10. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

11. Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

12. Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

13. Intentionally deleted. ~~Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,~~

~~Job No.:          005.220~~
~~Dated:           July 8, 2020~~
~~Prepared by:     Chad R. Abbott, PS #1340, of Abbott Land Survey coordinated by Bureau Veritas Matters shown:~~
   ~~a)  OHE across northerly portion of property without benefit of a recorded easement.~~
   ~~b)  PP (power pole) with US (underground conduit) and PP with ET on property without benefit of recorded easement~~
   ~~c)  Gas Valve on property without benefit of a recorded easement (unclear which property this services)~~
   ~~d)  Water Shed on conc. pad over south 15' zoning setback line~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:              Site 7 - 900 Country Club Lane, El Dorado, KS 67042
NCS No.:           CCHI2002636MS
Local No.:         201008
Drafted:           01/05/21

# Schedule B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.   Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.   Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.   Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.   Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.   Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.   Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.   Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~

     ~~General taxes for the year 2019, in the amount of $27,151.38, PAID~~

     ~~FOR INFORMATIONAL PURPOSES ONLY:~~
     ~~Tax Code No.: 007-4344110.~~
     ~~Alternate No.: 167-25-0-30-11-019-00-0.01~~
     ~~2019 Mill Levy: 173.885~~
     ~~2019 Assessed Value: $152,462.00 (The assessed value is subject to change.)~~
     ~~2019 General taxes include the following installments for special assessments: $686.52, PAID~~

     ~~Special assessments, if any, levied by the City of El Dorado which are not due and payable at the office of the County Treasurer.~~

     ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134:~~

     ~~Resolution No. 2335, a copy of which is recorded June 22, 2001 in Book 997, at Page 52; and Resolution No. 2322, a copy of which is recorded February 8, 2001 in Book 972, at Page 77; and Resolution for Upper Walnut Watershed Joint District No. 33 recorded October 27, 1959 in Book 236, at Page 13~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 7 - 900 Country Club Lane, El Dorado, KS 67042
NCS No.:        CCHI2002636MS
Local No.:      201008
Drafted:        01/05/21

8.      Right of Way Easement granted to Kansas Gas and Electric Company recorded February 26, 1953 in Misc. Book 191 at Page 42 and shown on the Survey prepared by Abbott Land Survey, Job No. 006.220, dated July , 2020, last revised December 17, 2020 ("El Dorado Survey").

9.      Petition, Resolution, and Certificate in connection with the Upper Walnut Watershed Joint District Number 33 of Butler and Chase Counties, Kansas, of which the real estate in question is a part, as evidenced by instruments of recorded October 27, 1959 in Misc. Book 236 at Page 13 and January 6, 1964 in Misc. Book 262 at Page 85.

10.     Utilities Easement granted to the City of El Dorado, Kansas recorded April 24, 1974 in Misc. Book 310 at Page 392 and shown on the El Dorado Survey.

11.     Terms and provisions of the Driveway and Easement Agreement between Beverly Enterprises-Kansas, Inc. and El Dorado Lodge #1698 recorded August 11, 1983 in Misc. Book 392 at Page 360 and shown on the El Dorado Survey.

12.     Intentionally deleted. ~~Mineral Deed, with Reservation Grant of an undivided 100% interest in the oil, gas and other minerals underlying said land contained in the recorded July 19, 2012 in Book 2013 at Page 10219, and all rights and easements thereunder by said holder of the oil, gas and other minerals or by any party claiming by, through, or under said holder. Affidavit of Non-Production recorded October 16, 2019 in Book 2019 at Page 8463~~.

13.     Intentionally deleted. ~~Encroachment of brick wall onto the property, according to the El Dorado Survey.~~

14.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

15.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and El Dorado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

16.     Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

17.     Intentionally deleted ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

18.     Intentionally deleted ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:              Site 7 - 900 Country Club Lane, El Dorado, KS 67042
NCS No.:           CCHI2002636MS
Local No.:         201008
Drafted:           01/05/21

19.    Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed
       by survey,
       Job No.:           006.220
       Dated:             July 7, 2020, last revised July 16, 2020
       Prepared by:       Chad R. Abbott, PS, #1340 for Abbott Land Survey, on behalf of Bureau Veritas
       Matters shown: a) Brick Wall crosses onto subject property without benefit of a known easement.

20.    Intentionally deleted. ~~Permanent Right-of-Way in favor of the City of El Dorado, Kansas,
       recorded August 11, 2020 in Book 2020 at Page 7130.~~

21.    Intentionally deleted. ~~Permanent Right-of-Way in favor of the City of El Dorado, Kansas,
       recorded August 11, 2020 in Book 2020 at Page 7131.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It
does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein,
nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment
must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 8 - 505 N. Main Street, Eskridge, KS 66423
NCS No.:       CCHI2002637MS
Local No.:     201009
Drafted:       01/05/21

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.   Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I—Requirements are met.~~

2.   Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.   Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.   Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.   Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.   Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.   Taxes for the year 2021 and subsequent years, a lien not yet due and payable. ~~The lien of real estate~~ taxes ~~or assessments imposed on the Title by a governmental authority due or payable November 1, 2020.~~

     ~~General taxes for the year 2019, in the amount of $14,783.82, PAID.~~

     ~~FOR INFORMATIONAL PURPOSES ONLY:~~
     ~~Tax Code No.: 03059~~
     ~~Alt No.: 243-05-0-20-01-005.00-0~~
     ~~20191 Levy: 179.453~~
     ~~2019 Assessed Value: $82,639.00 (The assessed value is subject to change.)~~
     ~~2019 General taxes include the following installments for special assessments, which are paid to date: $0.00 (special assessment value is subject to change)~~

8.   Intentionally deleted. ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None~~

     ~~Note: For your information, the policy, when issued, does not insure against loss or damage arising from special assessments by any district having power to impose them, if they are not due and payable at the office of the County Treasurer. Special assessments, if any, levied by the City of Eskridge, Kansas, which are not due and payable at the office of the County Treasurer.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 8 - 505 N. Main Street, Eskridge, KS 66423
NCS No.:         CCHI2002637MS
Local No.:       201009
Drafted:         01/05/21

9.    Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019 as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

10.   Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Eskridge Operator, LLC as Tenant, dated October 8, 2019 as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

11.   Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

12.   Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

13.   Intentionally deleted ~~Notice of Statutory Lien recorded August 22, 2019 at Book 240, page 120 between Eskridge Care & Rehabilitation Center and Kansas Department of Aging and Disability Services.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 12 - Spring Hill Care & Rehabilitation Center
NCS No.:        CCHI2002641MS
Local No.:      201013
Drafted:        01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.   Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.   Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.   Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.   Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.   Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.   Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.   Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~

     ~~General taxes for the year 2019, in the amount of $24,974.41, PAID~~

     ~~FOR INFORMATIONAL PURPOSES ONLY:~~
     ~~Tax Code No.: EF231514-4008~~
     ~~2019 Mill Levy: .147282000~~
     ~~2020 Assessed Value: $142,678.00~~
     ~~2019 General taxes include the following installments for special assessments: None~~

     ~~Special assessments, if any, levied by the City of Spring Hill which are not due and payable at the office of the~~
     ~~County Treasurer.~~

     ~~The following ordinance or resolution creating a district with the power to impose special assessments against the~~
     ~~Land has been recorded in conformity with K.S.A. 40-1134: None~~

8.   Sewer Line Easement and Temporary Construction Easement granted to the City of Spring Hill, filed in Misc. Book 170, Page 520.

9.   Easement granted to Continental Telephone Co. of Kansas, filed in Volume 884, Page 606.

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 9 - 210 Plaza Drive, Lansing, KS 66043
NCS No.:     CCHI2002638MS
Local No.:    201010
Drafted:       01/05/2021

## Schedule B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    ~~General taxes for the year 2019, in the amount of $17,176.88, PAID~~ Taxes for the year 2021 and subsequent years, a lien not yet due and payable

       ~~FOR INFORMATIONAL PURPOSES ONLY:~~
       ~~Tax Code No.: 12950~~
       ~~2019 Mill Levy: 148.104~~
       ~~2019 Assessed Value: $116,289.00~~
       ~~2019 General taxes include the following installments for special assessments: None~~

       ~~Special assessments, if any, levied by the City of Lansing which are not due and payable at the office of the County Treasurer.~~

       ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None~~

8.    Easement granted to Kansas City Cable Partners, filed in Book 663, Page 556.

9.    Intentionally deleted. ~~Terms and provisions of Cable Television Agreement filed in Book 663, Page 561.~~

10.   Right of Way Easement granted to LanDel Water District of Leavenworth County, Kansas, filed in Document No.2012R 11993.

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 9 - 210 Plaza Drive, Lansing, KS 66043
NCS No.:        CCHI2002638MS
Local No.:      201010
Drafted:        01/05/2021

11. Intentionally deleted. Utility Easements shown on the Plat of Holiday Hills. Ordinance No. 525: Vacating an Easement filed in Book 681, Page 844.

12. Intentionally deleted (Proof of termination of lease required). Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.

13. Intentionally deleted (Proof of termination of lease required). Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Lansing Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.

14. Intentionally deleted. Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.

15. Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.

16. Intentionally deleted. State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).

17. Intentionally deleted. Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

Job No.:        008.220
Dated:          Left Blank, last revised July 15, 2020
Prepared by:    Gregory S. McVicar, P.L.S, #1482 for Sherrill Associate, Inc., on behalf of Bureau Veritas
Matters shown:
          a)  Subject property obtains access through adjacent property without benefit of a known recorded easement.

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 10 - 1626 N 8th Street, Neodesha, KS 66757
NCS No.:        CCHI2002639MS
Local No.:      201011
Drafted:        01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.  Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I—Requirements are met.~~

2.  Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.  Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.  Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.  Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.  Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.  Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable November 1, 2020.~~

    ~~General taxes for the year 2019, in the amount of $13,499.66, PAID.~~

    ~~FOR INFORMATIONAL PURPOSES ONLY:~~
    ~~Tax Code No.:                    NDS1740~~
    ~~Alt No.:                         194 17 0 30 03 002 00 0 01~~

    ~~2019 Assessed Value: $65,043.00 (The assessed value is subject to change.)~~
    ~~2019 General taxes include the following installments for special assessments:  $0.00~~

    ~~The following ordinance or resolution creating a district with the power to impose special assessments against the~~

    ~~Land has been recorded in conformity with K.S.A. 40-1134:  None~~

    ~~Note:  For your information, the policy, when issued, does not insure against loss or damage arising from special assessments by any district having power to impose them, if they are not due and payable at the office of the County Treasurer. Special assessments, if any, levied by the City of Neodesha, Kansas, which are not due and payable at the office of the County Treasurer.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 10 - 1626 N 8th Street, Neodesha, KS 66757
NCS No.:         CCHI2002639MS
Local No.:       201011
Drafted:         01/05/2021

8.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

9.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Neodesha Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

10.    Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

11.    Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

13.    Intentionally deleted. ~~The following matters shown on the Survey prepared by Sherrill Associates, Inc., Job No. 19489-01, dated October 7, 2019 (the "Neodesha Survey"):~~
       ~~a.     Fence along southerly line lies within subject property by up to 1.4' x 249.9'~~
       ~~b.     Pedestrian access from abutter on the East through subject property without benefit of a known easement~~

13.    Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

       Job No.:        145063.20R000 009.220
       Dated:          August 12, 2020, last revised December 17, 2020
       Prepared by:    Gregory S. McVicar, LS, #1482 for Sherrill Associate, Inc., on behalf of Bureau Veritas
       Matters shown:
            a)   Fence along southerly line lies within subject property by up to 1.4' x 249.9';
            b)   Pedestrian access from abutter on the East through subject property without benefit of easement

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 11 - 1005 E Centennial Drive, Pittsburg, KS 66762
NCS No.:       CCHI2002640MS
Local No.:     201012
Drafted:       01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~

      ~~a)      General taxes for the year 2019, in the amount of $32,769.30, PAID~~

      ~~FOR INFORMATIONAL PURPOSES ONLY:~~
      ~~Tax Code No.: 209-32-0-40-1-007-00-0-01.~~
      ~~2019 Assessed Value: $209,744.00 (The assessed value is subject to change.)~~
      ~~2019 Mill Levy: 156.45400~~
      ~~2019 General taxes include the following installments for special assessments, which are paid to date: $0.00~~
      ~~(special assessments are subject to change)~~

      ~~Special assessments, if any, levied by the City of Pittsburg which are not due and payable at the office of the County Treasurer.~~

      ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: None~~

8.    An easement granted to Kansas Gas and Electric Company as described in the document recorded May 25, 1970 in Misc. Record 67 at Page 55.

9.    An easement granted to the City of Pittsburg, Kansas, a municipal corporation as described in the document recorded in Misc. Record 69 at Page 561.

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:                Site 11 - 1005 E Centennial Drive, Pittsburg, KS 66762
NCS No.:         CCHI2002640MS
Local No.:        201012
Drafted:           01/05/2021

10.    An easement granted to the City of Pittsburg, Kansas, a municipal corporation as described in the document recorded in Misc. Record 85 at Page 335.

11.    An easement granted to the City of Pittsburg, Kansas as described in the document recorded December 18, 2001 in Misc. Book 359 at Page 756.

12.    Assignment of Easement to One Gas, Inc., in the document recorded February 6, 2014 in Misc. Record 612 at Page 698.

13.    Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

14.    Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Pittsburg Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

15.    Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

16.    Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

17.    Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 12 - Spring Hill Care & Rehabilitation Center
NCS No.:      CCHI2002641MS
Local No.:     201013
Drafted:       01/05/2021

10.    Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

11.    Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Spring Hill Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

12.    Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

13.    Intentionally deleted. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

14.    Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 13 - 509 Grove Street, Wakefield, KS 67487
NCS No.:       CCHI2002642MS
Local No.:     201014
Drafted:       01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~
      ~~a)      General taxes for the year 2019, in the amount of $10,729.66, PAID~~

              ~~FOR INFORMATIONAL PURPOSES ONLY:~~
              ~~Tax Code No.: 173-06-0-10-14-001.01~~
              ~~2019 General taxes include the following installments for special assessments: None~~

      ~~b)      General taxes for the year 2019, in the amount of $5,671.88, PAID~~
              ~~FOR INFORMATIONAL PURPOSES ONLY:~~
              ~~Tax Code No.: 173-06-0-10-14-001~~
              ~~2019 General taxes include the following installments for special assessments: None~~

      ~~Special assessments, if any, levied by the City of Wakefield which are not due and payable at the office of the County Treasurer.~~
      ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134:~~

      ~~Resolution No. 143 establishing a water district for Waterworks Improvement Project 1986.~~
      ~~Ordinance No. 1041 for construction sanitary sewers in Sewer District No. 102-1972, designated Sewer Improvement Project A-1972~~
      ~~Ordinance No. 1027 establishing a Sanitary Sewer District No. 101-1972.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 13 - 509 Grove Street, Wakefield, KS 67487
NCS No.:       CCHI2002642MS
Local No.:     201014
Drafted:       01/05/2021

8.   Telephone Line Right-of-Way Easement granted to Twin Valley Telephone, Inc., dated February 22, 2006 and recorded February 24, 2006 in <u>Book CR078 at Page 302</u>. (~~Affects Tracts 1 & 2~~ Affects Tract 2)

9.   Intentionally deleted. ~~Ordinance No. 1034, vacating Fifth Street, between the west line of "G" Street and the east line of "H" Street; "H" Street between the North line of Fifth Street and the South line of Sixth Street; and the East/West and North/South alleys located in Block 36 of the Original Townsite all in the City of Wakefield, reserving to the City certain utility easements.~~

10.  Intentionally deleted. ~~Easements, if any, for public utilities, installed in, under or upon the vacated Fifth Street prior to the vacation thereof, and for which no notice appears in the Office of the Recorder/Register of Deeds.~~

11.  Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

12.  Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Lansing Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

13.  Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

14.  Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 13 - 509 Grove Street, Wakefield, KS 67487
NCS No.:       CCHI2002642MS
Local No.:     201014
Drafted:       01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~General Taxes for the year 2020 and all subsequent years.~~
      ~~a)      General taxes for the year 2019, in the amount of $10,729.66, PAID~~

           ~~FOR INFORMATIONAL PURPOSES ONLY:~~
           ~~Tax Code No.: 173-06-0-10-14-001.01~~
           ~~2019 General taxes include the following installments for special assessments: None~~

      ~~b)      General taxes for the year 2019, in the amount of $5,671.88, PAID~~
           ~~FOR INFORMATIONAL PURPOSES ONLY:~~
           ~~Tax Code No.: 173-06-0-10-14-001~~
           ~~2019 General taxes include the following installments for special assessments: None~~

      ~~Special assessments, if any, levied by the City of Wakefield which are not due and payable at the office of the County Treasurer.~~
      ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134:~~

      ~~Resolution No. 143 establishing a water district for Waterworks Improvement Project 1986.~~
      ~~Ordinance No. 1041 for construction sanitary sewers in Sewer District No. 102-1972, designated Sewer Improvement Project A-1972~~
      ~~Ordinance No. 1027 establishing a Sanitary Sewer District No. 101-1972.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:        Site 13 - 509 Grove Street, Wakefield, KS 67487
NCS No.:     CCHI2002642MS
Local No.:   201014
Drafted:     01/05/2021

8.   Telephone Line Right-of-Way Easement granted to Twin Valley Telephone, Inc., dated February 22, 2006 and recorded February 24, 2006 in Book CR078 at Page 302. (~~Affects Tracts 1 & 2~~ Affects Tract 2)

9.   Intentionally deleted. ~~Ordinance No. 1034, vacating Fifth Street, between the west line of "G" Street and the east line of "H" Street; "H" Street between the North line of Fifth Street and the South line of Sixth Street; and the East/West and North/South alleys located in Block 36 of the Original Townsite all in the City of Wakefield, reserving to the City certain utility easements.~~

10.  Intentionally deleted. ~~Easements, if any, for public utilities, installed in, under or upon the vacated Fifth Street prior to the vacation thereof, and for which no notice appears in the Office of the Recorder/Register of Deeds.~~

11.  Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

12.  Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Lansing Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

13.  Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

14.  Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:           Site 14 - 102 W Botkin Street, Wellington, KS 67152
NCS No.:        CCHI2002643MS
Local No.:      201015
Drafted:        01/05/2021

## SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable November 1, 2020.~~

      ~~General taxes for the year 2019, in the amount of $15,725.38, PAID.~~

      ~~FOR INFORMATIONAL PURPOSES ONLY:~~
      ~~Tax Code No.: W01535A~~
      ~~Alt No.: 096-156-23-0-00-00-002.00-0~~
      ~~2019 Assessed Value: $90,805.00 (The assessed value is subject to change.)~~
      ~~2019 General taxes include the following installments for special assessments, which are paid to date: $0.00 (Special Assessments are subject to change.)~~

8.    Intentionally deleted. ~~The following ordinance or resolution creating a district with the power to impose special assessments against the Land has been recorded in conformity with K.S.A. 40-1134: NONE~~

      ~~Note: For your information, the policy, when issued, does not insure against loss or damage arising from special assessments by any district having power to impose them, if they are not due and payable at the office of the County Treasurer.~~

      ~~Special assessments, if any, levied by the City of Wellington, which are not due and payable at the office of the County Treasurer.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:            Site 14 - 102 W Botkin Street, Wellington, KS 67152
NCS No.:         CCHI2002643MS
Local No.:       201015
Drafted:         01/05/2021

9.      Intentionally deleted. (See exception 11). ~~An oil and gas lease for the term therein provided with certain covenants, conditions and provisions, together with easements, if any, as set forth therein.~~

~~Dated:                          December 15, 2010~~
~~Lessor:                         John L. Larsen, II, Trustee of the John L. Larsen Trust~~
~~Lessee:                         L & B Land Services~~
~~Recording Date:                 January 21, 2011~~
~~Recording No:                   Book 824, Page 312.~~

10.     Affidavit re: Memorandum of Agreement between Targa Pipeline Mid-Continent Westok LLC and Sandridge Exploration and Production, LLC recorded April 1, 2016 in Book 975, Page 186.

11.     Intentionally deleted. ~~Affidavit of Non-Production recorded November 22, 2019 in Book 1054, Page 319.~~

12.     Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

13.     Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

14.     Intentionally deleted (see 17 below). ~~Encroachment of adjoiner's fence onto the property along the Eastern property line, according to the survey prepared by Abbott Land Survey, Job No. 140054, 19R000-007.220, dated September 6, 2019, last revised September 25, 2019.~~

15.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC, as Tenant, dated October 8, 2019 as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant and Oxford Financial, LLC, dated October 8, 2019.~~

16.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Wellington Operator, LLC, as Tenant, dated October 8, 2019 as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant and Oxford Financial, LLC, dated October 8, 2019.~~

17.     Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

        Job No.:         013.220
        Dated:           July 7, 2020, last revised December 17, 2020
        Prepared by:     Chad R. Abbott, PS, #1340 for Abbott Land Survey on behalf of Bureau Veritas
        Matters shown:
            a)   Fence crosses onto adjoining property, without benefit of recorded easement(s).

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:          Site 15 - 4007 E Lincoln Street, Wichita, KS 67218
NCS No.:     CCHI2002644MS
Local No.:    201016
Drafted:     01/05/2021

# SCHEDULE B

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and provisions of any lease or easement identified in Schedule A and the following matters:

1.    Intentionally deleted. ~~Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I - Requirements are met.~~

2.    Intentionally deleted. ~~Rights or claims of parties in possession not shown by the public records.~~

3.    Intentionally deleted. ~~Easements or claims of easements, not shown by the public records.~~

4.    Intentionally deleted. ~~Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.~~

5.    Intentionally deleted. ~~Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.~~

6.    Intentionally deleted. ~~Taxes or special assessments which are not shown as existing liens by the public records.~~

7.    Taxes for the year 2021 and subsequent years, a lien not yet due and payable ~~Real estate taxes for the year 2019 are shown paid in the original amount of $6,797.94, Tax Key No. C-30535, PIN 00175866, AIN 127260420100100A. NOTE: General Taxes - $6,791.23 Special Taxes - $6.71.~~

~~Real estate taxes for the year 2019 are shown paid in the original amount of $112.58, Tax Key No. C-30539, PIN 00175867, AIN 127260420100100B. NOTE: General Taxes - $105.87 Special Taxes - $6.71.~~

~~Real estate taxes for the year 2019 are shown paid in the original amount of $105.83, Tax Key No. C-14202-0002, PIN 00160052, AIN 127260420101400. NOTE: General Taxes - $99.12 Special Taxes - $6.71.~~

~~Real estate taxes for the year 2018 are shown paid in the original amount of $1,123.10, Tax Key C-14202-002A, PIN 00160054, AIN 127260420100100C. NOTE: General Taxes - $1,116.39 Special Taxes - $6.71.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:              Site 15 - 4007 E Lincoln Street, Wichita, KS 67218
NCS No.:        CCHI2002644MS
Local No.:       201016
Drafted:         01/05/2021

8.      Restrictive Covenants but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

Recording Date:              September 13, 1957
Recording No:                Book 403, Page 560.

Amendment to Restrictive Covenants filed January 3, 1962 in Misc. Book 493, Page 583.

9.      Easement (for sewer purposes) in favor of the City of Wichita recorded in Misc. Book 466 Page 560. (As to Tract 1)

10.     Easement (for sewer purposes) in favor of the City of Wichita recorded in Misc. Book 466 Page 561. (As to Tracts 1 and 2)

11.     Affidavit by employee of Kansas Gas and Electric Company claiming right of way over a portion of subject property recorded on Film 376 Page 793, as amended by Correction of Affidavit recorded on Film 808 Page 192

12.     Affidavit by employee of Kansas Gas and Electric Company claiming right of way over a portion of subject property recorded on Film 398 Page 313.

13.     Affidavit by employee of Kansas Gas and Electric Company claiming right of way over a portion of subject property recorded on Film 405 Page 1480, as amended by Correction of Affidavit recorded on Film 793 Page 1525, and further amended by Correction of Affidavit recorded on Film 808 Page 193.

14.     Easements and Drainage Easement, shown on the recorded plat of Mount St. Mary's Addition, filed February 6, 1956, in Plat Drawer M-1 1-17.

15.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Master Lease by and between Coronado 15, LLC as Landlord and Coronado Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Financial, LLC, dated October 8, 2019.~~

16.     Intentionally deleted (Proof of termination of lease required). ~~Unrecorded Sublease by and between Coronado Operator, LLC as Landlord and Wichita Operator, LLC as Tenant, dated October 8, 2019, as affected by the unrecorded Subordination and Attornment Agreement made by and among Landlord, Tenant, and Oxford Finance, LLC, dated October 8, 2019.~~

17.     Intentionally deleted. ~~Rights of parties in possession of portions of the premises in question, under oral tenancies, written leases, perpetual care agreements, life contracts or any other agreement, written or oral, by which said parties are granted any estate in the premises or any right to occupy a portion thereof.~~

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Site:               Site 15 - 4007 E Lincoln Street, Wichita, KS 67218
NCS No.:        CCHI2002644MS
Local No.:      201016
Drafted:        01/05/2021

18.     Rights of tenants, as tenants only, with no options to purchase or rights of first refusal, under unrecorded, written leases as of the date of this policy. ~~Tenancy rights, either as month to month or by virtue of written leases, of persons now in possession of any part of the Land.~~

19.     Intentionally deleted. ~~State court judgments, state tax liens, and federal tax liens, if any, against the party(ies) to be insured as owner(s).~~

20.     Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

      Job No.:            014.220
      Dated:             July 7, 2020, last revised December 10, 2020
      Prepared by:      Chad R. Abbott, PS, #1340 for Abbott Land Survey on behalf of Bureau Veritas
      Matters shown:
         a)  Fence crosses onto adjoining property, without benefit of recorded easement(s);
         b)  Concrete crosses onto adjoining property without benefit of recorded easement(s).

This is a PRO FORMA POLICY furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)


SCHEDULE 5.7(b)

Waivers of Citations


[Schedule to be provided and agreed upon by Buyer and Seller
PRIOR to the expiration of the Due Diligence Period.]

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)


SCHEDULE 5.11

Schedule of Environmental Reports


Coronado Portfolio: Phase I Environmental Site Assessment Reports prepared by EMG, each dated on or about September 26, 2019, and identified as EMG Project Numbers 140206.19R000-001.051 through 140206.19R000-015.051, copies of which have been previously provided to Purchaser.

Arrowhead: Phase I Environmental Site Assessment of Arrowhead Nursing Home prepared by Environmental Consultants Associates, Inc., dated as of August 5, 2003, and identified as Project Number: 070503, a copy of which has been previously provided to Purchaser.

PURCHASE AND SALE AGREEMENT
(*Mission – KS/GA Portfolio*)

SCHEDULE 5.11
(cont.)

1.  Phase I Environmental Site Assessment (1626 North 8th Street, Neodesha, Kansas, ETS Project No. 20-0500G) dated August 19, 2020

2.  Phase I Environmental Site Assessment (1005 East Centennial Drive, Pittsburg, Kansas, ETS Project No. 20-0500H) dated August 19, 2020

3.  Phase I Environmental Site Assessment (215 East Wilson Avenue, Spring Hill, Kansas, ETS Project No. 20-0500B) dated August 18, 2020

4.  Phase I Environmental Site Assessment (509 Grove Street, Wakefield, Kansas, ETS Project No. 20-0500O) dated August 19, 2020

5.  Phase I Environmental Site Assessment (102 West Botkin Street, Wellington, Kansas, ETS Project No. 20-0500K) dated August 19, 2020

6.  Phase I Environmental Site Assessment (4007 East Lincoln Street, Wichita, Kansas, ETS Project No. 20-0500L) dated August 19, 2020

7.  Phase I Environmental Site Assessment (611 31st Street, Wilson, Kansas, ETS Project No. 20- 0500N) dated August 19, 2020

8.  Phase I Environmental Site Assessment (749 Blake Street, Edwardsville, Kansas, ETS Project No. 20-0500E) dated August 18, 2020

9.  Phase I Environmental Site Assessment (1218 Kansas Street, Downs, Kansas, ETS Project No. 20-0500M) dated August 19, 2020

10. Phase I Environmental Site Assessment (900 Country Club Lane, El Dorado, Kansas, ETS Project No. 20-0500J) dated August 19, 2020

11. Phase I Environmental Site Assessment (505 North Main Street, Eskridge, Kansas, ETS Project No. 20-0500F) dated August 19, 2020

12. Phase I Environmental Site Assessment (210 Plaza Lane, Lansing, Kansas, ETS Project No. 20-0500A) dated August 17, 2020

13. Phase I Environmental Site Assessment (750 Blake Street, Edwardsville, Kansas, ETS Project No. 20-0500D) dated August 18, 2020

14. Phase I Environmental Site Assessment (751 Blake Street, Edwardsville, Kansas, ETS Project No. 20-0500C) dated August 19, 2020

15. Phase I Environmental Site Assessment (239 Arrowhead Boulevard, Jonesboro, Georgia, ETS Project No. 20-0500P) dated August 19, 2020

16. Site Assessment (612 Walnut Street, Cottonwood Falls, Kansas, ETS Project No. 20-0500I) dated August 19, 2020

## SCHEDULE 5.13

<u>Litigation</u>

Seller to provide information to Buyer for review
promptly after the execution of this Agreement

140109.00416/126156287v.12

SCHEDULE 5.20

<u>Insurance Policies</u>

Seller to provide information to Buyer for review
promptly after the execution of this Agreement

# EXHIBIT B

## MASTER LEASE AGREEMENT

by and among

**MICH 16 CHASE LLC, MICH 16 DOWNS LLC, MICH 16 EDWARDSVILLE LLC, MICH 16 EL DORADO LLC, MICH 16 ESKRIDGELLC, MICH 16 KAW LLC, MICH 16 LANSING LLC, MICH 16 NEODESHA LLC, MICH 16 PARKWAY LLC, MICH 16 PITTSBURG LLC, MICH 16 SPRING HILL LLC, MICH 16 WAKEFIELD LLC, MICH 16 WELLINGTON LLC, MICH 16 LINCOLN LLC, and MICH 16 WILSON LLC,** each a Kansas limited liability company, and **MICH 16 ARROWHEAD LLC,** a Georgia limited liability company,

as Lessors

**and**

**CORONADO OPERATOR, LLC,**

a Florida limited liability company,

as Lessee

April 29, 2022

## MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT (this "**Lease**") is made and entered into as of April 29, 2022 (the "**Effective Date**") by and among the Lessors which appear on the signature pages to this Lease, each a Delaware limited liability company (each a "**Lessor**", and collectively, the "**Lessors**"), and Coronado Operator, LLC, a Florida limited liability company ("**Lessee**"). The Lessors and Lessee are sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

R E C I T A L S :

A.     The Lessors own fee simple title in and to those certain parcels of real estate and the skilled nursing facilities which are more particularly described on **Exhibit A** attached hereto and made a part hereof (collectively, the "**Demised Premises**"), and the furnishings, furniture, equipment and fixtures used in or about the Demised Premises ("**Personal Property**").

B.     Lessors desire to lease the Demised Premises and Personal Property to Lessee and Lessee desires to lease the Demised Premises and Personal Property from Lessors.

C.     On the Commencement Date, the Lessee will sublease the Demised Premises to the Subtenants.

D.     The Parties have agreed to the terms and conditions of this Lease.

NOW THEREFORE, in consideration of the above Recitals which are incorporated herein by this reference and of the mutual covenants, agreements and undertakings hereinafter set forth, it is agreed that the use and occupancy of the Demised Premises, and the use of the Personal Property shall be subject to and in accordance with the terms, conditions and provisions of this Lease.

## ARTICLE I -    DEFINITIONS

1.1     The terms defined in this Article I shall, for all purposes of this Lease and all agreements supplemental hereto, have the meaning herein specified.

(a)     "**Facility**" and "**Facilities**" shall mean any and all skilled nursing facilities as more particularly described on **Exhibit A**.

(b)     "**Facility Loan**" or "**Facility Loans**" shall mean certain mortgage loans by a Lender secured by a Facility Mortgage and/or mezzanine and/or other loans which may be secured by interests in the Lessors'.

(c)     "**Facility Mortgage**" or "**Facility Mortgages**" shall mean, in connection with a Facility Loan, the mortgage(s), deed(s) of trust or similar document(s) creating a lien on a Facility and/or the mezzanine and/or other loan documents in connection therewith listed on Schedule 1.1(c) and all renewals, modifications, consolidations, replacements or restatements thereof delivered to Lessee from time to time during the Term pursuant to and in accordance with Article XXVI.

(d)     "**Lender**" shall mean the mortgage lenders and mezzanine lenders now and hereafter (and their successors and assigns), including, without limitation, Oxford Finance LLC, a Delaware limited liability company, and any other lender with a mortgage insured by HUD or otherwise that, from time to time, in Lessors' sole discretion, provide Facility Loans to the Lessors, which Facility Loans are secured by Facility

Mortgages on one or more Facilities or by equity pledges of interests in the Lessors or in certain of the direct and indirect owners of Lessors.

(e)    "**Loan Document**" or "**Loan Documents**" shall mean the loan documents listed on Schedule 1.1(c) attached hereto and incorporated herein and all renewals, modifications, consolidations, replacements or restatements thereof, and any other loan, credit, financing documents and refinancing documents now or hereafter affecting the Demised Premises and delivered to Lessee from time to time during the Term pursuant to and in accordance with Article XXVI.

(f)    "**Subtenants**" shall mean the individual operators of each of the Facilities as set forth on Schedule 1.1(f).

(g)    All other terms shall be as defined in other sections of this Lease.

ARTICLE II -   DEMISED PREMISES AND PERSONAL PROPERTY

2.1    Lessors, for and in consideration of the rents, covenants and agreements hereinafter reserved, mentioned and contained on the part of the Lessee, their successors and assigns, to be paid, kept and performed, do hereby lease unto Lessee the Demised Premises together with the Personal Property to be used in and upon the Demised Premises for the term hereinafter specified, for use and operation therein and thereon of skilled nursing facilities, in substantial compliance with all the rules and regulations and minimum standards applicable thereto, as prescribed by the State in which the Facilities are located and such other governmental authorities having jurisdiction thereof.

2.2    On the Commencement Date, Lessee will sublease each of the Facilities to the Subtenants pursuant to subleases to be approved in writing by Lessors in advance prior to the Commencement Date (each a "**Sublease**" and collectively the "**Subleases**"). Lessee hereby collaterally assigns the Subleases to Lessors as security for Lessee's performance under this Lease. Lessee shall not amend or modify the terms of any Sublease without the prior written consent of Lessors.  Each Subtenant under a Sublease has agreed in the Sublease that it assumes and agrees to be bound by and perform each and every obligation of the Lessee under this Lease. Lessee agrees that a default by a Subtenant under a Sublease shall be deemed a default by Lessee under this Lease which, if not cured within any applicable cure or grace period shall constitute an Event of Default and entitle Lessors to exercise any and all remedies provided by this Lease. Any Notice given by Lessors to Lessee shall be deemed a Notice given to each Subtenant.  All rent payable to Lessee by the Subtenants under the Subleases shall, upon Lessors' demand when an Event of Default has occurred and is continuing, be paid directly to Lessors or the Lender.  As security for the obligations of Lessee under this Lease, Lessee hereby collaterally assigns to Lessors all right, title and interest of Lessee under the Subleases.

ARTICLE III -  TERM OF LEASE

3.1    The term of this Lease (the "**Term**") shall begin and be effective as of the date set forth on the Commencement Date Rider, attached hereto as **Exhibit B** and made a part hereof ("**Commencement Date**"), and shall expire on April 30, 2032 (the "**Initial Term**"), unless sooner terminated or extended as hereinafter provided.

3.2    Following the Initial Term, and any subsequent extension thereto as applicable, the term of this Lease may be extended by Lessee for up to two (2) additional terms of five (5) years each (each an "**Extension**"), up to a total term of twenty (20) years from the Commencement Date.  In order to exercise each Extension, Lessee must provide written notice (an "**Extension Notice**") to Lessors at least one year and not more than eighteen (18) months prior to the expiration of the current Term, indicating an Extension shall occur, and there must be no Event of Default hereunder from the time the Extension Notice is given until the time that the Extension becomes effective that is not timely and fully cured by Lessee.  In the event an

Extension Notice is not properly provided in accordance with the foregoing, or in any event at the conclusion of the maximum Term of twenty (20) years, this Lease shall terminate upon expiration of the term then in effect and shall not be further extended except pursuant to a separate writing between Lessors and Lessee.

ARTICLE IV -  RENT

4.1             Lessee shall pay to Lessors, or as Lessors shall direct, without demand, deduction or offset for any reason whatsoever except as herein specifically provided, as fixed annual base rent ("**Base Rent**") for the Demised Premises and the Personal Property over and above all other and additional payments to be made by Lessee as provided in this Lease, the amount of FIVE MILLION AND NO/100 DOLLARS ($5,000,000), which shall be paid in twelve (12) equal monthly installments.  Beginning on the first (1st) anniversary of the Commencement Date and on each anniversary thereafter, the Base Rent shall be increased by the amount obtained when multiplying two- and one-half percent (2.5%) of the total annual Base Rent with respect to the prior year (the "**Escalator**").  All payments of Rent (as hereinafter defined), together with any tax and insurance deposits provided for in this Lease, shall be paid in advance on the first day of each month. Unless otherwise notified in writing, Lessors direct Lessee to deliver all rental payments payable to Lessors, as directed by Lessors.  A schedule of rent is attached hereto as Schedule 4.1.

4.2      This Lease is and shall be deemed and construed to be an absolute triple net lease and the Base Rent specified herein shall be net to Lessors in each year during the Term of this Lease. The Lessee shall pay all costs, expenses and obligations (ordinary and extraordinary) of every kind whatsoever relating to the Demised Premises and the Personal Property which may arise or become due during the Term of this Lease (the "**Additional Rent**"), including, but not limited to, the payment of property taxes as provided in Articles VI and VII of this Lease, the maintenance of insurance policies as provided in Article IX of this Lease, maintenance and repairs to the Demised Premises and each Facility required by Lender or to maintain the same in the same condition as of the commencement of the Lease excepting reasonable wear and tear as provided in Article XI of this Lease, and, in the event of an Event of Default under Section 19.1(a) below, payment to any parties providing goods and/or services with respect to operation of any Facility.  Lessee hereby agrees to indemnify, defend and hold harmless Lessors against any such costs, expenses and obligations.

4.3      All rental payments, together with all tax and insurance deposits provided for in this Lease shall be paid on or prior to the first (1st) day of each month.  Unless otherwise notified in writing rent should be payable by ACH or wire transfer to the account set forth on Schedule 4.1 or otherwise in accordance with the revised instructions of Lessors.

4.4      Except as otherwise specifically provided herein, no reduction in the number of licensed beds shall entitle Lessee to any reduction or adjustment of the Base Rent or Additional Rent (collectively, the "**Rent**") payable hereunder, which shall be and continue to be payable by Lessee in the full amount set forth herein notwithstanding any such reduction in the number of licensed beds.

ARTICLE V -  LATE CHARGES

5.1      If: (a) payment of any sums required to be paid or deposited by Lessee to Lessors under this Lease, or (b) payments made by Lessors under any provision hereof for which Lessors are entitled to reimbursement by Lessee, shall become overdue beyond five (5) calendar days after the date on which they are due and payable as set forth in this Lease, a late charge equal to the greater of five percent (5%) per month or the default rate charged by Lender on the sums so overdue shall be immediately due and payable to Lessors and said late charges shall be payable on the first (1st) day of the month next succeeding the month during which Lessors give notice of the incurrence of a late charge to Lessee.  In addition, Lessee shall be liable to Lessors for any late charges due under the Loan Documents, which accrue as a result of (a) the Lessee's failure to make payment of any sums required to be paid or deposited by Lessee to Lessors under this Lease; or (b) payments made by Lessors under any provision hereof for which Lessors are entitled to reimbursement by

3

Lessee. Any such late charges shall not be deemed to be a penalty but shall be deemed to be liquidated damages because of the impossibility of computing the actual amount of damages in advance. If nonpayment of any late charges shall occur, Lessors shall have, in addition to all other rights and remedies, all the rights and remedies provided for herein and by law in the case of nonpayment of Rent. The Parties further agree that such late charge is rent and not interest and such assessment does not constitute a lender or borrower/creditor relationship between Lessors and Lessee. Except as otherwise provided in this Article V, no failure by Lessors to insist upon the strict performance by Lessee of Lessee's obligations to pay late charges shall constitute a waiver by Lessors of their rights to enforce the provisions of this Article V in any instance thereafter occurring, and nothing contained herein shall be deemed to be a waiver of or limitation on the right of Lessors from declaring an Event of Default, as defined herein because of Lessee's failure to make any payment due hereunder when such payment was due.

## ARTICLE VI - PAYMENT OF TAXES AND ASSESSMENTS

6.1     Lessee will pay as Additional Rent before any fine, penalty, interest or cost may be added thereto for the nonpayment thereof, all taxes (except taxes for which Lessee shall make deposits with Lessors in accordance with the provisions of Article VII of this Lease), assessments, license and permit fees and other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever which during the Term of this Lease may have been, or may be assessed, levied, confirmed, imposed upon or become due and payable out of or in respect of, or become a lien on the Demised Premises and/or Personal Property or any part thereof (collectively, "**Taxes and Assessments**"). Lessors shall provide to Lessee copies of any bills received by Lessors for Taxes and Assessments. Except for taxes for which Lessee shall make deposits with Lessors or Lender in accordance with the provisions of Article VII, not later than ten (10) days prior to the due date for such Taxes and Assessments or five (5) days following their receipt of the bill therefore (whichever is later), Lessee shall pay to Lessors the amount of Taxes and Assessments due.

6.2     Any Taxes and Assessments relating to a fiscal period of any authority, a part of which is included within the Term of this Lease and a part of which is included in a period of time before or after the Term of this Lease, shall be adjusted pro rata between Lessors and Lessee as of the commencement and termination of the Term and each party shall be responsible for its pro rata share of any such Taxes and Assessments.

6.3     Reserved.

6.4     Lessee shall have the right to contest the amount or validity, in whole or in part, of any Taxes and Assessments by appropriate proceedings diligently conducted in good faith and Lessors shall cooperate with Lessee in connection therewith, but only after payment of such Taxes and Assessments; provided that, Lessee may postpone or defer such payment if all of the following conditions are met:

(a)     Neither the Demised Premises, the Personal Property any material license or certification nor any part thereof would by reason of such postponement or deferment be in danger of being forfeited or lost;

(b)     Lessee shall have deposited with Lessors, to be held in trust, cash or securities in an amount (against which Lessee shall receive a credit equal to the amount pertaining to the period such Taxes and Assessments are being contested held by Lessors pursuant to the terms of Section 7.1 hereof) reasonably satisfactory to Lessors but in no event less than the amount required by Lender, or if there is then no Lender encumbering the Demised Premises, then the full amount of such Taxes and Assessments, including the amount of any interest thereon and penalties in connection with the nonpayment thereof, which at such time shall be actually due and payable, and such additional amounts from time to time as may be necessary to keep on deposit at all times an amount equal to the amount required by Lender, or if there are no Loan Documents, then an

4

amount equal to the full amount of such Taxes and Assessments at any time actually due and payable, together with all interest, costs and penalties in connection therewith and all charges that may or might be assessed against or become a charge on the Demised Premises or any part thereof in such proceedings.

(c)    Lessee shall comply with Lender's requirements for a tax contest as if Lessee were the mortgagee or borrower under the Loan Documents.  If held by Lessors, the cash so deposited shall be deposited by Lessors in an interest bearing account and the cash or securities so deposited shall be held by Lessors until the final resolution of such contest and any lien filed against the Demised Premises shall have been released and discharged, and shall thereupon be returned to the Lessee, plus any accrued interest, less the amount of any loss, cost, damage and reasonable expense (including, without limitation, attorneys' fees and investment expenses) that Lender or Lessors may sustain in connection with the Taxes and Assessments so contested.  In the event Lender holds the sum required to be deposited by this <u>Section 6.4</u>, Lessors shall only pay Lessee interest if Lender pays Lessors' interest and such interest shall be paid to Lessee at the same interest rate and with the same deductions as paid to Lessors by Lender.

6.5    Upon the termination of any such proceedings, Lessee shall pay the amount of such Taxes and Assessments or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees, interest, penalties, or other liabilities in connection therewith, and such payment, at Lessee's request, shall be made by Lessors out of the amount deposited with respect to such Taxes and Assessments and accrued interest as aforesaid.  In the event such amount is insufficient, then the balance due shall be promptly paid by Lessee.  In the event the amount of funds deposited by Lessee with respect to any such contested Taxes and Assessments plus any accrued interest thereon is in excess of such Taxes and Assessments due as finally determined in such proceeding (including any costs, fees, interest, penalties or other liabilities in connection therewith), then such excess funds shall be promptly returned to Lessee by Lessors.

6.6    Lessors shall not be required to join in any proceedings referred to in this Article VI, unless the provisions of any law, rule or regulation at the time in effect shall require that such proceedings be brought by or in the name of Lessors in which event Lessors shall join in such proceedings or permit the same to be brought in their name and Lessee shall pay for all costs in connection therewith.  Lessors shall not ultimately be subjected to any liability for the payment of any costs or expenses in connection with any such proceedings, and Lessee will indemnify, defend and save harmless Lessors from any such costs and expenses, including, without limitation, reasonable attorneys' fees, as a result of such proceedings.  Lessee shall be entitled to any refund of any real estate taxes and penalties or interest thereon whether received directly or received by Lessors but previously reimbursed in full by Lessee.  Lessors agree that they will reasonably assist Lessee to provide any necessary information and execute any necessary documents in connection with proceedings referred to in this Article VI.

6.7    In the event that Lessors determine in their reasonable judgment, that they are not being adequately represented by Lessee's counsel in any proceedings referred to in this Article VI, Lessors may upon ten (10) days prior written notice to Lessee, obtain separate counsel to represent it in such action.  In such event, the cost of such counsel shall be paid by Lessors.  In the event that Lessors determine, in their reasonable judgment, that Lessee has abandoned any contest referred to in this Article VI or that Lessee is not vigorously pursuing any such contest with due diligence, Lessors may, upon ten (10) days' prior written notice to Lessee, if the Taxes and Assessments so contested by Lessee have not theretofore been paid, pay such Taxes and Assessments from the amounts deposited by Lessee pursuant to the terms of <u>Section 6.4</u> above.

6.8    If any profits or revenue tax shall be levied, assessed or imposed upon the income, profits or revenue arising from the Rent payable hereunder, partially or totally in lieu of or as a substitute for real estate taxes imposed upon the Demised Premises or Personal Property, then Lessee shall be responsible for the payment of such tax; provided, however, and for the avoidance of doubt, income taxes of Lessors are specifically excluded from the foregoing.

ARTICLE VII - TAX, INSURANCE AND REPLACEMENT RESERVE DEPOSITS

7.1     Lessee will make an initial (on the Commencement Date) and monthly real estate tax deposits with Lessors, in an amount equal to one twelfth (1/12th) of the actual annual real estate taxes levied against the Demised Premises, or if such amount is not yet specified then one twelfth (1/12th) of one hundred five percent (105%) of the annual real estate taxes levied against the Demised Premises for the previous year. Deposits shall be due and payable on the first (1st) day of each month as Additional Rent. The deposits shall be held by Lessors or Lender and used to pay the real estate taxes as they become due and payable. Deposits shall not be kept separate and apart from any other funds of Lessors or Lender. If the amount of Lessee's payments as made under this Article VII shall be less than the total amount due of the real estate taxes, then Lessee shall pay to Lessors the amount necessary to make up the deficiency in their pro rata share in the initial year of the Term of this Lease and thereafter shall pay the full deficiency no later than ten (10) days prior to the due date of such tax bill. In the event that Lessee has paid all sums due under this Section 7.1 and Lessors or Lender fail to pay the real estate taxes when due, Lessors or Lender shall be solely responsible for any late charges or loss which is a result of their failure to make timely payment hereunder. Not later than five (5) days following their receipt thereof, Lessee shall provide to Lessors copies of any bills received by it for Taxes and Assessments. Within five (5) days of any direct payment by Lessee of the Taxes and Assessments, a copy of the paid tax bill shall be delivered to Lessors.

7.2     Notwithstanding anything to the contrary contained herein, if Lessors are required under a HUD loan or by a HUD lender to make monthly deposits for insurance premiums and, except for this Lease, Lessors would actually be making such payments, or if Lessee does not pay in full annual insurance premiums in advance or pay pursuant to a premium payment installment plan, then Lessee will make monthly deposits for insurance premiums with Lessors, in an amount equal one twelfth (1/12th) of the insurance premiums, or such applicable amount required by HUD or a Lender. The deposits, if applicable, for insurance deposits, shall be due and payable on the first (1st) day of each month as Additional Rent. Not later than five (5) days following their receipt thereof, Lessors shall provide to Lessee copies of any insurance bills received by it, if not paid by directly by Lessee.

7.3     Lessee will spend at least the amount of $400 per licensed bed for each lease year for Facilities' capital expenditures and replacements ("**Capex**"). To the extent that Lessee fails to make such expenditures, then any balance shall be funded into a Capex reserve account.  Lessee shall be permitted to draw against the reserve account upon written notice to the Lessors specifying in detail the use of funds.  To the extent required by HUD or the Lender, Lessee will make monthly deposits for replacement reserves with Lessors, in the amount required by HUD or the Lender.  The deposit for replacement reserves shall be due and payable on the first (1st) day of each month as Additional Rent. For the avoidance of doubt, Lessee can use the Capex for, inter alia, alterations, renovations, capital repairs and replacements to the Facilities, including without limitation any of the following: replacement of furniture, fixtures and equipment, including refrigerators, ranges, major appliances, bathroom fixtures, doors (exterior and interior), central air conditioning and heating systems (including cooling towers, water chilling units, furnaces, boilers and fuel storage tanks) and major replacement of siding; major roof replacements, including major replacements of gutters, downspouts, eaves and soffits; major capital repairs and replacements of plumbing and sanitary systems; overhaul of elevator systems; major repaving, resurfacing and sealcoating of sidewalks, parking lots and driveways; repainting of entire building exterior; but excluding major alterations, renovations, additions (consisting of expansions of any Facility, including construction of a new wing or a new story on any Facility), normal maintenance and repairs.

7.4     All amounts required to be deposited pursuant to this Article VII shall be held for the benefit of Lessee for the purposes set forth herein; provided that upon the occurrence of an Event of Default under Section 19.1(a) hereof, Lessors may elect in their discretion to apply such amounts to obligations of Lessee under this Lease, in Lessors' discretion.

ARTICLE VIII -                OCCUPANCY

8.1     During the Term of this Lease, the Demised Premises shall be used and occupied by Lessee and Subtenants for and as skilled nursing facilities, and for no other purpose without Lessors' written consent in their sole discretion; provided that in the case of uses ancillary to operation of the Demised Premises as skilled nursing facilities, such consent shall not be unreasonably withheld, conditioned or delayed. Subject to the terms of Article XX hereof, Lessee shall at all times during the Term maintain in good standing and full force a probationary or non-probationary license (the "**License**") issued by the Kansas Department for Aging and Disability Services or the Georgia Department of Community Health, as applicable to each individual Facility (collectively "**DOH**"), and any other governmental agencies permitting the operation on the Demised Premises as skilled nursing facilities.

8.2     Lessee will not suffer any act to be done or any condition to exist on the Demised Premises which may be dangerous to the safety of others or which may, in law, constitute a public or private nuisance or which may void or make voidable any insurance then in force on the Demised Premises.

8.3     Upon termination of this Lease for any reason, Lessee will return to Lessors the Demised Premises in substantially the same condition as existed on the Commencement Date, reasonable wear and tear and damage by Casualty excepted, and licensed by the DOH and by any governmental agencies having jurisdiction over the Demised Premises as skilled nursing facilities with unrestricted licenses in full force and good standing for no less than the number of skilled and/or intermediate licensed beds as identified on Schedule 8.3. Except as otherwise specifically provided herein, no reduction in the number of licensed beds shall entitle Lessee to any reduction or adjustment of the Rent payable hereunder, which shall be and continue to be payable by Lessee in the full amount set forth herein notwithstanding any such reduction in the number of licensed beds. Lessee shall, within five (5) days following their receipt thereof, provide Lessors with a copy of any notice from the DOH or any federal, state or municipal governmental agency or authority regarding any reduction in the number of licensed beds and Lessors shall have the right to contest, by appropriate legal or administrative proceedings, any such reduction.

8.4     During the Term of this Lease, Lessee shall only use the Demised Premises in accordance with Environmental Laws (as hereinafter defined) and shall not use nor permit the Demised Premises to be used for the treatment, storage or disposal of any Hazardous Substances (as hereinafter defined) nor for any purpose involving the use of the Hazardous Substances; provided, however, that Lessee may use in and store at the Facilities such materials and substances as are customarily used in nursing homes (including those that are included within the definition of Hazardous Substances), but only in such quantities as are reasonably necessary for the routine business operation of each Facility. For purposes hereof "**Hazardous Substances**" shall mean any toxic or hazardous waste or pollutants, or substances, including, without limitation, asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances" or "Toxic Substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*, "Hazardous Materials" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802 *et seq.*, "Hazardous Waste" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901*et seq.*, any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061*et. seq.*, any "Toxic Pollutant" under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as amended, any "Hazardous Air Pollutant" under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws. "**Environmental Laws**" as used in this Lease means all federal, state and local environmental, health, or safety laws or regulations applicable to the Demised Premises or the Facilities, now or hereafter enacted. Lessee hereby agrees to indemnify, defend and hold Lessors harmless from and against, and shall reimburse Lessors for, any loss, claim, liability, damages, injunctive relief, injuries to persons, property or natural resources, costs, expense, action and causes of action in connection with the use, generation, treatment, storage, release or disposal of Hazardous Substances at or from the Demised Premises during the Term hereof, including, without limitation, the cost of any required or necessary repair, cleanup or detoxification and the preparation of any

7

closure or other required work to be performed, to the full extent that such action is attributable, directly or indirectly, to the use, generation, treatment, storage, release or disposal of Hazardous Substances on the Demised Premises during the Term.

8.5      In no event shall Lessee relocate any of the licensed beds, or certificate of need rights, if applicable, at the Facilities to another location, or otherwise reduce the number of licensed beds, without Lessors' express written consent which may be withheld in Lessors' sole discretion.  Any action taken by Lessee in connection with any of the foregoing matters without Lessors' express written consent shall be void and of no force and effect.  Any and all license and beds rights with respect to any of the Facilities, to the extent permitted under applicable law, shall be the property of Lessors and included in the Demised Premises hereunder.  In the event any Facility adds any licensed beds during the Term, which may be done only with Lessors' express written consent not to be unreasonably withheld, then to the extent permitted by applicable law such additional licensed beds shall become part of the Demised Premises and all rights with respect thereto shall be the property of the Lessors and may not be subsequently removed or transferred by Lessee.

ARTICLE IX -  INSURANCE

9.1      Lessee (by itself or through each of the Subtenants) shall, at its (their) sole cost and expense, as of the Commencement Date and during the Term, maintain fire, and casualty insurance with extended coverage endorsement, which includes coverage for malicious mischief and vandalism both on the Demised Premises and the Personal Property on the applicable state standard form with a responsible company having an A.M. Best Company rating of A-VII or higher.  Such insurance shall, at all times, be maintained (without any co-insurance clause, if possible) in an amount equal to the full replacement value of the Demised Premises and Personal Property, but in any event in an amount sufficient to prevent Lessors and Lessee from becoming co-insurers under applicable provisions of the insurance policies.  Such insurance shall at all times be payable to Lender, Lessors and Lessee, as their interests may appear and shall contain a loss-payable clause to the Lender, as its interest may appear.  Upon the reasonable request of Lessors, provided however no more often than once every sixty (60) months or such shorter period of time as may be required by Lessee's insurance carrier, Lessee shall furnish at Lessors' sole cost and expense, to Lessors and such insurance carrier, insurance appraisals in form and substance as are regularly and ordinarily made by insurance companies, such as Marshall & Swift's replacement cost estimate, in order to determine the then replacement value of the Demised Premises and Personal Property, and if such appraisal shows that the amount of casualty insurance maintained by Lessee hereunder is insufficient, the amount of insurance required by this Section 9.1 shall be adjusted accordingly.

9.2      Lessee shall also, at Lessee's sole cost and expense, cause to be issued and shall maintain during the Term of this Lease, insurance from an insurance company with a "A-VII" rating or higher from A.M. Best Company, but in no event with coverage less than:

(a)      A public liability policy naming Lessors and Lender as additional insured, and insuring Lessee against claims for bodily injury, or property damage occurring upon, in or about the Demised Premises, or in or upon the adjoining streets, sidewalks, passageways and areas, and including professional malpractice insurance covering employees of each Facility, such insurance to afford protection to the limits reasonably established by Lessee and the Subtenants in the operation of their business, but not less than $1,000,000 per each claim and $3,000,000 in the aggregate.

(b)      If there is a boiler, air conditioner or water heater located on the Demised Premises, boiler explosion insurance, in the amount of not less than the replacement cost of these items, under the terms of which Lessors and Lessee will be indemnified, as their interests may appear, against any loss or damage which may result from any accident or Casualty in connection with any boiler used in the Demised Premises, whereby any person or persons may be injured or killed or property damaged in or about the Demised Premises.

8

9.3 (a) General liability coverage shall be carried in favor of Lessee and the Subtenants, naming Lessors, and Lender as additional insureds, as their respective interests may appear, and any loss shall be payable as therein provided, notwithstanding any act or negligence of Lessors or Lessee or the Subtenants, which might otherwise result in forfeiture of insurance; and

(b) All policies of insurance shall not be canceled, terminated, reduced or materially modified without at least thirty (30) days' prior written notice to Lessors with the exception of ten (10) days' notice of cancellation for nonpayment of premiums; and

(c) The property policy shall have a standard mortgagee clause in favor of Lender, and shall contain, if obtainable, a waiver of the insurer's right of subrogation against funds paid under the standard mortgagee endorsement which are to be used to pay the cost of any repairing, rebuilding, restoring or replacing.

9.4 Certificates of insurance required by this Article IX shall be delivered to Lessors and Lender prior to or on the Commencement Date. Upon receipt thereof, Lessee shall deliver copies of insurance certificates to Lessors, which certificates shall be updated annually not less than ten (10) days prior to the expiration date thereof with proof of payment of insurance premiums in full (or subject to a premium payment installment plan).

9.5 Lessee shall at all times keep in effect business interruption insurance with loss of rents endorsement naming Lessors as an insured in an amount at least sufficient to cover:

(a) The loss of business income for the next succeeding twelve (12) months following the occurrence of the business interruption;

(b) The cost of all insurance premiums for insurance required to be carried by Lessee for such twelve (12) month period; and

(c) The aggregate of the amount of the monthly Base Rent for the next succeeding twelve (12) month period.

All proceeds of any business interruption insurance or loss of rents coverage shall be applied, first, to the payment of any Base Rent payments for the next succeeding twelve (12) months to the extent that such payments are due and payable; second, to the payment of any Taxes and Assessments and insurance deposits required for the next succeeding twelve (12) months to the extent that such payments are due and payable; and, thereafter, after all necessary repairing, rebuilding, restoring or replacing has been completed as required by the pertinent Articles of this Lease and the pertinent sections of the Loan Documents, any remaining balance of such proceeds shall be paid over to the Lessee.

9.6 Reserved.

9.7 Except as provided below, no sums shall be paid from such proceeds toward such repairing, rebuilding, restoring or replacing unless there shall not be in existence any uncured Event of Default and it shall be first demonstrated to the reasonable satisfaction of Lessors that the amount of money necessary to provide for any such repairing, rebuilding, restoring or replacing (according to any plans or specifications which may be adopted therefor) in excess of the amount received from any such insurance policies, has been expended or provided by Lessee for such repairing, rebuilding, restoring or replacing, or that Lessee has provided cash for such amount and that the amount received from such insurance policies is sufficient to complete such work. In the event there is any amount required from Lessee in excess of the amount received from such insurance policies, Lessee shall furnish such excess funds so that the funds will be sufficient to complete such repairing, rebuilding, restoring or replacing in accordance with the provisions of this Lease, the Loan Documents and any plans and specifications submitted in connection therewith, free from any liens or encumbrances of any kind

whatsoever. Funds held by Lessors shall be disbursed only upon the presentment of architect's or general contractor's certificates, waivers of lien, contractor's sworn statements, owner's sworn statements and other evidence of cost and payments as may be reasonably required.

9.8     Prior to making any such repairs to a single Facility costing in excess of One Hundred Fifty Thousand Dollars ($150,000), if so requested by Lessors, Lessee shall do the following or provide to Lessors the following documentation, as Lessors may reasonably require to protect their interest in the Demised Premises and Personal Property: (a) submit complete plans and specifications for such repairs prepared by an architect or general contractor whose qualifications shall be reasonably satisfactory to Lessors; (b) submit a stipulated sum construction contract made with a reputable and responsible builder or contractor, providing for the completion and payment for all work, labor and materials necessary to complete such repairs; (c) disburse such funds as may be required to complete said repairs by a national title insurance company or other responsible escrowee at Lessee's sole cost and expense to the contractor or contractors making such repairs in installments as such work progresses and upon presentment of such certificates, waivers of lien, sworn statements and other documents as may be required by such escrowee; and (d) take such other actions or provide such other documentation to Lessors as Lessors may reasonably require to protect their interest in the Demised Premises and Personal Property.

9.9     Notwithstanding anything in this Lease to the contrary, if any Lender is entitled to any insurance proceeds under the terms of any Facility Mortgage, the net proceeds shall be applied, held and/or disbursed in accordance with the terms of the Facility Mortgage. Lessors shall make commercially reasonable efforts to cause the net proceeds to be applied to the restoration of the Demised Premises. If the Lender elects to apply the net proceeds to the indebtedness secured by the Facility Mortgage, Lessor shall make available to Lessee for restoration of such Leased Property funds equal to the amount applied by the Lender so as to permit Lessee to restore the Demised Premises pursuant to the terms of this Lease.

ARTICLE X -   LESSORS' RIGHT TO PERFORM

10.1     Should Lessee fail to perform any of their covenants herein agreed to be performed, Lessors may, upon seven (7) days prior notice to Lessee specifying the work to be done or covenants to be performed and the approximate amount to be expended, but shall not be required to, make such payment or perform such covenants (any of the foregoing, "Protective Advances"), and all sums so expended by Lessors, including Lessors' reasonable expenses in enforcing or performing such covenants, including reasonable attorneys' fees shall by payable by Lessee to Lessors within five (5) days after written notice from Lessors with interest thereon at the Default Rate (as defined in Section 25.2 herein) thereafter. In particular, and without limiting the generality of the foregoing, following the occurrence and during the continuance of an Event of Default under Section 19.1(a) hereunder, Lessors shall be entitled to make Protective Advances pursuant to the terms hereof with respect to payments due to any parties providing goods and/or services for any of the Facilities. Any of the foregoing costs or expenses incurred or payments made by Lessors shall be deemed to be Additional Rent payable by Lessee and collectible as such by Lessors.

10.2     Performance of or payment to discharge said Lessee' obligations shall be optional by Lessors and such performance and payment shall in no way constitute a waiver of, or a limitation upon, Lessors' other rights and remedies hereunder, including, without limitation, Lessors' right to declare an Event of Default for such failure.

ARTICLE XI -     REPAIRS AND MAINTENANCE

11.1     Throughout the Term of this Lease, Lessee, at its sole cost and expense, will keep and maintain, or cause to be kept and maintained, the Demised Premises (including the grounds, sidewalks, roof, parking lots and curbs abutting the same) and the Personal Property in good order and condition without waste and in a suitable state of repair at least comparable to that which existed immediately prior to the

10

Commencement Date (ordinary wear and tear and damage by Casualty excepted), and will make or cause to be made, as and when the same shall become necessary, all structural and nonstructural, ordinary and extraordinary, exterior and interior, replacing, repairing and restoring necessary to that end.

Commencing with the third anniversary of the Effective Date, and no more often than every third anniversary thereafter, Lessors, their Lender and/or a third-party inspector to Lessors or Lender (as reasonably approved by Lessee), shall, upon reasonable prior notice, be granted access to the Demised Premises for purposes of inspecting the same to confirm that Lessee is maintaining the Demised Premises in the condition required under this Lease. To the extent that the property condition assessment prepared from such inspection indicates that certain repairs, replacements and/or maintenance are immediately required, Lessee agrees to have such repairs, replacements and/or maintenance completed in a timely manner; provided, however, that Lessee shall have the right to dispute the necessity and/or the timing with respect to any such matters identified in the property condition assessment. All replacing, repairing and restoring required of Lessee shall be of comparable quality equal to the original work and shall be in compliance with all standards and requirements of law, licenses and municipal ordinances necessary to operate the Demised Premises as skilled nursing facilities. Lessee shall cooperate with Lessors to perform repairs reasonably required by Lessors and/or Lender in consultation with Lessee, subject to a determination as to which of Lessors or Lessee shall bear the costs thereof.

11.2     In the event that any part of the improvements located on the Demised Premises or the Personal Property shall be damaged or destroyed by fire or other casualty (any such event, being called a "**Casualty**"), Lessee shall promptly replace, repair and restore the same as nearly as possible to the condition it was in immediately prior to such Casualty, in accordance with applicable law and the terms, covenants and conditions and other requirements of this Lease and provisions of the Loan Documents applicable in the event of such Casualty. The Demised Premises and the Personal Property shall be so replaced, repaired and restored as to be of at least equal value and substantially the same character as on the Commencement Date. If the estimated cost of any such restoring, replacing or repairing either:(i) will result in a reduction of beds upon completion, and/or (ii) will exceed One Hundred Fifty Thousand Dollars ($150,000), then the plans and specifications for same shall be first submitted to and approved by Lessors in writing, which approval shall not be unreasonably withheld or delayed or conditioned, and Lessee shall select an independent architect or engineer approved by Lessors (which approval shall not be unreasonably withheld or delayed or conditioned) who shall be in charge of preparing the plans for such repairing, restoring or replacing. Upon the demand of Lessors, Lessee shall deposit with a nationally recognized title insurance company, prior to the commencement of any such repairing, restoring or replacing, the total estimated cost thereof less the insurance proceeds and amounts required to be contributed by Lessors, if any, and disbursements shall be made pursuant to the terms of Section 9.8 hereof. Lessee covenants that it will give to Lessors prompt written notice of any Casualty affecting the Demised Premises in excess of One Hundred Fifty Thousand Dollars ($150,000). Any insurance proceeds with respect to a Casualty in excess of amounts required to repair the Facilities, as well as any award with respect to a condemnation of any of portion of the Demised Premises, shall be the property of Lessee.

11.3     Provided that there is no uncured Event of Default by Lessee under this Lease, Lessee shall have the right, at any time and from time to time, to remove and dispose of any Personal Property which may have become obsolete or unfit for use, or which is no longer useful in the operation of the Demised Premises, provided Lessee promptly replaces any such Personal Property so removed or disposed of with other personal property free of any security interest, liens or encumbrances, and the replacement personal property shall be of the same character, and at least equal usefulness and quality to any such Personal Property so removed or disposed of and such replacement property shall automatically become the property of and shall belong to Lessors and Lessee shall execute and deliver such bills of sale or other documents reasonably requested by Lessors to vest ownership of such replacement personal property in Lessors.

11.4     If Lessee cannot within a reasonable time after diligent efforts (but in no event less than twelve (12) months following the date of any applicable Casualty) obtain the necessary government approvals

11

needed to restore the Demised Premises to substantially the same condition which existed prior to such damage (the "**Required Reconstruction Approvals**"), then Lessee shall pay to Lessors an amount (the "**Compensatory Payment**") equal to the sum of: (a) the Fair Market Value of the Facility immediately before such damage or destruction less (b) the Fair Market Value of the Facility immediately after such damage or destruction (the "**Post-Casualty Facility**") less (c) any insurance proceeds received by Lessor, in which case the affected Demised Premises shall be removed from the Lease as part of the Demised Premises. Unless, within twelve (12) months following the date of any applicable Casualty, Lessee has provided Lessors with satisfactory evidence that it has obtained, or is in the process of and continuing to diligently obtain, the Required Reconstruction Approvals, Lessee shall be deemed to be unable to secure the Required Reconstruction Approvals and to be obligated to make the Compensatory Payment to Lessors (the "**Compensatory Payment Date**"). Lessors and Lessee shall have a period of three (3) months after the Compensatory Payment Date to attempt to sell the applicable Facility to an independent third party in an arms-length transaction and the gross purchase price payable to Lessors in connection with such transaction shall be deemed to be the Fair Market Value of the Post-Casualty Facility (a "**Casualty Sale**"). In the event a Casualty Sale does not result in the execution of a purchase and sale agreement within such three (3) month period, Lessors shall provide Lessee with notice of the closing/shutdown of the applicable Facility thereof and a written demand for the Compensatory Payment setting forth in reasonable detail the calculation thereof (the "**Compensatory Payment Statement**"). In the event a Casualty Sale does result in the execution of a purchase and sale agreement within such three (3) month period but closing does not occur thereunder, then the Fair Market Value of the Post-Casualty Facility shall be determined in the manner otherwise set forth in this Lease. The Compensatory Payment shall be due and payable thirty (30) days after the later of (i) Lessee's receipt of the Compensatory Payment Statement or (ii) the date of determination of the Fair Market Value of the Post-Casualty Facility. Upon Lessors' receipt of the Compensatory Payment (or upon the occurrence of a Casualty Sale, if earlier), this Lease shall terminate as to the affected Facility and Lessee and the applicable Subtenant shall have no further rights or obligations with respect thereto.

If it becomes necessary to determine the Fair Market Value of the Demised Premises with respect to the foregoing or any other provisions of this Lease, Lessors and Lessee shall first attempt to agree on such Fair Market Value and shall each submit to the other their respective determinations of Fair Market Value. If Lessors and Lessee are unable to so agree within a reasonable period of time not to exceed thirty (30) days, then Lessors and Lessee shall have twenty (20) days to attempt to agree upon a single Appraiser to make such determination. If the parties so agree upon a single Appraiser, such Appraiser shall, within ten (10) business days of being engaged, determine the Fair Market Value as of the relevant date (giving effect to the impact, if any, of inflation from the date of its decision to the relevant date), and such determination shall be final and binding upon the parties. The Appraiser shall determine Fair Market Value by selecting only one of the determinations of Lessor or Lessee that more closely reflects the Fair Market Value of the Demised Premises. The Appraiser shall render his/her/their decision within ten (10) Business Days following appointment. In no event may the Appraiser render a decision with respect to Fair Market Value other than a selection of one of the determinations proposed by Lessors or Lessee. No determination of Fair Market Value which is not precisely one of the determinations proposed by Lessors or Lessee shall be effective for any purpose—regardless of whether or not the Appraiser concludes that neither of such determinations is exactly on point. To promote a neutral decision, neither party shall engage in any ex parte contacts with the Appraiser, other than to facilitate, without editorial comment, the transmission of information with respect to the subject of Fair Market Value. However, at the request of the Appraiser, the Members may meet with the Appraiser in a session where representatives of Lessors and Lessee are present to make presentations to the Appraiser of equal time regarding the Fair Market Value of the Demised Premises.

If Lessors and Lessee are unable to agree upon a single Appraiser within such twenty (20) days, then each party shall have ten (10) days in which to provide the other with the name of a person selected to act as Appraiser on its behalf. Each such Appraiser shall, within ten (10) business days of being engaged, appoint a third Appraiser. If the first Appraisers fail to appoint a third Appraiser within such twenty (20) days, either Lessors or Lessee may apply to any court having jurisdiction to have such appointment made by such

court.  Such third Appraiser, shall, within ten (10) business days of being selected or appointed, determine the Fair Market Value as of the relevant date (giving effect to the impact, if any, of inflation from the date of its decision to the relevant date) as provided above by selecting which of the determinations of Lessor or Lessee more closely reflects the Fair Market Value of the Demised Premise, and such decision shall be final and binding upon the parties.

If either party fails to select an Appraiser within such ten (10) days or a selected Appraiser fails to make its determination within such ten (10) business days, the Appraiser selected by the other party or the Appraiser that makes its determination with such ten (10) business, as applicable, shall alone determine the Fair Market Value as of the relevant date (giving effect to the impact, if any, of inflation from the date of its decision to the relevant date) and such determination shall be final and binding upon the parties.  Lessors and Lessee shall each pay the fees and expenses of the Appraiser appointed by it and each shall pay one-half (½) of the fees and expenses of the third Appraiser.

For purposes of determining the Fair Market Value, the Demised Premises shall be valued at its highest and best use which shall be presumed to be as a fully-permitted facility operated in accordance with the provisions of this Lease.  In addition, the following specific matters shall be factored in or out, as appropriate, in determining the Fair Market Value.

As used herein, "**Appraiser**" means an appraiser licensed or otherwise qualified to do business in the applicable state where the Facility is located and who has substantial experience in performing appraisals of nursing home facilities similar to the Demised Premises and holds the Appraisal Institute's MAI designation, or, if such organization no longer exists or certifies appraisers, such successor organization or such other organization as is approved by Lessors.

## ARTICLE XII - ALTERATIONS AND DEMOLITION

12.1     Lessee will not remove or demolish the Demised Premises or any portion thereof or allow it to be removed or demolished, without the prior written consent of Lessors.  Subject to the Loan Documents, Lessee further agrees that they will not make, authorize or permit to be made any changes or alterations in or to the Demised Premises, that either: (i) involve a reduction of beds, and/or, (ii) involve costs in any twelve (12) month period exceeds One  Hundred Fifty Thousand Dollars ($150,000) per facility, without first obtaining Lessors' written consent thereto.  Notwithstanding the foregoing, Lessee may, without Lessors' prior written consent, make any alterations, additions, or improvements (collectively, "**Alterations**") to the Demised Premises so long as in each case: (i) the same do not (A) decrease the value of the Demised Premises, (B) adversely affect the exterior appearance of the Demised Premises, or (C) adversely affect the structural components of the improvements of the Demised Premises or the main electrical, mechanical, plumbing or ventilating and air conditioning systems for any Facility, (ii) the same are consistent in terms of style, quality and workmanship to the original improvements or fixtures, (iii) the same are constructed and performed in accordance with the provisions of this Section 12.1, (iv) the same do not reduce the number of beds at the Facility, and (v) the cost thereof does not exceed, in the aggregate, One Hundred Thousand Dollars ($100,000) per facility for any twelve (12) month period. Any Alterations (other than Alterations which meet the foregoing requirements of clauses (i), (ii), (iii) and (iv) above) shall be subject to Lessors' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Lessors agree that painting, landscaping, repaving, roof repair and replacement, and replacement of floor, wall and window coverings, shall be deemed Alterations which do not require Lessors' consent, regardless of the cost thereof, so long as the same meet the requirements of clauses (ii) and (iii) above. All Alterations to the Demised Premises shall become the property of Lessors and shall materially comply with all building and fire codes, and all other applicable codes, rules, regulations, laws and ordinances.  Not less than thirty (30) days prior to the commencement of any such changes or alterations that either: (i) involve a reduction of beds, and/or, (ii) that involve costs in any twelve (12) month period in excess of One Hundred Thousand Dollars ($100,000) per facility, Lessee shall furnish to Lessors, at Lessee's sole cost and expense, plans and specifications, prepared by

a licensed architect, for such changes or alterations and any additional insurance reasonably required by Lessors. Such plans and drawings shall include detailed architectural, mechanical, electrical and plumbing working drawings. The plans and drawings will be subject to Lessors' approval with respect to design, aesthetics, building code compliance and such other matters as Lessors deems relevant, which approval shall not unreasonably be withheld or delayed. Notwithstanding the provisions of the preceding sentence to the contrary, the review and approval by Lessors shall not be relied upon by Lessee that any such plans or drawings are in compliance with applicable laws or represent a sound design.

ARTICLE XIII -        COMPLIANCE WITH LAWS AND ORDINANCES

13.1    Throughout the Term of this Lease, Lessee, at its sole cost and expense, will observe and promptly comply in all material respects with all present and future laws, ordinances, orders, rules, regulations and requirements of any federal, state and municipal governmental agency or authority having jurisdiction over the Demised Premises and the operation thereof as skilled nursing facilities, which may be applicable to the Demised Premises, the Personal Property and the improvements located therein and including, but not limited to, the sidewalks, alleyways, passageways, vacant land, parking spaces, curb cuts, curbs adjoining the Demised Premises, whether or not such law, ordinance, order, rules, regulation or requirement shall necessitate structural changes or improvements.

13.2    Lessee shall comply in all material respects with the requirements of all policies of public liability and fire insurance and all other policies of insurance at any time in force with respect to the Demised Premises.

13.3    Prior to the Commencement Date, to the extent not already in effect, Lessee shall obtain, at its sole cost and expense, all necessary approvals, certifications and licenses from all appropriate governmental agencies necessary to permit Lessee and Subtenants to operate the Facilities as skilled nursing facilities, including, without limitation, the receipt of the License Lessee to operate each Facility. Lessee shall, subject to the terms of Article XX hereof, keep in good standing and in full force and effect all necessary licenses, permits and certifications required by any governmental authority for the purpose of maintaining and operating on the Demised Premises skilled nursing facilities, each including not less than the number of licensed skilled beds as identified for that Facility on Schedule 8.3, except through no fault of Lessee, and each Facility shall at all times, subject to the terms of Article XX hereof, shall continue to be qualified to and shall participate in the Medicare and Medicaid reimbursement programs.

13.4    Lessee will deliver to Lessors within five (5) business days following written receipt thereof, (i) any notice of a failed re-revisit with respect to a survey deficiency at any of the Facilities, or (ii) a Civil Monetary Penalty ("**CMP**") in an amount greater than $150,000 imposed at any of the Facilities. Lessee shall also deliver to Lessors, within five (5) business days after receipt any notice from any governmental agency terminating or suspending, or threatening termination or suspension of, any license or certification relating to any of the Facilities. Lessee will deliver to Lessors within five (5) business days copies of all other adverse notices from any licensing, certifying, regulatory, reimbursing or other agency which has jurisdiction over any Facility or over any license, permit or approval under which such Facility operates, any notice from the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("**CMS**"), the DOH or any governmental, quasi-governmental or other agency terminating, disqualifying or suspending, or threatening termination, disqualification or suspension, of the Medicaid or Medicare provider agreements (the "**Provider Agreements**"), the License or any other license or certification relating to the operations of any Facility or participation in any governmental or non-governmental reimbursement or third party payor program, including the Medicare or Medicaid reimbursement programs, and if Lessee becomes aware that any such notice likely to cause a material adverse effect is to be forthcoming before receipt thereof, it shall promptly inform Lessors thereof. Lessee will deliver to Lessors within five (5) business days after receipt all other notices, exit interviews, inspection reports and surveys (including re-visit) and notices of administrative hearing or court

14

pleadings from all state, federal and local governmental bodies regarding the Demised Premises or the nursing home operated thereon.

## ARTICLE XIV -    DISCHARGE OF LIENS

14.1     Subject to the right to contest provided in Section 14.2 hereof, Lessee will not create or permit to be created or to remain, and Lessee will discharge, any lien, encumbrance or charge levied on account of any mechanic's, laborer's or materialman's lien or any conditional sale, security agreement or chattel mortgage, or otherwise, which might be or become a lien, encumbrance or charge upon the Demised Premises or any part thereof or the income therefrom or the Personal Property, for work or materials or personal property furnished or supplied to, or claimed to have been supplied to or at the request of Lessee.  Lessee shall have the right to purchase equipment, furniture, or furnishings (other than as a replacement for any personal property owned by Lessors and leased to Lessee hereunder) which may be subject to a security agreement or chattel mortgage provided that all payments for any such equipment, furniture or furnishings shall be paid on or prior to the due dates thereof and Lessee shall indemnify Lessors against all charges, costs and expenses that may be incurred by Lessors with respect to such security agreement or chattel mortgage.

14.2     If any mechanic's, laborer's or materialman's lien caused or charged to Lessee shall at any time be filed against any portion of the Demised Premises or Personal Property, if allowed by the terms of the Loan Documents and the Lender, Lessee shall have the right to contest such lien or charge, provided Lessee, within sixty (60) days after notice of the filing thereof, will cause the same to be discharged of record or bonded off or in lieu thereof to secure Lessors against said lien by deposit with Lessors or Lender of such security (not to exceed one hundred percent (100%) of the amount thereof plus any interest, cost and penalty thereon) as may be reasonably demanded by Lessors or Lender to protect against such lien.  If Lessee shall fail to cause such lien to be discharged or bonded off within the aforesaid period, or to otherwise secure Lessors as aforesaid, then in addition to any other right or remedy, Lessors may, upon ten (10) days' prior notice, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by processing the discharge of such lien by deposit, title endorsement or by bonding proceedings.  Any amount so paid by Lessors and all costs and expenses incurred by Lessors in connection therewith, shall constitute Additional Rent payable by Lessee under this Lease and shall be paid by Lessee to Lessors within five (5) days after written demand from Lessors.  Except as herein provided, nothing contained herein shall in any way empower Lessee to do or suffer any act which can, may or shall cloud or encumber Lessors' or Lender's interest in the Demised Premises.

14.3     In the event that Lessors determine, in their reasonable judgment, that Lessee has abandoned any contest referred to in Section 14.2 above, or that Lessee is not pursuing any such contest adequately, expeditiously or with due diligence, Lessors may, upon ten (10) days' prior written notice to Lessee, discharge such lien by paying the amount claimed to be due from the security deposited by Lessee pursuant to the terms of said Section 14.2. Furthermore, in the event that Lessors determine in their reasonable judgment, that they are not being adequately represented by counsel for Lessee in any contest referred to in Section 14.2 hereof, Lessors shall notify Lessee and request a replacement of counsel – if Lessors and Lessee cannot agree upon replacement counsel, then Lessors may, upon ten (10) days prior written notice to Lessee, obtain separate counsel to represent it in such contest, the reasonable cost of such counsel to be paid by Lessee.

## ARTICLE XV - INSPECTION OF PREMISES AND RECORDS BY LESSORS

15.1     During reasonable business hours and upon reasonable prior advance notice to Lessee, Lessors or their authorized representatives shall have the right to enter and inspect the Demised Premises and Personal Property.

15.2     During reasonable business hours and upon prior notice to Lessee, Lessors or their authorized representatives, shall have the right up to, but not to exceed, one (1) time per year for each Facility to inspect and/or audit and, at Lessors' expense, make copies of, the books and records relating to the Demised Premises,

any Facility, Lessee, any managing entity or any consulting entity, including, without limitation, to the extent permitted by applicable law, all employment records, financial records, surveys and inspections reasonably required by Lessors; provided that, if an Event of Default has occurred and is continuing, the Lessors or their authorized representatives, during reasonable business hours and upon prior notice to Lessee, shall have the right to inspect and/or audit and, make copies of, the books and records relating to the Demised Premises, any Facility, Lessee, any managing entity or any consulting entity, including, without limitation, to the extent permitted by applicable law, all employment records, financial records, surveys and inspections at any time.

15.3     Lessors agree that upon entering and inspecting the Demised Premises, Personal Property and books and records, Lessors shall take all reasonable measures to avoid disruption to Lessee's routine business operation during any such entries and the person or persons will cause as little inconvenience to the Lessee, their, their employees and residents of such Facility as may reasonably be possible under the circumstances.

ARTICLE XVI -        COVENANTS OF LESSEE

16.1     Distributions.  Following the occurrence and during the continuance of any Event of Default, Lessee and each Subtenant shall not (i) declare, pay or make any Distribution (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock), (ii) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any membership or equity interest, (iii) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such person's capacity as such, or (iv) in the event of any monetary Event of Default, make any payment of any management, consulting or service fee to any related or affiliated party, except in the ordinary course of business (including without limitation payments to Lessee's consulting company for back office services) and in an amount that shall not exceed actual out-of-pocket expenses relating to administrative services provided with respect to the Demised Premises; and any obligation of Lessee to make any of the foregoing payments shall be and hereby is made subordinate and junior in right of payment to the payment of all Rent, and other payment obligations of Lessee hereunder. "Distribution" shall mean any direct or indirect dividend, distribution or other payment of any kind or character (whether in cash, securities or other property) in respect of any equity interests or any repayment of indebtedness to any member of Lessee or any affiliate or relative thereof.

16.2     Other Obligations.  Lessee and Subtenants shall not have any other liabilities, other than those which are necessary and related to their respective function and responsibilities as the licensed operator of the applicable Facility.

ARTICLE XVII -        RENT ABSOLUTE

17.1     Except as herein provided, damage to or destruction of any portion of the buildings, structures and fixtures upon the Demised Premises, by fire, the elements or any other cause whatsoever, whether with or without fault on the part of Lessee, shall not terminate this Lease or entitle Lessee to surrender the Demised Premises or entitle Lessee to any abatement of or reduction in the Rent payable, or otherwise affect the respective obligations of the Parties, any present or future law to the contrary notwithstanding.

ARTICLE XVIII -        ASSIGNMENT AND SUBLETTING

18.1     During the Term of this Lease, other than to the Subtenants as approved prior to the Commencement Date by Lessors, Lessee shall not assign this Lease or in any manner whatsoever sublet, assign, encumber or transfer all or any part of the Demised Premises or in any manner whatsoever transfer, assign or encumber any interest in the Demised Premises (whether by management agreement, or otherwise) or any interest in this Lease or allow Subtenants to in any manner whatsoever sublet, assign, encumber or transfer all or any part of the Demised Premises or in any manner whatsoever transfer, assign or encumber any interest in the Demised Premises (an "**Assignment**") without the prior written consent of Lessors and Lender.  Lessee acknowledges and agrees that Lessors have specifically chosen Lessee to operate each Facility based upon the

16

skill and expertise of Lessee and its principals in operating nursing homes and upon the character and reputation of such principals. Any violation or breach or attempted violation or breach of the provisions of this Article XVIII by Lessee, or any acts inconsistent herewith shall vest no right, title or interest herein or hereunder or in the Demised Premises in any transferee or assignee; and Lessors may, at their exclusive option, invoke the provisions of this Lease relating to default.

18.2    For purposes of this Article XVIII, the following (or any stricter requirements of the Lender) shall apply:

(a)    Any transfer or transfers of the membership interests in Lessee or Subtenants (or stock in a corporate Lessee, partnership interests in a partnership Lessee or stock in a corporate general partner of a partnership Lessee, as the case may be) however accomplished, whether in a single transaction or in a series of related or unrelated transactions, which result in the following with respect to the initial ownership in Lessee set forth on <u>Schedule 18.2</u> hereto: (i) any change of control and/or decision-making authority, or (ii) change in ownership, directly or indirectly, in more than ten percent (10%) in the aggregate of such membership interests in Lessee or Subtenants (or stock in a corporate Lessee, partnership interests in a partnership Lessee or stock in a corporate general partner of a partnership Lessee, as the case may be) or in violation of Article XXVII herein, shall be deemed an assignment of this Lease.

(b)    Any person, corporation, limited liability company or other entity to whom Lessee's interest under this Lease passes by operation of law, or otherwise, shall be bound by the provisions of this entire Lease and this Article XVIII, and except for subsequent subleases, assignments or transfers permitted by this Article XVIII, shall obtain the written consent of Lessors to any subsequent sublease, assignment, encumbrance or transfer or such event shall be deemed an Event of Default hereunder.

(c)    An agreement by any person, corporation or other entity, directly or indirectly, to assume Lessee's obligations under this Lease shall be deemed an assignment.

(d)    If Lessee is a corporation, partnership, limited liability company, or other entity, the term "Assignment" also includes any change in the manager, general partner or director of the entity.

Notwithstanding anything contained herein, Lessors shall have the unrestricted right to sell or otherwise transfer any of the Facilities, and in such a case Lessors may freely assign this Lease (or portion thereof following division pursuant to the terms hereof) to any such transferee, and Lessee and Subtenants shall fully attorn to and recognize any such transferee as the Lessors hereunder; provided that any such successor landlord/lessor shall be bound by all terms and conditions contained herein.

18.3    Notwithstanding anything contained herein, Lessors shall have the unrestricted right to install, or to lease or provide license or right to others to install, and operate one or more cell phone towers or similar equipment upon the Real Property (including the roof or exterior walls or structures), and to grant any easement, right of access or similar right or privilege in connection therewith, and any and all income, revenue and profit derived or arising therefrom (including, for avoidance of doubt, with respect to any such arrangements already in place as of the Commencement Date) shall be received by Lessors, provided that same does not interfere with use and operation of any Facility and is otherwise permitted by law.

18.4    Notwithstanding anything in this Article XVIII to the contrary, Lessee may, without the prior consent of Lessors but upon written notice to Lessors, do any of the following (each a "<u>Permitted Transfer</u>"): (a) transfer ownership interests, whether direct or indirect, in Lessee provided that immediately and at all times after such transfer, a group consisting of some combination of the current holders of ownership interest plus senior managers of the Lessee, Subtenants or parent entity collectively (x) own more than 50% of the direct and indirect interests in Lessee (which ownership calculation shall include any interest held by or in an estate planning vehicle) and (y) retain operational control of Lessee (subpart (x) and (y) collectively, the "<u>Lessee</u>

Ownership Requirements"), provided further and on the conditions that (1) Lessee and such transferee deliver to Lessors promptly, but in any event within ten (10) Business Days prior to the effectuation and closing of such transfer (A) the assignment documentation effecting the transfer or such direct or indirect interests in Lessee, (B) a revised organizational chart of Lessee including, without limitation, it's direct and indirect owners and (C) such other documentation related to such transfer as Lessors may reasonably require; and (2) each of the Guarantors shall executed a reaffirmation and acknowledgment of their Guaranty in form and substance acceptable to Lessors; (b) enter into residency agreements with residents of the Facilities; or (c) sublease portions of the Facilities not to exceed 2,000 rentable square feet, in the aggregate, in connection with the delivery of amenities for the residents of the Facilities (*e.g.*, without limitation, a beauty salon, rehab facility, nail salon, etc.), such subleases to be terminable upon 30 days' notice and end on or before the end of the Term, provided, further, that (1) Lessee and such Subtenants deliver to Lessors promptly, but in any even within ten (10) Business Days following the closing of such sublease (A) a copy of the sublease, (B) such Subtenants' organizational chart and (C) such other documentation related to such sublease as Lessors may reasonably require; and (2) each of the Guarantors shall execute a reaffirmation and acknowledgment of their Guaranty in form and substance acceptable to Lessors. Lessors agrees that it will not charge any fee for any consent to a transfer under this Article XVIII, provided that Lessee's obligation to pay Lessors' legal fees for review of such transfer will not be deemed a transfer fee.

18.5    Notwithstanding anything in this Article XVIII to the contrary, Lessors hereby consent to a management team buy-out of the Lessee and/or Subtenants which is led by the chief executive officer of the management team ("Management Buy-Out"). In the event of a proposed Management Buy Out, (1) Lessee shall provide written notice to the Lessors at least ten (10) Business Days prior to the effectuation and closing of the Management Buy Out and include with the notice a description of the transaction and identification of the contemplated direct and indirect owners and such other documentation related to such transfer as Lessors may reasonably request. In connection with the foregoing, each of the Guarantors shall execute a reaffirmation and acknowledgment of their respective Guaranty.

## ARTICLE XIX -       EVENTS OF DEFAULT

19.1    The occurrence of any of the following acts or events shall be deemed to be a default ("**Events of Default**") on the part of the Lessee:

(a)    The failure of Lessee to pay when due any Rent payment, or any part thereof, or any other scheduled sum or sums of money due or payable to Lessors under the provisions of this Lease when such failure shall continue for a period of five (5) calendar days unless a shorter period of time is required by the Loan Documents or HUD either for rent or debt service payments;

(b)    The failure of any of Lessee to perform, or the violation by any of Lessee of, any of the material covenants, terms, conditions or provisions of this Lease (that are not otherwise specifically listed in this Section 19.1), if such failure or violation shall not be cured within thirty (30) days after Lessee's receipt of notice thereof from Lessors; provided that if such failure cannot be cured within such period with commercially reasonable efforts, such failure shall not become an Event of Default under the terms hereof for sixty (60) additional days (for a total of ninety (90) days after such failure or violation), so long as Lessee continues to employ commercially reasonable efforts to remedy such failure;

(c)    The failure of Lessee to comply with, or the violation by Lessee of, any of the terms, conditions or provisions of the Loan Documents (excluding those terms, conditions or provisions requiring the making of principal or interest payments which relate specifically to Lessors), if such failure or violation shall not be cured within thirty (30) days (or such lesser period as may be provided in the Loan Documents) after receipt of notice thereof; ; provided that if such failure cannot be cured within such period with commercially reasonable efforts, such failure shall not become an Event of Default under the terms hereof for a reasonable

18

period required to cure not to exceed thirty (30) additional days (for a total of sixty (60) days after such failure or violation), so long as Lessee continues to employ commercially reasonable efforts to remedy such failure;

(d)    The removal by any local, state or federal agency having jurisdiction over the operation of the Facility of ten percent (10%) or more of the residents located at the Facility for a period of ten (10) days or more other than during any period of repair or restoration following any Casualty or partial taking;

(e)    In the event Lessee or any Subtenant removes any physical beds or a substantial portion of the Personal Property, or Lessee or any Subtenant removes Personal Property necessary to the operation of a Facility, the failure of Lessee to replace within thirty (30) days the physical beds or the Personal Property so removed by Lessee subject to the provisions of Section 20.2 hereof;

(f)    The making by Lessee of an assignment of this Lease, or substantially all of the assets of Lessee or any Subtenant, for the benefit of creditors or any other unauthorized assignment;

(g)    The levying of a writ of execution or attachment on or against the property of Lessee or any Subtenant which is not discharged or stayed by action of Lessee contesting same, within sixty (60) days after such levy or attachment (provided if the stay is vacated or ended, this section shall again apply);

(h)    If proceedings are instituted in a court of competent jurisdiction for the reorganization, liquidation or involuntary dissolution of the Lessee or any Subtenant for their adjudication as a bankrupt or insolvent, or for the appointment of a receiver of the property of Lessee, and said proceedings are not dismissed and any receiver, trustee or liquidator appointed therein discharged within sixty (60) days after the institution of said proceedings;

(i)    The sale, transfer or assignment of the interest of Lessee in the Demised Premises by execution or other legal process;

(j)    Any conveyance or transfer in violation of Article XVIII hereof;

(k)    A default shall occur under the Guaranty of Lease;

(l)    The abandonment of the Demised Premises by Lessee or if Lessee voluntarily ceases operations at any Facility for a period in excess of twenty-four (24) hours, except in the event of a Casualty (including any loss of power to operate), an involuntary taking or planned renovations during which appropriate arrangements are made for interim care of residents and the orderly resumption of operation of the Facility after a period of not more than thirty (30) days;

(m)    The voluntary transfer by Lessee of residents numbering more than three percent (3%) of the number of licensed beds, whether in a single transfer or a series of transfers, in any calendar year from any Facility to any other nursing home facility owned or leased or under common control with Lessee or their affiliates where such transfer is not for reasons relating to the health and well-being of the patients transferred or is otherwise required by law;

(n)    Any suspension, termination or restriction placed upon Lessee or any Facility, or the ability to admit residents or patients (*e.g.*, an admissions ban or non-payment for new admissions by Medicare or Medicaid) that would have a material adverse effect on the operation of any Facility for its Permitted Use, and such suspension, termination or restriction continues for more than thirty (30) calendar days after imposition thereof;

(o)    Failure with respect to two (2) revisits for any survey deficiency at a Facility if the Lessee fails to secure a third (3rd) revisit resulting in the clearance of deficiencies within sixty (60) days of the second (2nd) revisit;

(p)    Failure on the part of Lessee or any Subtenant during the Term of this Lease to cure or abate any written violation claimed by any governmental authority, of any law, order, ordinance, rule or regulation pertaining to the operation of any Facility that would have a material adverse effect on the operation of any Facility for its Permitted Use within the time permitted for such cure or abatement;

(q)    The institution of any proceedings against Lessee or any Subtenant by any governmental authority either to: (i) revoke any license granted to Lessee or any Subtenant for the operation of any Facility as a skilled nursing facility; or (ii) decertify any Facility from participation in the Medicare or Medicaid reimbursement program;

(r)    The designation of any Facility as a Special Focus Facility by CMS which designated Facility;

(s)    A survey deficiency of the level of "IJ" or worse at any Facility that is not abated within ten (10) business days of the receipt of the deficiency;

(t)    The occurrence of a payment-related default, beyond any applicable notice and cure period, under a line of credit or similar loan maintained by Lessee or any Subtenant;

(u)    The failure of the Lessee or any Subtenant to pay all bed taxes, if any, against any Facility prior to delinquency;

(v)    Any "Event of Default" by the Guarantor under the Guaranty of Lease; and

(w)    The failure of Lessee or any Subtenant to pay any and all bed taxes against any Facility prior to delinquency, and the foregoing is not remedies within ten (10) days after Lessee's receipt of notice thereof from Lessors.

## ARTICLE XX - RIGHT TO CONTEST/CURE

20.1    Anything to the contrary stated herein notwithstanding, Lessee shall have the right upon written notice thereof to Lessors, to contest by appropriate administrative or legal proceedings, diligently conducted in good faith, the validity or application of any law, ordinance, regulation or rule mentioned herein, and to delay compliance therewith pending the prosecution of such proceedings, including, without limitation, any proceeding pursuant to Section 19.1(o) above.  In the event such contest involves a Substandard Quality of Care, Medicaid or Medicare Decertification or license revocation, Lessee shall give Lessors written notice of their election to contest same and Lessors may elect to participate in or monitor such contest as it deems necessary.  Notwithstanding anything to the contrary contained herein, despite the existence and continuance of such Event of Default described in this paragraph, Lessors shall forbear from asserting any remedies arising solely from the occurrence of such Event of Default hereunder; provided, that during said contest: (a) no civil or criminal liability would thereby be incurred by Lessors and no lien or charge would thereby be imposed upon or satisfied out of the Demised Premises; (b) there continues during the course of such contest authority to continue operations of the Demised Premises as a nursing home (which may be temporary or provisional); (c) such situation does not cause Lessors to be in default under any of the Loan Documents; and (d) such Event of Default does not jeopardize the License or the Provider Agreements, or the operations, certifications or value of the Demised Premises and the Personal Property.

20

20.2     Except for an Event of Default of Lessee in the payment of Rent, or any additional payment required hereunder, in any case where Lessors shall have given to Lessee a written notice specifying a situation which, as hereinbefore provided, must be remedied by Lessee within a certain time period, and, if for causes beyond Lessee's control, it would not reasonably be possible for Lessee to remedy such situation within such period, then, provided Lessee, promptly upon receipt of such notice, shall advise Lessors in writing of Lessee's intention to institute, and shall, as soon as reasonably possible thereafter, duly institute, and thereafter diligently prosecute to completion, all steps necessary to remedy such situation and shall remedy the same, during the period necessary to remedy such situation, (but not exceeding a total of one hundred twenty (120) days following Lessee's becoming aware of such situation), notwithstanding anything to the contrary contained herein, although such situation shall be deemed an Event of Default hereunder, Lessors shall forbear from asserting any remedies arising solely from the occurrence of such Event of Default until such cure period has expired and if Lessee is in compliance with the terms of this Section 20.2; provided, however, that: (a) no civil or criminal liability would thereby be incurred by Lessors and no lien or charge would thereby be imposed upon or satisfied out of all or any part of the Demised Premises; (b) there continues during such remedy authority to continue to operate such Facilities as nursing homes (which may be temporary or provisional); (c) such situation does not cause Lessors to be in default pursuant to the terms of any Loan Document; (d) such Event of Default does not jeopardize the License or the Provider Agreements, or the operations, certifications or value of the Demised Premises and the Personal Property; (e) the Loan Documents do not preclude or prohibit Lessors from granting the Lessee forbearance as provided in this Section 20.2.

20.3     Lessee shall promptly provide Lessors with a copy of any notice from DOH or other governmental authority or agency threatening or requesting a reduction in the number of licensed beds at any Facility.  Lessee shall have the right to contest any such reduction and shall notify Lessors within fifteen (15) days following the date of such notice (or such shorter period as required to provide notice to Lessors not later than ten (10) days prior to the cutoff date for any such contest) whether or not Lessee shall undertake such contest.  If Lessee fails to contest any such reduction, Lessors may, following written notice to Lessee of their intent to do so, contest any such reduction.  Lessors shall additionally have the right to intervene in any such contest dealing with a reduction in the number of licensed beds at any Facility.

20.4     The cost for any contest permitted under this Article XX shall be borne solely by the Lessee.  Lessors, at any time during any contest, may participate in the same, provided, that in the event Lessors determine in their reasonable discretion that Lessee is not adequately pursuing such contest to their conclusion, Lessee shall reimburse Lessors for any costs incurred by Lessors in connection with their becoming involved in appealing such contest, which shall be deemed Additional Rent hereunder.

ARTICLE XXI -          LESSORS' REMEDIES UPON DEFAULT

21.1     In the event of any Event of Default by Lessee that has occurred and is continuing or has not been cured within the applicable cure period, Lessors may, if they so elect, and with notice of such election to Lessee, and upon demand upon Lessee, forthwith terminate this Lease, and Lessee's right to possession of the Demised Premises, or, at the option of Lessors, terminate Lessee's right to possession of the Demised Premises without terminating this Lease.  Upon any such termination of this Lease, or upon any such termination of Lessee's right to possession without termination of this Lease, Lessee shall vacate the Demised Premises immediately and shall quietly and peaceably deliver possession thereof to Lessors in accordance with applicable law, and Lessee hereby grants to Lessors full and free license to enter into and upon the Demised Premises in such event with process of law and to repossess the Demised Premises and Personal Property as Lessors' former estate.  In the event of any such termination of this Lease, Lessors shall again have possession and enjoyment of the Demised Premises and Personal Property to the extent as if this Lease had not been made, and thereupon this Lease and everything herein contained on the part of Lessee to be done and performed shall cease and terminate, all, however, without prejudice to and without relinquishing the rights of Lessors to Rent (which, upon such termination of this Lease and entry of Lessors upon the Demised Premises, shall, in

any event, be the right to receive Rent due up to the time of such entry) or any other right given to Lessors hereunder or by operation of law (subject to the other provisions in this Article XXI).

21.2    In the event of an uncured Event of Default and Lessors elect either to terminate this Lease or to terminate Lessee's right to possession of the Demised Premises, then all licenses, certifications, permits and authorizations (including the License and Provider Agreements) issued by any governmental agency, body or authority in connection with or relating to the Demised Premises and any Facility thereon shall be deemed as being assigned to Lessors to the extent the same are legally assignable.  Lessors shall also have the right to continue to utilize the telephone numbers, internet domain and name used by Lessee in connection with the operation of any Facility.  In connection with the foregoing clauses of this Section 21.2, this Lease shall be deemed and construed as an assignment for purposes of vesting in Lessors all right, title and interest in and to (a) all licenses, certifications, permits and authorizations (including the License and Provider Agreements) obtained in connection with the operation of such Facility and (b) the names and telephone numbers used in connection with the operation of such Facility.  Lessee hereby agrees to take such other action and execute such other documents as may be reasonably necessary in order to vest in Lessors all right, title and interest to the items specified herein.

21.3    If any Lessee abandons the Demised Premises or otherwise entitles Lessors so to elect, and Lessors elect to terminate Lessee's right to possession only, without terminating this Lease Lessors may, at their option, enter into the Demised Premises, remove Lessee's signs and other evidences of tenancy and take and hold possession thereof as in the foregoing Section 21.1 of this Article XXI provided, without such entry and possession terminating this Lease or releasing Lessee, in whole or in part, from Lessee's obligation to pay the Rent hereunder for the full remaining term of this Lease, and in any such case, Lessee shall pay to Lessors a sum equal to the entire amount of the Rent reserved hereunder and required to be paid by Lessee for the full term of the Lease. Upon and after entry into possession without termination of this Lease, Lessors may attempt to relet the Demised Premises or any part thereof for the account of Lessee for such rent or may operate any Facility for such time and upon such terms as Lessors in their sole discretion shall determine.  In any such case, Lessors may make repairs, alterations and additions in or to the Demised Premises, to the extent reasonably deemed by Lessors desirable, and Lessee shall, upon demand, pay the cost thereof, together with Lessors' expenses of reletting.  In the event Lessors elect to take possession and operate the Demised Premises, any profits due to such operation shall reduce the rents payable hereunder. If the consideration collected by Lessors upon any such reletting is not sufficient to pay monthly the full amount of Rent reserved in this Lease, together with the costs of repairs, alterations, additions and Lessors' expenses, Lessee shall pay to Lessors the amount of each monthly deficiency upon demand.

21.4    Lessee's liability to Lessors for damages upon the occurrence, and continuation past any cure period, of an Event of Default shall in all events survive the termination by Lessors of this Lease or the termination by Lessors of Lessee's right to possession only. In the event that Lessors shall re-let or re-lease the Demised Premises after termination of this Lease under this Article XXI, then any such collected rent for any period shall be used to abate against and offset against Rent, Additional Rent and/or any and all amounts otherwise due and owing by Lessee hereunder only for the same such period.

21.5    No receipt of funds by Lessors from Lessee after service of any notice of an Event of Default, termination of this Lease or of possession of the Demised Premises or after commencement of any suit or proceeding of Lessee, shall in any way reinstate, continue or extend this Lease or in any way affect the notice of the Event of Default or demand or in any way be deemed a waiver by Lessors of any of their rights unless consented to in writing by Lessors.

21.6    Notwithstanding the foregoing or anything contained in this Lease to the contrary, in connection with Lessors' exercise of its remedies hereunder, Lessors shall be required to provide a Proper Successor (as defined below) for the Facilities so as to allow Lessee to vacate the Facilities and deliver possession thereof to Lessors (or their designee).  As used herein, "Proper Successor" means a qualified and duly licensed

operator for Facilities, or one as to which the applicable state licensing authority has indicated its willingness to issue licenses upon transfer of possession of the Facilities. This provision shall survive the expiration or earlier termination of this Lease.

ARTICLE XXII -      LIABILITY OF LESSORS

It is expressly agreed by the Parties that in no case shall Lessors, any partners, officers, directors, manager, members, agents or employees of Lessors be liable under any express or implied covenant, agreement or provisions of this Lease for any damages whatsoever to Lessee beyond the loss of rent reserved in this Lease, accruing after or upon any act or breach hereunder on the part of Lessors and for which damages may be sought to be recovered against Lessors.

ARTICLE XXIII -      CUMULATIVE REMEDIES OF LESSORS

The specific remedies to which Lessors may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Lessors may be lawfully entitled in case of any breach or threatened breach by Lessee of any provision or provisions of this Lease. The failure of Lessors to insist, in any one or more cases, upon the strict performance of any of the terms, covenants, conditions, provisions or agreements of this Lease, or to exercise any option herein contained, shall not be construed as a waiver or relinquishment for the future of any such term, covenant, condition, provisions, agreement or option.

ARTICLE XXIV -      SECURITY FOR RENT

24.1     Lessee and/or Subtenants and certain affiliates of Lessee and Subtenants have obtained one or more working capital lines of credit (as each may hereafter be amended, superseded, replaced and/or refinanced, collectively, the "Lines of Credit", and each, a "Line of Credit") from a third-party working capital lender (the "Working Capital Lender") and have granted the Working Capital Lender a security interest in, among other things, accounts, account payments, accounts receivable, general intangibles (including, without limitation, payment intangibles) and deposit accounts owned by Lessee and/or Subtenants, and all products and proceeds thereof (the "Working Capital Lender's Collateral"). Lessors acknowledge that the Working Capital Lender's Collateral as of the date Commencement Date includes a pledge of the equity in Lessee and Subtenants and, as such, no pledges of such equity shall be granted to Lessors as of the Commencement Date. Notwithstanding the foregoing, Lessee and the Subtenants shall grant Lessors a subordinate lien on every right and interest of Lessee in and to this Lease, and to the extent permitted by law on any of Lessee's cash, accounts receivable, furnishings, equipment, or fixtures, general intangibles, licenses including the Facilities operating licenses, Provider Agreements, inventory, goods or property of any kind belonging to Lessee and located at or used in connection with the Facilities ("**Lessors' Lien**") subject to and conditioned upon Lessors' execution of a reasonable and market form of intercreditor/subordination agreement from the Working Capital Lender. This Lease shall constitute a security agreement under the Uniform Commercial Code granting Lessors a security interest in all property secured by the Lessors' Lien and Lessors may file financing statements required to perfect such security interest (subject to Lessee's review and approval), which documents shall be filed or recorded at the expense of Lessors. Such lien is granted for the purpose of securing the payments and performance required of Lessee under this Lease including but not limited to of Rent, Additional Rent, charges, penalties, and damages herein covenanted to be paid by Lessee, and for the purpose of securing the performance of all of Lessee's obligations under this Lease. Such lien shall be in addition to all rights to Lessors given and provided by law.

24.2     The obligations of Lessee under this Lease shall be secured by the guarantee of Curis Holdings LLC, a Florida limited liability company and the Subtenants (collectively, the "**Guarantor**" and such guarantee, the "**Guaranty of Lease**"), in the forms attached as **Exhibit C** hereto.

23

24.3     No later than the Effective Date, Lessee shall have deposited the aggregate, non-refundable (except as otherwise set forth herein) amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000) ("**Security Deposit**") as security for the full and faithful performance by Lessee of each and every term, provision, covenant and condition of this Lease.  The Security Deposit shall not be considered an advance payment of Rent (or of any other sum payable to Lessors under this Lease) or a measure of Lessors' damages in a case of a default by Lessee.  Lessors shall have no obligation to maintain the Security Deposit separate and apart from Lessors' general and/or other funds and may freely utilize the Security Deposit subject to obligations hereunder to return the Security Deposit to Lessee.  Without limitation of the foregoing, in the event required by a Lender, Lessors may deposit the Security Deposit with Lender, and/or pledge its rights in the Security Deposit to such Lender.  Upon the occurrence and during the continuance of any Event of Default, Lessors may elect to apply all or any part of the Security Deposit to the payment of any sum in default, any other sum that Lessors may expend or be required to expend by reason of Lessee's default or any other amounts due by Lessee hereunder.  Upon the expiration or earlier termination of this Lease, following Lessors' determination of any amounts due and owing to Lessors and application of the Security Deposit to such outstanding amounts, any remaining portion of the Security Deposit shall be paid by Lessors to Lessee within thirty (30) days following such expiration or earlier termination.

## ARTICLE XXV -      INDEMNIFICATION

25.1     Lessee agrees to protect, indemnify and save harmless Lessors and any future tenant(s) of Lessors with respect to any of the Facilities from and against any claims, demands, losses, and causes of action of any nature whatsoever asserted against or incurred by Lessors (unless resulting from the gross negligence or willful misconduct of one or more Lessors) on account of: (a) any failure on the part of Lessee during the Term of this Lease to perform or comply with any of the terms of this Lease; (b) injury to or death of persons or loss of or damage to property, occurring on the Demised Premises or any adjoining sidewalks, streets or ways or in any manner growing out of or connected with the use or occupation of the Demised Premises or the condition thereof, or the use of any existing or future sewer system, or the use of any adjoining sidewalks, streets or ways occurring after the Commencement Date; (c) any claims, penalties, recoveries, interest, monetary sanctions, fees, or other liabilities imposed by a governmental agency, or other third party payor related to the operations of or payments made to any Facility while Lessee was providing skilled nursing services; (d) any claims for professional liability or malpractice which are alleged to have occurred at any Facility; (e) any quality assurance fees or bed taxes relating to any of the Facilities; or (f) additional costs incurred by Lessors to monitor any Facility after the occurrence of any of the events set forth in <u>Section 19.1</u>.  Lessee further agrees to pay any reasonable attorneys' fees and expenses incident to the defense by Lessors of any such claims, demands or causes of action.

25.2     In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Lease ("**Indemnitee's Claim**") is made against or received by any indemnified party (hereinafter "**Indemnitee**") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "**Indemnitor**") in writing within thirty (30) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim (or such earlier period to the extent that any earlier filing is required), provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim (including any delay which results in the entry of a default judgment).  Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its sole, absolute and unreviewable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense to the extent funds are available ("**Available Funds**") to fully indemnify such claims, and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim.  Upon the receipt of the written request of Indemnitee (which shall not be required more than one (1)

24

time in a calendar month), Indemnitor shall within ten (10) business days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, which failure to report causes Indemnitee material harm, or in the event that Indemnitor does not have the Available Funds, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "**Indemnification Default**") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims plus interest thereon from the date incurred until paid in full at a rate equal to the prime rate of interest as most recently published by the *Wall Street Journal* plus five percent (5%) (the "**Default Rate**").

## ARTICLE XXVI - SUBORDINATION PROVISIONS

26.1    This Lease shall be subject and subordinate to all Facility Mortgages now or hereinafter in effect and to all renewals, modifications, consolidations, replacements, restatements, increases and extensions of any such Facility Mortgages. At any Lender's direction, Lessee shall attorn to the Lender, or any successor-in-interest to Lessors or the Lender, including without limitation, any such party which takes title by foreclosure, power of sale, deed in lieu of foreclosure, pursuant to a proceeding under the Bankruptcy Code or alternative procedure, or at law or in equity. The transfer of the title to the Demised Premises, any part thereof or any underlying lease to any Lender, or any successor in interest to Lessors or Lender by foreclosure, deed in lieu of foreclosure, pursuant to a proceeding under the Bankruptcy Code or any alternative procedure, or at law or in equity shall not be considered a default or breach by Lessors of this Lease. This Section 26.1 shall be self-operative and no further instrument of subordination shall be required to make the interest of any Lender or future landlord(s) superior to the interest of Lessee. Notwithstanding the previous sentence, however, Lessee shall, together with the Lender, execute and deliver promptly any certificate or agreement that Lessors and any Lender may request in confirmation of such subordination (subject to reasonable review and comment by Lessee), so long as the same contains commercially reasonable non-disturbance and attornment provisions.

26.2    Lender shall have the right to remedy any default by Lessors under this Lease, or to cause any default of Lessors under this Lease to be remedied, and for such purpose Lessee hereby grants such Lender an additional period of thirty (30) days to enable such Lender to remedy, or cause to be remedied, any such default in addition to the period given to Lessors for remedying, or causing to be remedied, any such default. Lessee shall accept timely performance by such Lender of any term, covenant, condition or agreement to be performed by Lessors under this Lease with the same force and effect as though performed by Lessors. No default under this Lease shall exist or shall be deemed to exist (i) as long as such Lender, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, or (ii) if possession of the Demised Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Lender, as long as such Lender, in good faith, shall have notified Lessee that such Lender has instituted proceedings under the Facility Mortgage, as applicable, within such thirty (30) day period, and as long as Lender shall thereafter prosecute such proceedings with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence. In the event of the termination of this Lease by reason of any default hereunder or for any other reasons whatsoever except by

virtue of the stated expiration hereof, upon such Lender's written request, given within thirty (30) days after any such termination, Lessee, within fifteen (15) days after receipt of such request, shall execute and deliver to such Lender or its designee or nominee a new lease of the Demised Premises for the remainder of the Term of this Lease upon all of the terms, covenants and conditions of this Lease. Neither such Lender nor its designee or nominee shall become liable under this Lease except as specifically provided for in the SNDA.

26.3    In the event of any act or omission of Lessors which would give Lessee the right, immediately or after lapse of a period of time or notice, to cancel or terminate this Lease, or to claim a partial or total eviction, Lessee shall not exercise such right (i) until it has given written notice of such act or omission to Lender, and (ii) unless such act or omission shall be one which is not capable of being remedied by Lessors or Lender within a reasonable period of time until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Lender shall have become entitled under the Facility Mortgage or any other Loan Documents in connection therewith, to remedy the same (which reasonable period shall in no event be less than the period to which Lessors would be entitled under this Lease or otherwise, after notice, to effect such remedy).

26.4    As to any Facility Mortgage to which this Lease is subordinate, Lessors shall provide Lessee with a reasonable and market form of "subordination and non-disturbance agreement" (an "**SNDA**") reasonably acceptable to such Facility Mortgagee and Lessee providing that if such Facility Mortgagee acquires the Demised Premises by way of foreclosure or deed in lieu of foreclosure, such Facility Mortgagee will not disturb Lessee's possession under this Lease and will recognize Lessee's rights hereunder if and for so long as no Event of Default has occurred and is continuing under this Lease.  If Lessors do not provide a commercially reasonable form of SNDA, then this Lease shall not be subordinated to any such Facility Mortgage.  If required by a Lender, Lessors and Lessee shall implement a lock box arrangement whereby Rent payable monthly under this Lease shall be paid into the lock box.

26.5    Lessors agree to deliver to Lessee from time-to-time amendments and/or restatements of the existing Facility Loan Documents or new Facility Loan Documents and until such amendments and/or restatements or new Facility Loan Documents are delivered to Lessee, Lessee shall continue to be bound by the existing or previous Facility Loan Documents. Lessee agrees that it shall not unreasonably withhold or delay its consent to any amendment of the Lease reasonably required by a Facility Mortgagee, and Lessee shall be deemed to have withheld or delayed its consent unreasonably if Lessee has received the non-disturbance agreement provided for above and the requested amendment does not materially or adversely (a) alter the economic terms of this Lease, (b) diminish the rights of Lessee under this Lease or (c) increase the obligations of Lessee under this Lease.

26.6    Notwithstanding anything to the contrary contained herein, it is understood, agreed and acknowledged that Lessors shall have the right to finance, refinance and guaranty such financing or refinancing, from time to time, the Demised Premises and Personal Property, and grant a mortgage, deed of trust or security interest thereon, to assign or pledge any or all of their interest in this Lease and to assign or pledge the revenues and receipts to be received by Lessors hereunder to a third party.

### ARTICLE XXVII -LESSEE'S FAITHFUL COMPLIANCE WITH LOAN DOCUMENTS AND HUD REQUIREMENTS

27.1    Anything in this Lease contained to the contrary notwithstanding, Lessee shall at all times and in all respects fully, timely and faithfully comply with and observe each and all of the conditions, covenants, and provisions required on the part of Lessors under the Loan Documents to which this Lease is subordinate or to which it later may become subordinate, including, without limitation, such conditions, covenants and provisions thereof as related to the financial covenants and financial reporting, related to operations, related to the care, maintenance, repair, insurance, restoration, preservation and condemnation of the Demised Premises, provided that such conditions, covenants and provisions may require: (a) compliance and observance to a

standard or degree which differs from that required by the provisions of this Lease (but not materially), and (b) performance not required by the provisions of this Lease which, in either case of (a) or (b) shall not diminish Lessee's rights or materially increase Lessee's obligations under this Lease.  Lessors shall provide copies of the applicable documents to Lessee and disclose in writing to Lessee such conditions, covenants and provisions of the Loan Documents which require particular compliance.  Lessee further agrees that it shall use its best efforts to comply with and observe each and all of such material covenants, conditions and provisions of any Loan Document affecting the Demised Premises so that the Loan Documents will at all times be in good standing and there will not be any default on the part of Lessors thereunder.  However, nothing in this Article XXVI shall be construed to obligate Lessee to pay any part of the principal or interest secured by the Loan Documents, or to deposit any reserves (other than reserves expressly provided for in this Lease).  Other than as specifically provided herein, Lessee specifically acknowledges and agrees that it may not sublet or assign all or any portion of the Demised Premises or their interests under this Lease without if Lessors have not first obtained the written consent of Lender.

27.2    Notwithstanding anything to the contrary contained herein, Lessee further agree to cooperate with a lender to Lessors that will provide a loan insured by the United States Department of Housing and Urban Development (an "FHA Mortgagee") so as to grant such FHA Mortgagee a subordinate security interest in Lessee's accounts and other assets, with respect to the Facilities, and to execute loan and bank documents (in form and substance acceptable to Lessee) (collectively, the "HUD AR Loan Documents") in connection with the same, including an Intercreditor Agreement and Rider to Intercreditor Agreement under Section 232 (subject to standard negotiations by the parties), and to setup and maintain lockboxes to effectuate the same, provided that such security interest shall be subordinate to the lien of any working capital line secured by Lessee. Lessee shall also comply with other requirements imposed by an FHA Mortgagee with respect to healthcare facility financing, to provide any and all information to the FHA Mortgagee as requested and as required in order to secure loans to be made by an FHA Mortgagee.

27.3    Lessee acknowledges that Lessors intend to refinance the Facility Loan(s) with a new mortgage loan(s) to be insured by HUD under the provisions of Section 232 of the National Housing Act, and the Regulations thereunder. To the extent Lessors so refinances some or all of the Facility Loan(s), Lessors will be entering into a HUD Regulatory Agreement (the "HUD Regulatory Agreement") with the Federal Housing Commissioner (the "Commissioner") in connection with the said new mortgage loan(s). This Lease is intended to comply with the requirements of the National Housing Act and Section 232 thereunder and all regulations promulgated pursuant thereto. In the event of any conflict between the terms of this Lease and the terms of the HUD Regulatory Agreement between Lessee and Commissioner, the terms of the HUD Regulatory Agreement shall control. This Lease and Lessee's obligations hereunder shall be subject to the requirements of HUD including, without limitation, the HUD Regulatory Agreement and such limitations as may be imposed by the Commissioner including, without limitation, with respect to assignments and subleases, and the furnishing of such financial reports and operating statements and compliance with applicable laws and execution of such agreements and documents as may be required by HUD and the Commissioner.

27.4    To the extent that any provision of this Lease shall be in conflict with the provisions of the HUD Regulatory Agreements or any applicable section of Section 232 of the National Housing Act and/or the Multifamily Accelerated Processing (MAP) Guide provisions applicable to Section 232, the provisions of the Facility Mortgage, the HUD Regulatory Agreements, such sections of Section 232 of the National Housing Act and/or the Multifamily Accelerated Processing (MAP) Guide provisions applicable to Section 232, as the case may be, shall be controlling. Further, while a HUD insured Mortgage Loan is outstanding, in addition to observing the terms and conditions contained in this Article, Lessee shall observe the other terms and conditions under this Lease to the extent they are (x) not inconsistent therewith or (y) more stringent than the terms and conditions under this Article. In the event of any conflict between the terms and conditions of this Article and any other terms and conditions of this Lease, the terms and conditions of this Article shall control.

27

ARTICLE XXVIII -    [RESERVED]

ARTICLE XXIX -    LESSEE'S ATTORNMENT

29.1    If by reason of a default upon the part of Lessors herein in the performance of any of the terms and conditions of the Loan Documents and the Lender forecloses on the estate of Lessors in the Demised Premises, Lessee covenants and agrees that Lessee will attorn to the then holder of such mortgage or the purchaser in such foreclosure proceedings, as the case may be, and will recognize such holder of the mortgage or such purchaser as Lessors under this Lease. Lessee covenants and agrees to execute and deliver, at any time and from time to time, upon the request of Lessors, or of the holder of such mortgage or the purchaser in foreclosure proceedings, any instrument which may be necessary or appropriate to evidence such attornment. In the event any such proceedings are brought against Lessors under such mortgage or the holder of any such mortgage, then Lessee further waives the provisions of any statute or rule or law now or hereafter in effect which may terminate this Lease or give or purport to give Lessee any right of election to terminate this Lease or to surrender possession of the Demised Premises and agrees that, pending any final order, this Lease shall not be affected in any way whatsoever by any such proceedings.

ARTICLE XXX -    REPRESENTATIONS

30.1    Lessors represents, warrants and covenants to Lessee as follows:

(a)    Each Lessor is a limited liability company, duly organized and validly existing under the laws of the State of Delaware, and has the full right and power to enter into, and perform its obligations under this Lease and all agreements or documents entered into or executed in connection therewith, and has taken all requisite actions to authorize the execution, delivery and performance of this Lease and all agreements and documents entered into or executed in connection therewith.

(b)    Neither the execution and delivery of this Lease, nor any agreement referred to or contemplated hereby, by Lessors will violate any provision of their Operating Agreements, be in conflict with, constitute a default or create a right of termination or cancellation under any agreement or commitment to which any Lessors are a party.

(c)    Except for any Loan Documents, each Lessor has or on the Commencement Date will have valid fee simple title to the Demised Premises and the Personal Property, free and clear of all liens, charges, security interests, leasehold rights or interests, reservation, restrictions, adverse claims, encumbrances and other defects in or limitations on title other than liens for taxes not yet due and payable (collectively, "**Encumbrances**");

(d)    No representation or warranty by or on behalf of Lessors contained in this Lease and no statement by or on behalf of Lessors in any certificate, list, exhibit or other instrument furnished or to be furnished to Lessee by or on behalf of Lessors pursuant hereto contains any untrue statement of a material fact, or omits or will omit to state any material facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any material respect.

(e)    Unless otherwise indicated in a specific representation or warranty contained herein, each representation and warranty of Lessors hereunder shall be true, complete and correct in all material respects as of the date hereof and as of the Commencement Date with the same force and effect as though such representation or warranty made on such date, and all representations and warranties shall survive the Commencement Date.

28

30.2    Lessee represents and covenants to Lessors as follows:

(a)    Lessee is a limited liability company, duly organized and validly existing in good standing under the laws of the State of Florida, and has full right and power to enter into, or perform its obligations under this Lease and has taken all requisite actions to authorize the execution, delivery and performance of this Lease.

(b)    Lessee acknowledges that it has inspected the Demised Premises and the Personal Property and subject to the other terms and conditions of this Lease, agrees to lease the same in their present "AS IS-WHERE IS" condition. Lessee further acknowledges, except as set forth explicitly in this Lease, Lessors make no representations, express or implied, as to the physical condition of the Demised Premises and the Personal Property or any other matter or thing affecting or related to the Demised Premises or the Personal Property.

(c)    In addition to all other covenants contained herein, Lessee expressly covenants that it shall keep and maintain at each Facility at all times in good order and repair all items of Personal Property necessary for operating such Facility in full compliance with all material laws, rules and regulations of DOH and any other applicable governmental authorities. Lessee shall maintain all such items in good order and repair, subject to reasonable wear and tear, and shall promptly replace any such items which become obsolete, damaged or destroyed with substitute items equivalent to that which has been replaced and such replacement items shall become and be deemed the personal property of Lessors.

(d)    No representation or warranty by or on behalf of Lessee contained in this Lease and no statement by or on behalf of Lessee in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Lessors by or on behalf of Lessee pursuant hereto contains any untrue statement of a substantial fact, or omits or will omit to state any substantial facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any substantial respect.

(e)    Unless otherwise indicated in a specific representation or warranty contained herein, each representation and warranty of Lessee hereunder shall be true, complete and correct in all material respects as of the Commencement Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Commencement Date.

ARTICLE XXXI -        NON-SOLICITATION

31.1    Except for those facilities listed in attached Schedule 31.1 and any facilities where after the date of this Lease Lessee assumes ownership, operation, or management of a facility as or on behalf of a receiver and/or trustee in a third party receivership, neither Lessee, Guarantor, nor any affiliate shall own, operate, manage or consult for any skilled nursing facility within (a) a one (1) mile radius of any Facility located within a metropolitan statistical area having a population of 500,000 or more, or (b) a five (5) mile radius of any Facility located within a metropolitan statistical area having a population of less than 500,000, without the prior written consent of Lessors, not to be unreasonably withheld, delayed or conditioned, and which consent shall be deemed granted by Lessors if Lessors fails to send a notice of disapproval within thirty (30) days of its receipt of such notice. ANY SUCH NOTICE FROM LESSEE TO LESSORS SHALL BE TYPED IN 10 FONT OR LARGER AND IN CAPITAL LETTERS AND STATE THAT LESSORS' CONSENT SHALL BE DEEMED TO BE GIVEN IF LESSORS FAILS TO RESPOND WITHIN 30 DAYS. Notwithstanding the immediately preceding sentence: (aa) none of Lessee, Guarantors, or any affiliate may construct and at completion operate a skilled nursing facility within an eight (8) mile radius of any Facility unless the cost of construction for such newly built facility is financed by Lessors and the newly build facility is added as a Facility under this Lease, and (bb) the foregoing shall not prevent Mission Health or an affiliate thereof from operating

29

or managing, on an interim basis, any skilled nursing facility in violation of the foregoing radius restriction which arises from any receivership, bankruptcy or similar insolvency program or proceeding.

31.2     Neither Lessee, nor any affiliate of Lessee, without the prior written consent of the Lessors, unless reasonably necessary for a patient's appropriate medical needs, shall solicit any Facility residents for transfer to other facilities owned or operated by Lessee or its affiliates during the Term of the Lease and for a period of twelve (12) months following the termination of this Lease; provided however, that advertisements and similar announcements by Lessee seeking residents that are not directed solely to the Facility's residents but rather to the public at large through advertisements in newspapers, periodicals or the media in general shall not be deemed to be an inducement or prohibited hereunder.

13.3     Neither Lessee nor any affiliate of Lessee shall solicit any employee of any Facility, during the Term of the Lease and for a period of twelve (12) months following the termination of this Lease; provided however, that advertisements and similar announcements by Lessee seeking employees that are not directed solely to the Facility's management and supervisory personnel but rather to the public at large or to members of a trade organization or industry or through advertisements in newspapers, periodicals or the media in general shall not be deemed to be an inducement or prohibited hereunder.

## ARTICLE XXXII -     CONDEMNATION

32.1     <u>Condemnation</u>. "**Condemnation**" as used herein shall mean the exercise of any governmental power, whether by legal proceedings or otherwise, by any public or quasi-public authority, or private corporation or individual, having the power of condemnation ("**Condemnor**") or a voluntary sale or transfer by Lessors to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

(a)     <u>Total Taking</u>. If the Demised Premises is totally and permanently taken by Condemnation, this Lease shall terminate with respect to such Facility as of the day before the date the Condemnor has the right to possession of the property being condemned (the "**Date of Taking**"). The Base Rent shall be adjusted in a manner that is fair, just and equitable to both Lessors and Lessee, based upon, among other relevant factors, the loss of revenue in such Facility.

(b)     <u>Partial Taking</u>. If a portion of the Demised Premises is taken by Condemnation, this Lease shall remain in effect if any Facility is not thereby rendered Unsuitable for Its Permitted Use (except that this Lease shall terminate with respect to the portion of the Demised Premises so taken), but if such Facility is thereby rendered Unsuitable for its Permitted Use, this Lease shall terminate as of the day before the Date of Taking. In the event of any such partial taking in which the Lease is not so terminated as to the applicable Facility and such partial taking affects the building of such Facility (as opposed to components of the Facility such as landscaping, sidewalks, etc.), Base Rent applicable to such Facility shall be adjusted in a manner that is fair, just and equitable to both Lessors and Lessee, based upon, among other relevant factors, the loss of beds or units, if any, in such Facility. "**Unsuitable for Its Permitted Use**" as used herein shall mean a state or condition of the Facility such that by reason of Condemnation, in the good faith judgment of Lessors and Lessee, the Facility cannot be operated on a commercially practicable basis for its permitted use as a skilled nursing facility.

(c)     <u>Restoration</u>. If there is a partial taking of the Demised Premises and this Lease remains in full force and effect pursuant to <u>Section 32.1(b)</u>, Lessors shall make available to Lessee the portion of the award necessary and specifically identified or allocated for restoration of the Demised Premises and Lessee shall accomplish all necessary restoration whether or not the amount provided or allocated by the Condemnor for restoration is sufficient.

(d)    Award Distribution. Subject to Section 32.1(c) above, the entire award shall belong to and be paid to Lessors, except that Lessee shall be entitled to receive from the award, if and to the extent such award specifically includes such item, lost profits value and moving expenses.

(e)    Temporary Taking. The taking of the Demised Premises and/or any part(s) thereof, shall constitute a taking by Condemnation only when the use and occupancy by the taking authority has continued for longer than one hundred eighty (180) consecutive days. During any shorter period, which shall be considered a temporary taking, all the provisions of this Lease shall remain in full force and effect and the award allocable to the Term shall be paid to Lessee.

ARTICLE XXXIII -    FINANCIAL STATEMENTS AND REPORTING

33.1    Lessee shall furnish to Lessors full and complete financial statements (or as otherwise reasonably required by Lender) of the operations of the Demised Premises and the Facilities for each such fiscal period identified herein, in a form satisfactory to Lessors, which shall be certified by the manager of Lessee that such Financial Statements present fairly the financial condition of Lessee and which shall contain a detailed income and expense statement, statement of payor mix, monthly census for each Facility and identify any payments made by any Lessee to any managing entity or consulting entity in accordance with generally accepted accounting principles (collectively, the "**Financial Statements**").  Financial Statements shall be provided as follows: (a) within thirty (30) days after the end of each month, showing the results of operations of each Facility for such month dated as of the end of each month; (b) within forty-five (45) days after the end of each quarter, showing the results of operations of each Facility for such quarter dated as of the end of each quarter; and (c) within one hundred twenty (120) days after the end of each of its fiscal years, showing the results of operations of the Facilities for the annual fiscal period dated as of the end of the fiscal year.  Each monthly and quarterly statement shall be certified as being true and correct by an officer of Lessee as applicable. The annual Financial Statements shall be audited balance sheets, statements of income or operations, retained earnings, shareholders' equity and cash flows for such fiscal year. For the avoidance of doubt, the Financial Statements will depart from the generally accepted accounting principles requirement that rent expense from operating leases be straight-lined for any incremental increases over the term of such operating lease.

33.2    At all times, Lessee shall keep and maintain full and correct records and books of account of the operations of Lessee in the Demised Premises and records and books of account of the entire business operations of Lessee in accordance with generally accepted accounting principles.  Upon request by Lessors, from time to time, Lessee shall make available, for inspection by Lessors or any such designee, during reasonable business hours, at the Facilities or Lessee's offices, the records and books of account covering the entire business operations of Lessee on the Demised Premises.

ARTICLE XXXIV -    LICENSURE/TERMINATION

34.1    Prior to the anticipated Commencement Date, within such time period as required by the DOH, and to the extent not already existing as of the Commencement Date, Lessee hereby agrees to cause each Subtenant to submit a complete application (except for the Commencement Date Rider, if required) to DOH in order to obtain the License permitting each Subtenant to operate its Facility as a skilled nursing facility, and to promptly submit any further documents as required in order to complete such application.  It is a condition precedent to Lessee's and Subtenants' rights to possession of each Facility that they obtain and maintain a License to operate each such Facility.  Copies of the License applications shall be provided to Lessors within seven (7) days of submission to CDPH.

34.2    Upon termination of this Lease (whether by reason of default, the natural expiration of the Term or otherwise, the following provisions shall be applicable:

(a)    Upon the expiration or other termination of this Lease, Lessee shall return to Lessors the Demised Premises and the Personal Property in a good, operating condition, licensed by DOH and by any governmental agencies having jurisdiction over the Demised Premises, reasonable wear and tear and damage by Casualty excepted, and free of liens or encumbrances arising through Lessee except for tax liens for current general real estate taxes or special assessments, personalty leases and other expenses incurred in the ordinary course of business which shall be prorated.

(b)    Lessors shall keep and shall not be obligated to return to Lessee any Base Rent paid by Lessee.  Lessors shall pay to Lessee the amount of any unused tax, insurance or other reserve deposited by Lessee during the Term, other than those relating to expenses accrued during the Term; provided that in the event any such amounts are held by a Lender, Lessors shall remit such amounts to Lessee upon Lessors' receipt from the Lender.  Lessee shall pay all bills incurred in the ownership of the Demised Premises and operation of any Facility from the Commencement Date through the termination date and shall receive and keep all income and suffer all losses incurred in the ownership of the Demised Premises and operation of the Facilities from the Commencement Date through the termination date.

(c)    During the period from the Commencement Date to the termination date:

(i)    Lessee shall be responsible for the payment of all real estate taxes in accordance with the provisions of Article VI hereof;

(ii)    Lessee shall maintain all required insurance and Lessee shall be liable for payment of and shall pay the premiums thereon; and

(iii)    In case of termination, Lessee shall be liable to return to Lessors, the Demised Premises and all Personal Property including all replacement Personal Property in a good and operating condition, reasonable wear and tear and damage by Casualty excepted, and free of liens or encumbrances arising through Lessee except for tax liens for current general real estate taxes or special assessments, which shall be prorated to the termination date, and except as to consumable items to the extent of consumption thereof, which, as consumed, will be replenished by Lessee in the ordinary course of business.

(d)    Upon termination of this Lease, the Parties will request appropriate inspections by governmental agencies upon the return of the Demised Premises to Lessors.  Lessee agrees that it will cure any violations found involving the Demised Premises or Personal Property.  Lessee agrees to execute such documents and take such actions as may be required in order to restore Lessors to ownership and possession of the Demised Premises and the Personal Property, including, without limitation, execution of any assignment or change of ownership documents required to license Lessors or any such assignee to operate the Facilities.

(e)    Lessee shall keep and maintain medical records in accordance with applicable law and permit reasonable access and copy thereof by Lessors in accordance with such law, and solely to the extent permitted by law.

(f)    Lessee shall keep and maintain such financial and operational records (including, without limitation, cost reports/contracts) as are required for the operation of the business under applicable laws.

(g)    Upon termination or expiration of this Lease, any furniture, fixtures, equipment, linens, food, supplies and personal property acquired by Lessee with respect to the Facility shall become the property of Lessors, and this Lease shall serve as an assignment for purposes of giving effect to such transfer.

ARTICLE XXXV -    CONDITIONS PRECEDENT AND CONCURRENT TO CLOSING

35.1    The following having occurred, or being prepared to occur, shall be conditions precedent to Lessee's obligation to proceed with this Lease:

(a)    Lessors' delivery of the Commencement Date Rider dated as of the Commencement Date, between Lessors and Lessee attached hereto as **Exhibit B**;

(b)    All schedules and exhibits to this Lease shall be true, complete and correct in all material respects.

35.2    The following shall be conditions precedent to Lessors' obligation to proceed with this Lease:

(a)    The execution and delivery of the Commencement Date Rider dated as of the Commencement Date, between Lessors and Lessee attached hereto as **Exhibit B**;

(b)    The execution and delivery prior to the Commencement Date of the Guaranty of Lease, in the form attached hereto as **Exhibit C**;

(c)    Lessee shall have duly and timely performed and fulfilled all of their duties, obligations, promises, covenants and agreements hereunder; and

(d)    Lessee shall not be in material breach of any term, provision or condition of this Lease.

35.3    Notwithstanding anything contained in Section 35.1 to the contrary, Lessee may in its sole discretion waive any conditions precedent or conditions concurrent contained in Section 35.1.

35.4    Notwithstanding anything contained in Section 35.2 to the contrary, Lessors may in their sole discretion waive any conditions precedent or conditions concurrent contained in Section 35.2.

ARTICLE XXXVI -    TRANSFER OF OPERATIONS UPON TERMINATION OF LEASE

36.1    The date on which (i) this Lease either terminates or expires pursuant to its terms or is terminated by either party whether pursuant to a right granted to it hereunder or otherwise, (ii) Lessee's right to possession of the Demised Premises is terminated pursuant to a right granted to it hereunder or otherwise, or (iii) Lessee otherwise abandons the Demised Premises shall be referred to as the "**Closing Date**" in this Article XXXVI.  On the Closing Date, this Lease shall be deemed and construed as an absolute assignment for purposes of vesting in Lessors (or Lessors' designee) all of Lessee's right, title and interest in and to the following intangible property which is now or hereafter used in connection with the operation of the Demised Premises to the extent that the same are assignable by law (the "**Intangibles**") and an assumption by Lessors (or Lessors' designee) of Lessee's obligations under the Intangibles from and after the Closing Date; provided that, from and after the Closing Date, Lessee shall indemnify, defend and hold harmless Lessors against any claims, losses, costs or damages, including reasonable attorneys' fees incurred or arising by reason of Lessee's obligations under the Intangibles during the Term of this Lease, and that Lessors shall indemnify, defend and hold harmless Lessee against any claims, losses, costs or damages, including reasonable attorneys' fees incurred or arising by reason of Lessors' obligations under the Intangibles from and after the termination of this Lease:

(a)    service contracts and equipment leases for the benefit of the Demised Premises to which Lessee or Subtenants are a party, and which can be terminated without penalty by Lessee within sixty (60) or fewer days' notice or which Lessors' request be assigned to Lessors (or Lessors' designee) pursuant to

33

this Article XXXVI, subject to any required consents of the Lessors or providers under such service contracts and equipment leases;

(b)    to the extent permitted by law, any provider agreements with Medicare, Medicaid or any other third-party payor programs (excluding the right to any reimbursement for periods prior to the Closing Date, as defined above) entered in connection with the Demised Premises to the extent assignable by Lessee or Subtenants; provided that in addition thereto Lessors (or Lessors' designees) shall be permitted to bill under Lessee's Medicare and Medicaid provider agreements, as applicable, until any assignment thereof has become effective, and Lessee shall promptly remit to Lessors (or Lessors' designees) any funds received with respect to such billing as they relate to dates of service following the Closing Date (it being expressly understood that Lessee shall be entitled to any funds received for service performed prior to the Closing Date);

(c)    all existing agreements with residents and any guarantors thereof of the Demised Premises, to the extent assignable by Lessee (excluding the right to any payments for periods prior to the Closing Date) and any and all patient trust fund accounts; and

(d)    at Lessors' option, the business of Lessee as conducted at the Demised Premises as a going concern, including but not limited to the name of the business conducted thereon and all telephone numbers presently in use therein.

36.2    Lessors shall be entitled to receive and retain all revenues from the Demised Premises accruing on or after 12:01 a.m. on the Closing Date.  Within fifteen (15) business days after the Closing Date, the following adjustments and prorations shall be determined as of the Closing Date:

(a)    Real estate taxes, ad valorem taxes, school taxes, assessments and personal property, intangible and use taxes, if any.  If the information as to the actual amount of any of the foregoing taxes and assessments are not available for the tax year in which the Closing Date occurs, the proration of such taxes shall be estimated based upon reasonable information available to the parties, including information disclosed by the local tax office or other public information, and an adjustment shall be made when actual figures are published or otherwise become available.

(b)    Lessee will terminate the employment of all employees on the Closing Date and shall be and remain liable for any and all wages, accrued vacation and sick leave pay for employees of the Demised Premises with respect to the period prior to 12:01 a.m. on the Closing Date.

(c)    Lessors shall receive a credit equal to any advance payments by patients at the Demised Premises to the extent attributable to periods after 12:01 a.m. on the Closing Date.

(d)    The present insurance coverage on the Demised Premises shall be terminated as of the Closing Date and there shall be no proration of insurance premiums.

(e)    All other income from, and expenses of, the Demised Premises (other than mortgage interest and principal), including but not limited to public utility charges and deposits, maintenance charges and service charges shall be prorated between Lessee and Lessors as of 12:01 a.m. on the Closing Date.  Lessee shall, if possible, obtain final utility meter readings as of the Closing Date.  To the extent that information for any such proration is not available, Lessee and Lessors shall effect such proration within sixty (60) days after the Closing Date.

(f)    Lessee shall be and remain responsible for any employee severance pay, accrued benefits (whether vested or unvested), and related taxes which may be payable as the result of any termination of an employee's employment on or prior to 12:01 a.m. on the Closing Date; provided that if the same is a

34

result of Lessors' or Lessors' designee's failure to comply with the WARN Act, then Lessors shall be responsible therefor and shall indemnity Lessee therefor.

36.3    All necessary arrangements shall be made to provide possession of the Demised Premises to Lessors or any such designee on the Closing Date, at which time of possession Lessee shall deliver to Lessors, or such designee, all medical records, patient records and other personal information concerning all patients residing at the Demised Premises as of the Closing Date and other relevant records used or developed in connection with the business conducted at the Demised Premises.  Such transfer and delivery shall be in accordance with all applicable laws, rules and regulations concerning the transfer of medical records and other types of patient records.

36.4    For the period commencing on the Closing Date and ending on the date Lessors, or any such designee, obtains any and all appropriate state or other governmental licenses and certifications required to operate each Facility, Lessee hereby agree that, to the extent permitted by law, Lessors, or any Lessors' designee, shall have the right, but not the obligation, to manage and operate the Demised Premises, on a triple net basis, and shall be entitled to all revenues of the Demised Premises during such period, and to use any and all licenses, certifications, provider agreements and managed care contracts issued to Lessee and the Subtenants by any federal, state or other governmental authority for such operation of the Demised Premises, if permitted by any such governmental authorities.  If Lessors or such designees exercise the right described above in this <u>Section 36.4</u>, the provisions of this <u>Section 36.4</u> shall be self-operative and shall constitute a management agreement between Lessee, on the one hand, and Lessors or any such designee, on the other hand, on the terms set forth above in this <u>Section 36.4</u>; provided, however, that upon the request of Lessors or any such designee, Lessee shall enter into a separate management agreement on the terms set forth in this <u>Section 36.4</u> and on such other terms and provisions as may be specified by Lessors or any designee.

36.5    Lessee shall provide Lessors with an accounting within fifteen (15) days after the Closing Date of all funds belonging to patients at the Demised Premises which are held by Lessee in a custodial capacity.  Such accounting shall set forth the names of the patients for whom such funds are held, the amounts held on behalf of each such patient and Lessee's warranty that the accounting is true, correct and complete.  Additionally, Lessee, in accordance with all applicable rules and regulations, shall make all necessary arrangements to transfer such funds to a bank account designated by Lessors, and Lessors shall in writing acknowledge receipt of and expressly assume all Lessee's financial and custodial obligations with respect thereto.  Notwithstanding the foregoing, Lessee will indemnify, defend and hold Lessors harmless, from all liabilities, claims and demands, including reasonable attorney's fees, in the event the amount of funds, if any, transferred to Lessors' bank account as provided above, did not represent the full amount of the funds then or thereafter shown to have been delivered to Lessee as custodian that remain undisbursed for the benefit of the patient for whom such funds were deposited, or with respect to any matters relating to patient funds which accrued during the Term and Lessors will indemnify, defend and hold Lessee harmless from all liabilities, claims and demands, including reasonable attorney's fees with respect to any matters relating to patient funds which accrue after the Term.

36.6    All cash, checks and cash equivalent at the Demised Premises and deposits in bank accounts (other than patient trust accounts) relating to the Demised Premises on the Closing Date shall remain Lessee's property after the Closing Date.  Subject to the provisions of Article XXIV hereof, all accounts receivable, loans receivable and other receivables of Lessee whether derived from operation of the Demised Premises or otherwise, shall remain the property of Lessee after the Closing Date.  Lessee shall retain full responsibility for the collection thereof.  Lessors shall assume responsibility for the billing and collection of payments on account of services rendered by it on and after the Closing Date.  In order to facilitate Lessee's collection efforts, Lessee agrees to deliver to Lessors, within a reasonable time after the Closing Date, a schedule identifying all of those private pay balances owing for the month prior to the Closing Date and Lessors agree to apply any payments received which are specifically designated as being applicable to services rendered prior to the Closing Date to reduce the pre-Closing Date balances of said patients by promptly remitting said payments to Lessee.  Payments

140109.00416/127070941v.8

received by Lessors or Lessee from patients owing money for services rendered by Lessors and Lessee and which are not allocated to a particular time period shall, for the first 45 days following the Closing Date, be applied to balances owed for services rendered by Lessee, and thereafter, shall be applied one-half (1/2) to the payment of Lessors' accounts receivable for that particular patient and one-half (1/2) to the payment of Lessee's account receivable for that particular patient. Lessors shall cooperate with Lessee's collection of their preclosing accounts receivable. Lessors shall have no liability for uncollectible receivables and shall not be obligated to bear any expense as a result of such activities on behalf of Lessee. Subject to the provisions of Article XXIV hereof, Lessors shall remit to Lessee or any assignee those portions of any payments received by Lessors which are specifically designated as repayment or reimbursement arising out of cost reports filed for the cost reporting periods ending on or prior to the Closing Date.

36.7    With respect to residents at the Demised Premises on the Closing Date, Lessors and Lessee agree as follows:

(a)    With respect to Medicare and Medicaid residents, Lessors and Lessee agree that subject to the provisions of Article XXIV hereof, payment for in-house residents covered by Medicare or Medicaid on the Closing Date will be made (on a per diem basis) by Medicare or Medicaid under current regulations directly to Lessee for services rendered at the Demised Premises prior to the Closing Date. Said payments shall be the sole responsibility of Lessee and, and Lessors shall in no way be liable therefor. After the Closing Date, Lessors and Lessee shall each have the right to review supporting books, records and documentation that are in the possession of the other relating to Medicaid or Medicare payments.

(b)    If, following the Closing Date, Lessors receives payment from any state or federal agency or third-party provider which represents reimbursement with respect to services provided at the Demised Premises prior to the Closing Date, Lessors agree that, subject to the provisions of Article XXIV hereof, it shall remit such payments to Lessee. Payments by Lessors to Lessee shall be accompanied by a copy of the appropriate remittance.

36.8    In addition to the obligations required to be performed hereunder by Lessee and Lessors on and after the Closing Date, Lessee and Lessors agree to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing Date such other instruments, documents and materials and Lessee shall perform such other acts and to execute, acknowledge, and/or deliver subsequent to the Closing Date such other instruments, as the other may reasonably request in order to effectuate the consummation of the transaction contemplated herein.

36.9    Lessee and Subtenants for themselves, their successors and assigns hereby indemnify and agree to defend and hold Lessors and their successors and assigns, as well as any future tenant of Lessors with respect to any of the Facilities harmless from any and all claims, demands, obligations, losses, liabilities, damages, recoveries and deficiencies (including interest, penalties and reasonable attorney's fees, costs and expenses) which any of them may suffer as a result of the breach by Lessee in the performance of any of their commitments, covenants or obligations under this Article XXXVI, or with respect to any suits, arbitration proceedings, administrative actions or investigations which relate to the use by Lessee of the Demised Premises during the Term or for any liability which may arise or accrue from operation of the Demised Premises as a nursing home during the Term, including without limitation, any amounts due or to be reimbursed to any governmental authority based upon any audit or review of Lessee, or of any Facility or the operation thereof and pertaining to the period prior to the Closing Date or any amounts recaptured under Titles XVIII or XIX based upon applicable Medicaid/Medicare recapture regulations. The rights of Lessors under this paragraph are without prejudice to any other remedies not inconsistent herewith which Lessors may have against Lessee pursuant to the terms of this Lease. The foregoing indemnity shall survive the expiration or termination of this Lease, whether due to lapse of time or otherwise, for a period of eighteen (18) months.

36.10    Lessors for themselves, their successors and assigns hereby indemnify and agree to defend and hold Lessee and Subtenants and their successors and assigns, with respect to any of the Facilities harmless from any and all claims, demands, obligations, losses, liabilities, damages, recoveries and deficiencies (including interest, penalties and reasonable attorney's fees, costs and expenses) which any of them may suffer as a result of the breach by Lessors in the performance of any of their commitments, covenants or obligations under this Article XXXVI, or with respect to any suits, arbitration proceedings, administrative actions or investigations which relate to the use by Lessee of the Demised Premises from and after the Term or for any liability which may arise or accrue from operation of the Demised Premises as a nursing home from and after the Term, including without limitation, any amounts due or to be reimbursed to any governmental authority based upon any audit or review of Lessee, or of any Facility or the operation thereof and pertaining to the period after the expiration or earlier termination of this Lease or any amounts recaptured under Titles XVIII or XIX based upon applicable Medicaid/Medicare recapture regulations.  The rights of Lessee and Subtenants under this paragraph are without prejudice to any other remedies not inconsistent herewith which Lessee and Subtenants may have against Lessor pursuant to the terms of this Lease.  The foregoing indemnity shall survive the expiration or termination of this Lease, whether due to lapse of time or otherwise, for a period of twelve (12) months.

36.11    Lessors shall have the right to offset against any monies due Lessee pursuant to the terms of this Article XXXVI, any amounts due by Lessee to Lessors pursuant to this Lease, including without limitation any amounts due for taxes, utilities, unemployment insurance premiums, payroll obligations or any other obligation arising from the operation of the Demised Premises.

36.12    Anything to the contrary contained in this Article XXXVI notwithstanding, in the event the termination of this Lease is due to a default by Lessee hereunder, none of the provisions of this Article XXXVI shall in any way limit, reduce, restrict or modify the rights otherwise granted to Lessors pursuant to this Lease, and to the extent any monies are due to Lessee pursuant to this Article XXXVI, such sums shall be applied by Lessors to any damages suffered by Lessors as a result of Lessee's default hereunder.

36.13    Lessors and Lessee agree to cooperate with each other in order to effectuate the terms and provisions of this Article XXXVI.

ARTICLE XXXVII -    RESERVED.

ARTICLE XXXVIII -   RESERVED

ARTICLE XXXIX -    MISCELLANEOUS

39.1    Lessee, upon paying the Rent and all other charges herein provided, and for observing and keeping the covenants, agreements, terms and conditions of this Lease on their part to be performed, shall lawfully and quietly hold, occupy and enjoy the Demised Premises and Personal Property during the Term of this Lease, and subject to their terms, without hindrance by Lessors or by any other person or persons claiming under Lessors.

39.2    All payments to be made by the Lessee hereunder (other than Base Rent), whether or not designated as "Additional Rent", shall be deemed Additional Rent, so that in the event of a default of payment when due, Lessors shall be entitled to all of the remedies available at law or equity, or under this Lease, for the nonpayment of Rent.

39.3    It is understood and agreed that the granting of any consent by Lessors to Lessee to perform any act of Lessee requiring Lessors' consent under the terms of this Lease, or the failure on the part of Lessors to object to any such action taken by Lessee without Lessors' consent, shall not be deemed a waiver by Lessors of their rights to require such consent for any further similar act by Lessee, and Lessee hereby expressly

covenants and warrants that as to all matters requiring Lessors' consent under the terms of this Lease, shall secure such consent for each and every happening of the event requiring such consent, and shall not claim any waiver on the part of Lessors of the requirement to secure such consent.

      39.4     Lessors and Lessee agree that, at the request of either party, a short form memorandum of this Lease may be recorded, to be filed in the real property records of the county in which the Demised Premises are located.

      39.5     Lessee represents that it did not deal with any broker in connection with this Lease, and hereby indemnifies Lessors against the claims or demands of any broker claimed through a relationship with Lessee. Lessors represent that they did not deal with any broker in connection with this Lease, and hereby indemnify Lessee against the claims or demands of any broker claimed through a relationship with Lessors.

      39.6     If an action shall be brought account of any breach of or to enforce or interpret any of the terms, covenants or conditions of this Lease, the prevailing party shall be entitled to recover from the other party, as part of the prevailing party's costs, reasonable attorneys' fees, the amount of which shall be fixed by the court and shall be made a part of any judgment rendered.

      39.7     Should Lessee hold possession hereunder after the expiration of the Term of this Lease with or without the consent of Lessors, Lessee shall become a tenant on a month-to-month basis upon all the terms, covenants and conditions herein specified, excepting however that Lessee shall pay Lessors a monthly rental, for the period of such month-to-month tenancy, in an amount equal to twice the last Rent specified.

      39.8     All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a)(i) upon the delivery (or refusal to accept delivery) by personal delivery, or (ii) reliable overnight express delivery service, and (b) by electronic mail transmission, addressed as follows:

| | |
|---|---|
| To Lessors: | c/o Mich NH 16 LLC<br>33 35th Street, Suite A404<br>Brooklyn, New York 11232<br>Attention: Boruch Drillman<br>Email: barrymich1234@gmail.com |
| With a copy to: | NBC Law<br>675 Third Avenue, 8th Floor<br>New York, New York 10017<br>Attention:  Edward H. Burnbaum, Esq.<br>Email: eburnbaum@nbclaw.com |
| To Lessee: | Coronado Operator, LLC<br>2907 West Bay to Bay Boulevard, Suite 303<br>Tampa, FL  33629<br>Attention: Stuart Lindeman<br>Email: slindeman@missionhealthcommunities.com |
| With a copy to: | Curis Holdings, LLC<br>2909 West Bay to Bay Boulevard, Suite 300<br>Tampa, FL  33629<br>Attention: Scott Feuer and Brian Crino<br>Email: sfeuer@scpandco.com and<br>    bcrino@scpandco.com |

140109.00416/127070941v.8

|  | With a copy | Blank Rome LLP |
|--|--|--|
|  |  | One Logan Square |
|  |  | Philadelphia, PA 19103-6998 |
|  |  | Attention: Matthew J. Comisky, Esquire |
|  |  | Email: matthew.comisky@blankrome.com |

or such other address that any Party designates to the other by written notice given in the manner stated above. Any notice sent by electronic mail shall be deemed delivered upon transmission, so long as said transmission is evidenced by proof of said transmittal and sent before 5:00 p.m. local time at the place of the recipient and if sent after 5:00 p.m. shall be deemed delivered on the next business day. Notices from counsel to Lessors shall for all purposes hereunder constitute notice from Lessors. Notices from counsel to Lessee shall for all purposes hereunder constitute notice from Lessee.

39.9    Each party agrees at any time, and from time to time, upon not less than ten (10) days prior written request from the other Party, but no more often than twice per year except in the case of Lessors' financing, refinancing or sale of the Facilities, to execute, acknowledge and deliver to the other Party a statement in writing, certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), the dates to which the Rent has been paid, the amount of the Additional Rent held by Lessors, and whether to the best Knowledge of such Party an Event of Default has occurred or whether any events have occurred which, with the giving of notice or the passage of time, or both, could constitute an Event of Default hereunder, it being intended that any such statement delivered pursuant to this section may be relied upon by any prospective assignee, mortgagee or purchaser of the fee interest in the Demised Premises or of this Lease.

39.10    All of the provisions of this Lease shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof.

39.11    Any reference herein to the expiration of this Lease shall be deemed to include any termination thereof by expiration, or pursuant to Articles referring to earlier termination.

39.12    The headings and titles in this Lease are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Lease, or in any way affect this Lease.

39.13    This Lease contains the entire agreement between the Parties and any executory agreement hereafter made shall be ineffective to change, modify or discharge it in whole or in part unless such executory agreement is in writing and signed by the Party against whom enforcement of the change, modification or discharge is sought. This Lease cannot be changed orally or terminated orally.

39.14    Except as otherwise herein expressly provided, the covenants, conditions and agreements in this Lease shall bind and inure to the benefit of Lessors and Lessee and their respective successors and assigns.

39.15    All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require. "Any" or "any" shall mean "any and all"; "or" shall mean "and/or"; "including" shall mean "including, but not limited to".

39.16    This Lease may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement. Originals

signatures circulated by facsimile and/or electronic mail or other electronic method shall be deemed to constitute the delivery of an original signature.

39.17    If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

39.18    This Lease shall be construed in accordance with the laws of the State of Delaware without regard to conflict of laws principles.

39.19    It is expressly understood and agreed that except as otherwise expressly provided herein, this Lease shall not be construed as creating any personal liability whatsoever against any member, officer, director, shareholder or agent of Lessors and/or of Lessee and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any obligations set forth herein or to perform any covenant, either expressed or implied, herein contained, and that, except as otherwise provided herein, all personal liability of any member, officer, director, shareholder or agent of Lessors and/or of Lessee of every sort, if any, is hereby expressly waived by the other Party.

39.20    The term "Knowledge" as used herein shall be deemed to mean the best of a Person's knowledge, and of the principals, officers and agents of such Person.  Any fact or circumstance that a Person and their principals, officers or agents reasonably should know assuming commercially reasonable best efforts were utilized, shall be deemed the Knowledge of such Person.  The term "commercially reasonable best efforts" shall mean the efforts that a commercially reasonable Person desirous of achieving a result would use in similar circumstances to achieve that result as expeditiously as reasonably practicable, provided, however, that a Person required to use commercially reasonable best efforts under this Lease will not thereby be required to take any action that would result in a material adverse change in the benefits to such Person of this Lease or the transactions contemplated hereby or to make any change in its business, incur any extraordinary fees or expenses or incur any other material burden.  "Person" shall mean any individual, partnership (general and/or limited), association, corporation, limited liability company, trust, joint venture or other legal entity of any and every nature whatsoever.

39.21    Governing Law.    THIS AGREEMENT AND THE TRANSACTION DOCUMENTS SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.

39.22    WAIVER OF JURY TRIAL.  THE PARTIES TO THIS AGREEMENT EACH HEREBY KNOWINGLY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE AGREEMENT AND CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

140109.00416/127070941v.8

IN WITNESS WHEREOF, the parties have caused this Commencement Date Rider to be executed as of the date first set forth above.

**LESSORS**:

MICH 16 ARROWHEAD LLC, a Georgia limited liability company
MICH 16 CHASE LLC, a Kansas limited liability company
MICH 16 DOWNS LLC, a Kansas limited liability company
MICH 16 EDWARDSVILLE LLC, a Kansas limited liability company
MICH 16 EL DORADO LLC, a Kansas limited liability company
MICH 16 ESKRIDGELLC, a Kansas limited liability company
MICH 16 KAS LLC, a Kansas limited liability company
MICH 16 LANSING LLC, a Kansas limited liability company
MICH 16 NEODESHA LLC, a Kansas limited liability company
MICH 16 PARKWAY LLC, a Kansas limited liability company
MICH 16 PITTSBURG LLC, a Kansas limited liability company
MICH 16 SPRING HILL LLC, a Kansas limited liability company
MICH 16 WAKEFIELD LLC, a Kansas limited liability company
MICH 16 WELLINGTON LLC, a Kansas limited liability company
MICH 16 LINCOLN LLC, a Kansas limited liability company
MICH 16 WILSON LLC, a Kansas limited liability company

By:    MICH NH 16 LLC,
       a Delaware limited liability company

By: _____
Name: Boruch Drillman
Title:  Authorized Signatory

**LESSEE**:

**CORONADO OPERATOR, LLC,**
a Florida limited liability company

By: _____
Name: Stuart Lindeman
Title:  CEO

Signature page to Master Lease

## EXHIBIT A

Description of Facilities

| Facility Name | Facility address | Type | # of Beds |
|---|---|---|---|
| Arrowhead Health & Rehabilitation Center | 239 Arrowhead Boulevard Jonesboro, GA 30236 | Skilled Nursing Facility | 115 |
| Chase County Care & Rehabilitation Center | 612 Walnut, Po Box 589 Cottonwood Falls, KS 66845 | Skilled Nursing Facility | 46 |
| Downs Care & Rehabilitation Center | 1218 Kansas Street Downs, KS 67437 | Skilled Nursing Facility | 45 |
| Parkway Care & Rehabilitation | 749 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 50 |
| Kaw River Care & Rehabilitation Center | 750 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 45 |
| Edwardsville Care & Rehab Center | 751 Blake Street Edwardsville, KS 66111 | Skilled Nursing Facility | 102 |
| El Dorado Care & Rehabilitation Center | 900 Country Club Lane El Dorado, KS 67042 | Skilled Nursing Facility | 50 |
| Eskridge Care & Rehabilitation Center | 505 N. Main Street Eskridge, KS 66423 | Skilled Nursing Facility | 60 |
| Lansing Care & Rehabilitation Center | 210 Plaza Drive, Po Box 250 Lansing, KS 66043 | Skilled Nursing Facility | 58 |
| Neodesha Care & Rehabilitation Center | 1626 N 8th Street Neodesha, KS 66757 | Skilled Nursing Facility | 45 |
| Pittsburg Care and Rehabilitation Center | 1005 E Centennial Drive Pittsburg, KS 66762 | Skilled Nursing Facility | 86 |
| Spring Hill Care & Rehabilitation Center | 251 E Wilson Avenue Spring Hill, KS 66083 | Skilled Nursing Facility | 45 |
| Wakefield Care & Rehabilitation Center | 509 Grove Street Wakefield, KS 67487 | Skilled Nursing Facility | 45 |
| Wellington Care & Rehabilitation Center | 102 W Botkin Street Wellington, KS 67152 | Skilled Nursing Facility | 45 |
| Wichita Care & Rehabilitation Center | 4007 E Lincoln Street Wichita, KS 67218 | Skilled Nursing Facility | 50 |
| Wilson Care & Rehabilitation Center | 611 31st Street, Po Box 160 Wilson, KS 67490 | Skilled Nursing Facility | 40 |

**EXHIBIT B**

**COMMENCEMENT DATE RIDER**

This Commencement Date Rider is entered into as _____ 1, 2022 between _____(collectively, the "**Lessors**"), and _____ (collectively, the "**Lessee**").

WHEREAS, Lessors and Lessee entered into that certain Master Lease Agreement (the "Lease") pursuant to which Lessors has agreed to lease to Lessee and Lessee has agreed to lease from Lessors the Demised Premises and Personal Property described therein; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the definitions ascribed to them in the Lease;

NOW, THEREFORE, in consideration of the mutual covenants herein, the parties hereto agree as follows:

Lease Term. Lessors and Lessee agree that the term of the Lease shall commence on _____ __, 2022 (the "**Commencement Date**") and terminate on the day prior to the [_____] ([__]) year anniversary of the Commencement Date, unless sooner terminated as provided therein.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Commencement Date Rider to be executed as of the date first set forth above.

**LESSORS**:

MICH 16 ARROWHEAD LLC, a Georgia limited liability company
MICH 16 CHASE LLC, a Kansas limited liability company
MICH 16 DOWNS LLC, a Kansas limited liability company
MICH 16 EDWARDSVILLE LLC, a Kansas limited liability company
MICH 16 EL DORADO LLC, a Kansas limited liability company
MICH 16 ESKRIDGELLC, a Kansas limited liability company
MICH 16 KAW LLC, a Kansas limited liability company
MICH 16 LANSING LLC, a Kansas limited liability company
MICH 16 NEODESHA LLC, a Kansas limited liability company
MICH 16 PARKWAY LLC, a Kansas limited liability company
MICH 16 PITTSBURG LLC, a Kansas limited liability company
MICH 16 SPRING HILL LLC, a Kansas limited liability company
MICH 16 WAKEFIELD LLC, a Kansas limited liability company
MICH 16 WELLINGTON LLC, a Kansas limited liability company
MICH 16 LINCOLN LLC, a Kansas limited liability company
MICH 16 WILSON LLC, a Kansas limited liability company

By:    MICH NH 16 LLC,
       a Delaware limited liability company


       By: _____
       Name:  Eliyahu Konovitch
       Title:    Chief Financial Officer

**LESSEE**:

**CORONADO OPERATOR, LLC,**
a Florida limited liability company


By: _____
Name:  Stuart Lindeman
Title:    CEO

# EXHIBIT C

# FORM OF GUARANTY

LEASE GUARANTY
*(Curis Holdings-Coronado)*

This GUARANTY (this "Guaranty") is given as of April ___, 2022 ("Effective Date"), by Curis Holdings LLC, a Florida limited liability company ("Guarantor"), in favor of the Landlord entities listed on Exhibit A to this Guaranty (together, "Landlord"), with reference to the following facts:

RECITALS

A.    Coronado Operator, LLC, a Florida limited liability company ("Tenant"), has executed and delivered to Landlord a Master Lease dated the same date as this Guaranty (as amended, restated, modified, renewed or replaced, the "Master Lease") pursuant to which Tenant is leasing from Landlord the skilled nursing facilities identified in the Master Lease (the "Facilities").

B.    Tenant has subleased the Facilities to the entities listed on Exhibit B (each a "Subtenant" and collectively, the "Subtenants") to this Guaranty pursuant to a sublease between such subtenant and Tenant (collectively, the "Subleases").

C.    Guarantor is an affiliate of Tenant and Subtenants and acknowledges that it will be economically benefitted by Tenant's execution of the Master Lease.  It is to the advantage of Guarantor that Landlord enter into the Master Lease and consent to the Subleases.

D.    As a material inducement to Landlord to lease the Facilities pursuant to the Master Lease and consent to the Subleases, Guarantor has agreed to guarantee the payment of all amounts due from, and the performance of all obligations undertaken by Tenant and its Affiliates under the Master Lease and the other Transaction Documents (as defined in the Master Lease), all as hereinafter set forth.

WHEREFORE, the parties hereby agree as follows:

1.    Defined Terms.  All capitalized terms used herein and not defined herein shall have the meaning for such terms set forth in the Master Lease.

2.    Guaranty.  Guarantor hereby unconditionally and irrevocably guaranties to Landlord (i) the payment when due of all Rent and all other sums payable by Tenant and its Affiliates under the Master Lease and all the other Transaction Documents; and (ii) the faithful and prompt performance when due of each and every one of the terms, conditions and covenants to be kept and performed by Tenant and its Affiliates under the Transaction Documents, any and all amendments, modifications, extensions and renewals of the Transaction Documents, including without limitation all indemnification obligations, insurance obligations, and all obligations to operate, rebuild, restore or replace any facilities or improvements now or hereafter located on the real estate covered by the Master Lease (collectively, the "Guaranteed Obligations").  In the event of the failure of Tenant or its Affiliates to pay any such amounts owed, or to render any other performance required of Tenant or its Affiliates under the Transaction Documents, when due, Guarantor shall, upon prior written notice from Landlord, perform or cause to be performed all provisions of the Transaction Documents to be performed by Tenant or its Affiliates thereunder,

and pay all damages that may result from the non-performance thereof to the full extent provided under the Transaction Documents.  As to the Guaranteed Obligations, Guarantor's liability under this Guaranty is without limit.

3.     <u>Survival of Guaranteed Obligations</u>.   The obligations of Guarantor under this Guaranty with respect to the Transaction Documents shall survive and continue in full force and effect notwithstanding:

(a)     any amendment, modification, or extension of any Transaction Document;

(b)     any compromise, release, consent, extension, indulgence or other action or inaction in respect of any terms of any Transaction Document or any other guarantor;

(c)     any exercise or nonexercise by Landlord of any right, power or remedy under or in respect of any Transaction Document or any security held by Landlord with respect thereto, or any waiver of any such right, power or remedy;

(d)     any bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, liquidation, or the like of Tenant or any other guarantor;

(e)     any limitation of Tenant's liability under any Transaction Document or any limitation of Tenant's liability thereunder which may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of any Transaction Document or any term thereof;

(f)     any sale, lease, or transfer of all or any part of any interest in any Facilities to any other person, firm or entity other than to Landlord;

(g)     any extensions of time for performance under the Transaction Documents, whether prior to or after maturity;

(h)     the release of any collateral from any lien in favor of Landlord, or the release of Tenant from performance or observation of any of the agreements, covenants, terms or conditions contained in any Transaction Document by operation of law or otherwise;

(i)     the fact that Tenant may or may not be personally liable, in whole or in part, under the terms of any Transaction Document to pay any money judgment;

(j)     the failure to give Guarantor any notice of acceptance, default or otherwise;

(k)     any other guaranty now or hereafter executed by Guarantor or anyone else in connection with any Transaction Document;

(l)     any rights, powers or privileges Landlord may now or hereafter have against any other person, entity or collateral; or

(m)     any other circumstances, whether or not Guarantor has notice or knowledge thereof, other than the payment or performance of all of the Guaranteed Obligations.

4.      <u>Primary Liability</u>.  The liability of Guarantor with respect to the Transaction Documents shall be primary, direct and immediate, and Landlord may proceed against Guarantor: (i) prior to or in lieu of proceeding against Tenant, its assets, any security deposit, or any other guarantor; and (ii) prior to or in lieu of pursuing any other rights or remedies available to Landlord. All rights and remedies afforded to Landlord by reason of this Guaranty or by law are separate, independent and cumulative, and the exercise of any rights or remedies shall not in any way limit, restrict or prejudice the exercise of any other rights or remedies.  In the event of any default under any Transaction Document, a separate action or actions may be brought and prosecuted against Guarantor whether or not Tenant is joined therein or a separate action or actions are brought against Tenant or any other guarantor.  Landlord may maintain successive actions for other defaults. Landlord's rights hereunder shall not be exhausted by its exercise of any of its rights or remedies or by any such action or by any number of successive actions until and unless all Guaranteed Obligations have been paid and fully performed.

5.      <u>Obligations Not Affected</u>.  In such manner, upon such terms and at such times as Landlord in its sole discretion deems necessary or expedient, and without notice to Guarantor, Landlord may: (a) amend, alter, compromise, accelerate, extend or change the time or manner for the payment or the performance of any obligation hereby guaranteed; (b) extend, amend or terminate any of the Transaction Documents; or (c) release Tenant by consent to any assignment (or otherwise) as to all or any portion of the Guaranteed Obligations.  Any exercise or non-exercise by Landlord of any right hereby given Landlord, dealing by Landlord with Guarantor or any other guarantor, Tenant or any other person, or change, impairment, release or suspension of any right or remedy of Landlord against any person including Tenant and any other guarantor will not affect any of the obligations of Guarantor hereunder or give Guarantor any recourse or offset against Landlord.

6.      <u>Waiver</u>.  With respect to the Transaction Documents, Guarantor hereby waives and relinquishes:

(a)      any right to require Landlord to proceed against Tenant or any other person or to proceed against or exhaust any security held by Landlord at any time or to pursue any other remedy in Landlord's power before proceeding against Guarantor or to require that Landlord cause a marshaling of Tenant's assets or to proceed against Tenant;

(b)      any defense that may arise by reason of the incapacity or lack of authority of any other person or persons;

(c)      notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Tenant, Landlord, any creditor of Tenant or Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Landlord or in connection with any obligation hereby guaranteed;

(d)      any defense based upon an election of remedies by Landlord which destroys or otherwise impairs the subrogation rights of Guarantor or the right of Guarantor to proceed against Tenant for reimbursement, or both;

(e)      any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal;

(f)      any duty on the part of Landlord to disclose to Guarantor any facts Landlord may now or hereafter know about Tenant, regardless of whether Landlord has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Tenant and of all circumstances bearing on the risk of non-payment or non-performance of any Guaranteed Obligations;

(g)      any defense arising because of Landlord's election, in any proceeding instituted under the federal Bankruptcy Code, of the application of Section 1111 (b)(2) of the federal Bankruptcy Code; and

(h)      all rights and remedies accorded by applicable law to guarantors, including without limitation, any extension of time conferred by any law now or hereafter in effect and any requirement or notice of acceptance of this Guaranty or any other notice to which the undersigned may now or hereafter be entitled to the extent such waiver of notice is permitted by applicable law.

7.      <u>Warranties</u>.  With respect to the Transaction Documents, Guarantor warrants that: (a)      this Guaranty is executed at Tenant's request; and (b) Guarantor has established adequate means of obtaining from Tenant on a continuing basis financial and other information pertaining to Tenant's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Guarantor further agrees that Landlord shall have no obligation to disclose to Guarantor information or material acquired in the course of Landlord's relationship with Tenant.

8.      <u>No-Subrogation</u>.  Until all obligations of Tenant under the Transaction Documents have been satisfied and discharged in full , Guarantor shall not have any right of subrogation and waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord with respect to the Master Lease.

9.      <u>Subordination</u>.  Upon the occurrence of an Event of Default under any Transaction Document, which is not cured by Guarantor or any other guarantor, the indebtedness or obligations of Tenant to Guarantor shall not be paid in whole or in part nor will Guarantor accept any payment of or on account of any amounts owing, without the prior written consent of Landlord and at Landlord's request, Guarantor shall cause Tenant to pay to Landlord all or any part of the subordinated indebtedness until the obligations under the Transaction Documents have been paid in full.  Any payment by Tenant in violation of this Guaranty shall be received by Guarantor in trust for Landlord, and Guarantor shall cause the same to be paid to Landlord promptly on account of the amounts owing from Tenant to Landlord.  No such payment will reduce or affect in any manner the liability of Guarantor under this Guaranty.

4

10.    No Delay.  Any payments required to be made by Guarantor hereunder shall become due on demand in accordance with the terms hereof immediately upon the happening of an Event of Default under any Transaction Document.

11.    Application of Payments.  With respect to the Transaction Documents, and with or without notice to Guarantor, Landlord, in Landlord's sole discretion and at any time and from time to time and in such manner and upon such terms as Landlord deems appropriate, may (a) apply any or all payments or recoveries from Tenant or from any other guarantor under any other instrument or realized from any security, in such manner and order of priority as Landlord may determine, to any indebtedness or other obligation of Tenant with respect to the Transaction Documents and whether or not such indebtedness or other obligation is guaranteed hereby or is otherwise secured or is due at the time of such application, and (b) refund to Tenant any payment received by Landlord under the Transaction Documents.

12.    Guaranty Default.

(a)    As used herein, the term "Guaranty Default" shall mean one or more of the following events (subject to applicable cure periods):

(i)    the failure of Guarantor to pay the amounts required to be paid hereunder at the times specified in this Guaranty;

(ii)    the failure of Guarantor to observe and perform any covenants, conditions or agreement on its part to be observed or performed, other than as referred to in Subsection (i) above, for a period of thirty (30) days after written notice of such failure has been given to Guarantor by Landlord, unless Landlord agrees in writing to an extension of such time prior to its expiration; or

(iii)    the occurrence of an Event of Default under the Master Lease or any of the other Transaction Documents.

(b)    Upon the occurrence of a Guaranty Default, Landlord shall have the right to bring such actions at law or in equity, including appropriate injunctive relief, as it deems appropriate to compel compliance, payment or deposit, and among other remedies to recover its reasonable attorneys' fees in any proceeding, including any appeal therefrom and any post-judgement proceedings.

13.    [Reserved].

14.    Notices.  All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a)(i) upon the delivery (or refusal to accept delivery) by personal delivery, or (ii) reliable overnight express delivery service, and (b) by electronic mail transmission, addressed as follows:

5

|            |                                                                                                                                                                                          |
|------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| <u>Guarantors:</u> | Curis Holdings, LLC<br>2907 West Bay to Bay Boulevard, Suite 303<br>Tampa, FL 33629<br>Attention: Stuart Lindeman<br>Email: <u>slindeman@missionhealthcommunities.com</u>                  |
| With a copy to:<br>(which shall not<br>constitute notice) | Blank Rome LLP<br>One Logan Square<br>Philadelphia, PA 19103-6998<br>Attention: Matthew J. Comisky, Esquire<br>Email: <u>matthew.comisky@blankrome.com</u>                 |
| <u>Landlord:</u> | c/o Mich NH 16 LLC<br>33 35th Street, Suite A404<br>Brooklyn, New York 11232<br>Attention: Boruch Drillman<br>Email: <u>barrymich1234@gmail.com</u>                                        |
| With copy to: (which<br>shall not constitute<br>notice) | NBC Law<br>675 Third Avenue, 8th Floor<br>New York, NY 10017<br>Attention: Edward H. Burnbaum, Esquire<br>Email: <u>eburnbaum@nbclaw.com</u>                  |

or such other address that any Party designates to the other by written notice given in the manner stated above. Any notice sent by electronic mail shall be deemed delivered upon transmission, so long as said transmission is evidenced by proof of said transmittal, and sent before 5:00 p.m. local time at the place of the recipient and if sent after 5:00 p.m. shall be deemed delivered on the next business day. Notices from counsel shall for all purposes hereunder constitute notice from such party.

15. <u>Miscellaneous</u>.

(a)    No term, condition or provision of this Guaranty may be waived except by an express written instrument to that effect signed by Landlord. No waiver of any term, condition or provision of this Guaranty will be deemed a waiver of any other term, condition or provision, irrespective of similarity, or constitute a continuing waiver of the same term, condition or provision, unless otherwise expressly provided.

(b)    If any one or more of the terms, conditions or provisions contained in this Guaranty is found in a final award or judgment rendered by any court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining terms, conditions and provisions of this Guaranty shall not in any way be affected or impaired thereby, and this Guaranty shall be interpreted and construed as if the invalid, illegal, or unenforceable term, condition or provision had never been contained in this Guaranty.

(c)      THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, EXCEPT THAT THE LAWS OF THE STATE IN WHICH A FACILITY IS LOCATED SHALL GOVERN THIS AGREEMENT TO THE EXTENT NECESSARY (i) TO OBTAIN THE BENEFIT OF THE RIGHTS AND REMEDIES SET FORTH HEREIN WITH RESPECT TO SUCH FACILITY, AND (ii) FOR PROCEDURAL REQUIREMENTS WHICH MUST BE GOVERNED BY THE LAWS OF THE STATE IN WHICH SUCH FACILITY IS LOCATED.  GUARANTOR CONSENTS TO IN PERSONAM JURISDICTION BEFORE THE STATE AND FEDERAL COURTS OF ILLINOIS AND AGREES THAT ALL DISPUTES CONCERNING THIS GUARANTY BE HEARD IN THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED OR IN ILLINOIS .  GUARANTOR AGREES THAT SERVICE OF PROCESS MAY BE EFFECTED UPON IT UNDER ANY METHOD PERMISSIBLE UNDER THE LAWS OF THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED OR ILLINOIS AND IRREVOCABLY WAIVES ANY OBJECTION TO VENUE IN THE STATE AND FEDERAL COURTS OF THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED AND OF ILLINOIS.

(d)      GUARANTOR AND LANDLORD HEREBY WAIVE TRIAL BY JURY AND THE RIGHT THERETO IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING ON, UNDER, OUT OF, BY REASON OF OR RELATING IN ANY WAY TO THIS GUARANTY OR THE INTERPRETATION, BREACH OR ENFORCEMENT THEREOF.

(e)      In the event of any suit, action, arbitration or other proceeding to interpret this Guaranty, or to determine or enforce any right or obligation created hereby, the prevailing party in the action shall recover such party's actual costs and expenses reasonably incurred in connection therewith, including, but not limited to, reasonable attorneys' fees and costs of appeal, post judgment enforcement proceedings (if any) and bankruptcy proceedings (if any).  Any court, arbitrator or panel of arbitrators shall, in entering any judgment or making any award in any such suit, action, arbitration or other proceeding, in addition to any and all other relief awarded to such prevailing party, include in such-judgment or award such party's costs and expenses as provided in this paragraph.

(f)      Guarantor (i) represents that they have been represented and advised by counsel in connection with the execution of this Guaranty; (ii) acknowledges receipt of a copy of the Transaction Documents; and (iii) further represents that Guarantor has been advised by counsel with respect thereto.  This Guaranty shall be construed and interpreted in accordance with the plain meaning of its language, and not for or against Guarantor or Landlord, and as a whole, giving effect to all of the terms, conditions and provisions hereof.

(g)      Except as provided in any other written agreement now or at any time hereafter in force between Landlord and Guarantor, this Guaranty shall constitute the entire agreement of Guarantor with Landlord with respect to the subject matter hereof, and no representation, understanding, promise or condition concerning the subject matter hereof will be binding upon Landlord or Guarantor unless expressed herein.

(h)    All stipulations, obligations, liabilities and undertakings under this Guaranty shall be binding upon Guarantor and its respective successors and assigns and shall inure to the benefit of Landlord and to the benefit of Landlord's successors and assigns.

(i)    Whenever the singular shall be used hereunder, it shall be deemed to include the plural (and vice-versa) and reference to one gender shall be construed to include all other genders, including neuter, whenever the context of this Guaranty so requires.  Section captions or headings used in the Guaranty are for convenience and reference only, and shall not affect the construction thereof.

*[Signatures and acknowledgment follows.]*

Guaranty (Master Lease)
140109.00416/127071128v.3

*Signature Page to*
*Lease Guaranty*
*(HGP - Curis Holdings-Coronado)*

GUARANTOR:

Curis Holdings LLC,
a Florida limited liability company

By: _____

Name:    Stuart Lindeman

Title:    President and Chief Executive Officer

*Exhibit A to*
*Lease Guaranty*
*(Curis Holdings-Coronado)*


List of Landlords

MICH 16 ARROWHEAD LLC, a Georgia limited liability company
MICH 16 CHASE LLC, a Kansas limited liability company
MICH 16 DOWNS LLC, a Kansas limited liability company
MICH 16 EDWARDSVILLE LLC, a Kansas limited liability company
MICH 16 EL DORADO LLC, a Kansas limited liability company
MICH 16 ESKRIDGE LLC, a Kansas limited liability company
MICH 16 KAW LLC, a Kansas limited liability company
MICH 16 LANSING LLC, a Kansas limited liability company
MICH 16 NEODESHA LLC, a Kansas limited liability company
MICH 16 PARKWAY LLC, a Kansas limited liability company
MICH 16 PITTSBURG LLC, a Kansas limited liability company
MICH 16 SPRING HILL LLC, a Kansas limited liability company
MICH 16 WAKEFIELD LLC, a Kansas limited liability company
MICH 16 WELLINGTON LLC, a Kansas limited liability company
MICH 16 LINCOLN LLC, a Kansas limited liability company and
MICH 16 WILSON LLC, a Kansas limited liability company

140109.00416/127071128v.3

*Exhibit B to*
*Lease Guaranty*
*(Curis Holdings-Coronado)*

List of Subtenants

1.      Arrowhead Operator, LLC

2.      Chase County Operator, LLC

3.      Downs Operator, LLC

4.      Parkway Operator, LLC

5.      Kaw River Operator, LLC

6.      Edwardsville Operator, LLC

7.      El Dorado Operator, LLC

8.      Eskridge Operator, LLC

9.      Lansing Operator, LLC

10.     Neodesha Operator, LLC,

11.     Pittsburg Operator, LLC

12.     Spring Hill Operator, LLC

13.     Wakefield Operator, LLC

14.     Wellington Operator, LLC

15.     Wichita Operator, LLC

16.     Wilson Operator, LLC

140109.00416/127071128v.3

LEASE GUARANTY
*(Subtenant - Coronado)*

This GUARANTY (this "Guaranty") is given as of April 15, 2022 ("Effective Date"), by the Subtenant entities listed on Exhibit A to this Guaranty (each a "Guarantor", and collectively, the "Guarantors"), in favor of the Landlord entities listed on Exhibit B to this Guaranty ("Landlord"), with reference to the following facts:

RECITALS

A.      Coronado Operator LLC, a Florida limited liability company ("Tenant"), has executed and delivered to Landlord a Master Lease dated the same date as this Guaranty (as amended, restated, modified, renewed or replaced, the "Master Lease") pursuant to which Tenant is leasing from Landlord the skilled nursing facilities identified in the Master Lease (the "Facilities").

B.      Each Guarantor is the subtenant of one of the Facilities pursuant to a sublease between such Guarantor and Tenant (collectively, the "Subleases"). It is to the advantage of each Guarantor that Landlord enter into the Master Lease and consent to the Subleases.

C.      As a material inducement to Landlord to lease the Facilities pursuant to the Master Lease and consent to the Subleases, the Guarantors have agreed to guarantee the payment of all amounts due from, and the performance of all obligations undertaken by the Tenant and its Affiliates under the Master Lease and the other Transaction Documents (as defined in the Master Lease), all as hereinafter set forth.

WHEREFORE, the parties hereby agree as follows:

1.      Defined Terms. All capitalized terms used herein and not defined herein shall have the meaning for such terms set forth in the Master Lease.

2.      Guaranty. Each Guarantor hereby unconditionally and irrevocably guaranties to Landlord (i) the payment when due of all Rent and all other sums payable by the Tenant and its Affiliates under the Master Lease and all the other Transaction Documents; and (ii) the faithful and prompt performance when due of each and every one of the terms, conditions and covenants to be kept and performed by Tenant and its Affiliates under the Transaction Documents, any and all amendments, modifications, extensions and renewals of the Transaction Documents, including without limitation all indemnification obligations, insurance obligations, and all obligations to operate, rebuild, restore or replace any facilities or improvements now or hereafter located on the real estate covered by the Master Lease (collectively, the "Guaranteed Obligations"). In the event of the failure of Tenant or its Affiliates to pay any such amounts owed, or to render any other performance required of Tenant or its Affiliates under the Transaction Documents, when due, Guarantors shall, upon prior written notice from Landlord, perform or cause to be performed all provisions of the Transaction Documents to be performed by Tenant or its Affiliates thereunder, and pay all damages that may result from the non-performance thereof to the full extent provided under the Transaction Documents. As to the Guaranteed Obligations, each Guarantor's liability under this Guaranty is without limit.

1

3.　　Survival of Guaranteed Obligations.  The obligations of each Guarantor under this Guaranty with respect to the Transaction Documents shall survive and continue in full force and effect notwithstanding:

(a)　　any amendment, modification, or extension of any Transaction Document;

(b)　　any compromise, release, consent, extension, indulgence or other action or inaction in respect of any terms of any Transaction Document or any other guarantor (including any other Guarantor);

(c)　　any exercise or nonexercise by Landlord of any right, power or remedy under or in respect of any Transaction Document or any security held by Landlord with respect thereto, or any waiver of any such right, power or remedy;

(d)　　any bankruptcy, insolvency, reorganization, arrangement, adjustment, composition, liquidation, or the like of the Tenant or any other guarantor (including any other Guarantor);

(e)　　any limitation of Tenant's liability under any Transaction Document or any limitation of Tenant's liability thereunder which may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of any Transaction Document or any term thereof;

(f)　　any sale, lease, or transfer of all or any part of any interest in any Facilities to any other person, firm or entity other than to Landlord;

(g)　　any extensions of time for performance under the Transaction Documents, whether prior to or after maturity;

(h)　　the release of any collateral from any lien in favor of Landlord, or the release of Tenant from performance or observation of any of the agreements, covenants, terms or conditions contained in any Transaction Document by operation of law or otherwise;

(i)　　the fact that Tenant may or may not be personally liable, in whole or in part, under the terms of any Transaction Document to pay any money judgment;

(j)　　the failure to give a Guarantor any notice of acceptance, default or otherwise;

(k)　　any other guaranty now or hereafter executed by Guarantor or anyone else in connection with any Transaction Document;

(l)　　any rights, powers or privileges Landlord may now or hereafter have against any other person, entity or collateral; or

(m)　　any other circumstances, whether or not Guarantor have notice or knowledge thereof, other than the payment or performance of all of the Guaranteed Obligations.

140109.00416/127071129v.3

4.      Primary Liability.  The liability of each Guarantor with respect to the Transaction Documents shall be primary, direct and immediate, and Landlord may proceed against a Guarantor: (i) prior to or in lieu of proceeding against Tenant, its assets, any security deposit, or any other guarantor; and (ii) prior to or in lieu of pursuing any other rights or remedies available to Landlord. All rights and remedies afforded to Landlord by reason of this Guaranty or by law are separate, independent and cumulative, and the exercise of any rights or remedies shall not in any way limit, restrict or prejudice the exercise of any other rights or remedies.  In the event of any default under any Transaction Document, a separate action or actions may be brought and prosecuted against a Guarantor whether or not Tenant is joined therein or a separate action or actions are brought against Tenant or any other Guarantor.  Landlord may maintain successive actions for other defaults. Landlord's rights hereunder shall not be exhausted by its exercise of any of its rights or remedies or by any such action or by any number of successive actions until and unless all indebtedness and obligations the payment and performance of which are hereby guaranteed have been paid and fully performed.

5.      Obligations Not Affected.  In such manner, upon such terms and at such times as Landlord in its sole discretion deems necessary or expedient, and without notice to Guarantors, Landlord may: (a) amend, alter, compromise, accelerate, extend or change the time or manner for the payment or the performance of any obligation hereby guaranteed; (b) extend, amend or terminate any of the Transaction Documents; or (c) release Tenant by consent to any assignment (or otherwise) as to all or any portion of the Guaranteed Obligations.  Any exercise or non-exercise by Landlord of any right hereby given Landlord, dealing by Landlord with a Guarantor or any other guarantor, Tenant or any other person, or change, impairment, release or suspension of any right or remedy of Landlord against any person including Tenant and any other guarantor will not affect any of the obligations of Guarantors hereunder or give Guarantors any recourse or offset against Landlord.

6.      Waiver. With respect to the Transaction Documents, each Guarantor hereby waives and relinquishes:

(a)      any right to require Landlord to proceed against the Tenant or any other person or to proceed against or exhaust any security held by Landlord at any time or to pursue any other remedy in Landlord's power before proceeding against a Guarantor or to require that Landlord cause a marshaling of Tenant's assets or to proceed against Tenant;

(b)      any defense that may arise by reason of the incapacity or lack of authority of any other person or persons;

(c)      notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Tenant, Landlord, any creditor of Tenant or a Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Landlord or in connection with any obligation hereby guaranteed;

(d)      any defense based upon an election of remedies by Landlord which destroys or otherwise impairs the subrogation rights of a Guarantor or the right of a Guarantor to proceed against Tenant for reimbursement, or both;

140109.00416/127071129v.3

(e)     any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal;

(f)     any duty on the part of Landlord to disclose to a Guarantor any facts Landlord may now or hereafter know about Tenant, regardless of whether Landlord has reason to believe that any such facts materially increase the risk beyond that which Guarantors intend to assume or has reason to believe that such facts are unknown to Guarantors or has a reasonable opportunity to communicate such facts to Guarantors, it being understood and agreed that Guarantors are fully responsible for being and keeping informed of the financial condition of Tenant and of all circumstances bearing on the risk of non-payment or non-performance of any Guaranteed Obligations;

(g)     any defense arising because of Landlord's election, in any proceeding instituted under the federal Bankruptcy Code, of the application of Section 1111 (b)(2) of the federal Bankruptcy Code; and

(h)     all rights and remedies accorded by applicable law to guarantors, including without limitation, any extension of time conferred by any law now or hereafter in effect and any requirement or notice of acceptance of this Guaranty or any other notice to which the undersigned may now or hereafter be entitled to the extent such waiver of notice is permitted by applicable law.

7.     <u>Warranties</u>.  With respect to the Transaction Documents, each Guarantor warrants that: (a) this Guaranty is executed at Tenant's request; and (b) such Guarantor has established adequate means of obtaining from Tenant on a continuing basis financial and other information pertaining to Tenant's financial condition.  Each Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect a Guarantor's risks hereunder, and each Guarantor further agrees that Landlord shall have no obligation to disclose to a Guarantor information or material acquired in the course of Landlord's relationship with Tenant.

8.     <u>No-Subrogation</u>.  Until all obligations of Tenant under the Transaction Documents have been satisfied and discharged in full, no Guarantor shall have any right of subrogation and waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord with respect to the Master Lease.

9.     <u>Subordination</u>.  Upon the occurrence of an Event of Default under any Transaction Document, which is not cured by a Guarantor, the indebtedness or obligations of Tenant to Guarantors shall not be paid in whole or in part nor will any Guarantor accept any payment of or on account of any amounts owing, without the prior written consent of Landlord and at Landlord's request, each Guarantor shall cause Tenant to pay to Landlord all or any part of the subordinated indebtedness until the obligations under the Transaction Documents have been paid in full.  Any payment by Tenant in violation of this Guaranty shall be received by Guarantor in trust for Landlord, and each Guarantor shall cause the same to be paid to Landlord immediately on account of the amounts owing from Tenant to Landlord.  No such payment will reduce or affect in any manner the liability of a Guarantor under this Guaranty.

4

10.    <u>No Delay</u>.  Any payments required to be made by a Guarantor hereunder shall become due on demand in accordance with the terms hereof immediately upon the happening of an Event of Default under any Transaction Document.

11.    <u>Application of Payments</u>.  With respect to the Transaction Documents, and with or without notice to Guarantors, Landlord, in Landlord's sole discretion and at any time and from time to time and in such manner and upon such terms as Landlord deems appropriate, may (a) apply any or all payments or recoveries from Tenant or from any other guarantor under any other instrument or realized from any security, in such manner and order of priority as Landlord may determine, to any indebtedness or other obligation of the Tenant with respect to the Transaction Documents and whether or not such indebtedness or other obligation is guaranteed hereby or is otherwise secured or is due at the time of such application, and (b) refund to Tenant any payment received by Landlord under the Transaction Documents.

12.    <u>Guaranty Default</u>.

(a)    As used herein, the term Guaranty Default shall mean one or more of the following events (subject to applicable cure periods):

(i)    the failure of Guarantors to pay the amounts required to be paid hereunder at the times specified in this Guaranty;

(ii)    the failure of a Guarantor to observe and perform any covenants, conditions or agreement on its part to be observed or performed, other than as referred to in Subsection (i) above, for a period of thirty (30) days after written notice of such failure has been given to Guarantors by Landlord, unless Landlord agrees in writing to an extension of such time prior to its expiration; or

(iii)    the occurrence of an Event of Default under the Master Lease or any of the other Transaction Documents.

(b)    Upon the occurrence of a Guaranty Default, Landlord shall have the right to bring such actions at law or in equity, including appropriate injunctive relief, as it deems appropriate to compel compliance, payment or deposit, and among other remedies to recover its attorneys' fees in any proceeding, including any appeal therefrom and any post-judgement proceedings.

13.    <u>Reserved</u>.

14.    <u>Notices</u>.  All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a)(i) upon the delivery (or refusal to accept delivery) by personal delivery, or (ii) reliable overnight express delivery service, and (b) by electronic mail transmission, addressed as follows:

| Guarantors: | c/o Curis Holdings, LLC |
|---|---|
| | 2907 West Bay to Bay Boulevard, Suite 303 |
| | Tampa, FL 33629 |
| | Attention: Stuart Lindeman |
| | Email: slindeman@missionhealthcommunities.com |
| | |
| With a copy to: (which shall not constitute notice) | Blank Rome LLP |
| | One Logan Square |
| | Philadelphia, PA 19103-6998 |
| | Attention: Matthew J. Comisky, Esquire |
| | Email: matthew.comisky@blankrome.com |
| | |
| Landlord: | c/o Mich NH 16 LLC |
| | 33 35th Street, Suite A404 |
| | Brooklyn, New York 11232 |
| | Attention: Boruch Drillman |
| | Email: barrymich1234@gmail.com |
| | |
| With copy to: (which shall not constitute notice) | NBC Law |
| | 675 Third Avenue, 8th Floor |
| | New York, NY 10017 |
| | Attention: Edward H. Burnbaum, Esquire |
| | Email: eburnbaum@nbclaw.com |

or such other address that any Party designates to the other by written notice given in the manner stated above.  Any notice sent by electronic mail shall be deemed delivered upon transmission, so long as said transmission is evidenced by proof of said transmittal, and sent before 5:00 p.m. local time at the place of the recipient and if sent after 5:00 p.m. shall be deemed delivered on the next business day.  Notices from counsel shall for all purposes hereunder constitute notice from such party.

15.  Miscellaneous.

(a)  No term, condition or provision of this Guaranty may be waived except by an express written instrument to that effect signed by Landlord.  No waiver of any term, condition or provision of this Guaranty will be deemed a waiver of any other term, condition or provision, irrespective of similarity, or constitute a continuing waiver of the same term, condition or provision, unless otherwise expressly provided.

(b)  If any one or more of the terms, conditions or provisions contained in this Guaranty is found in a final award or judgment rendered by any court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining terms, conditions and provisions of this Guaranty shall not in any way be affected or impaired thereby, and this Guaranty shall be interpreted and construed as if the invalid, illegal, or unenforceable term, condition or provision had never been contained in this Guaranty.

140109.00416/127071129v.3

(c)    THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, EXCEPT THAT THE LAWS OF THE STATE IN WHICH A FACILITY IS LOCATED SHALL GOVERN THIS AGREEMENT TO THE EXTENT NECESSARY (i) TO OBTAIN THE BENEFIT OF THE RIGHTS AND REMEDIES SET FORTH HEREIN WITH RESPECT TO SUCH FACILITY, AND (ii) FOR PROCEDURAL REQUIREMENTS WHICH MUST BE GOVERNED BY THE LAWS OF THE STATE IN WHICH SUCH FACILITY IS LOCATED.  EACH GUARANTOR CONSENTS TO IN PERSONAM JURISDICTION BEFORE THE STATE AND FEDERAL COURTS OF ILLINOIS AND AGREES THAT ALL DISPUTES CONCERNING THIS GUARANTY BE HEARD IN THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED OR IN ILLINOIS.  EACH GUARANTOR AGREES THAT SERVICE OF PROCESS MAY BE EFFECTED UPON IT UNDER ANY METHOD PERMISSIBLE UNDER THE LAWS OF THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED OR ILLINOIS AND IRREVOCABLY WAIVES ANY OBJECTION TO VENUE IN THE STATE AND FEDERAL COURTS OF THE STATE OR STATES IN WHICH THE FACILITY OR FACILITIES ARE LOCATED AND OF ILLINOIS.

(d)    EACH GUARANTOR AND LANDLORD HEREBY WAIVE TRIAL BY JURY AND THE RIGHT THERETO IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING ON, UNDER, OUT OF, BY REASON OF OR RELATING IN ANY WAY TO THIS GUARANTY OR THE INTERPRETATION, BREACH OR ENFORCEMENT THEREOF.

(e)    In the event of any suit, action, arbitration or other proceeding to interpret this Guaranty, or to determine or enforce any right or obligation created hereby, the prevailing party in the action shall recover such party's actual costs and expenses reasonably incurred in connection therewith, including, but not limited to, attorneys' fees and costs of appeal, post judgment enforcement proceedings (if any) and bankruptcy proceedings (if any).  Any court, arbitrator or panel of arbitrators shall, in entering any judgment or making any award in any such suit, action, arbitration or other proceeding, in addition to any and all other relief awarded to such prevailing party, include in such judgment or award such party's costs and expenses as provided in this paragraph.

(f)    Each Guarantor (i) represents that they have been represented and advised by counsel in connection with the execution of this Guaranty; (ii) acknowledges receipt of a copy of the Transaction Documents; and (iii) further represents that such Guarantor has been advised by counsel with respect thereto.  This Guaranty shall be construed and interpreted in accordance with the plain meaning of its language, and not for or against Guarantor or Landlord, and as a whole, giving effect to all of the terms, conditions and provisions hereof.

(g)    Except as provided in any other written agreement now or at any time hereafter in force between Landlord and a Guarantor, this Guaranty shall constitute the entire agreement of Guarantors with Landlord with respect to the subject matter hereof, and no representation, understanding, promise or condition concerning the subject matter hereof will be binding upon Landlord or Guarantors unless expressed herein.

140109.00416/127071129v.3

(h)     All stipulations, obligations, liabilities and undertakings under this Guaranty shall be binding upon each Guarantor and its respective successors and assigns and shall inure to the benefit of Landlord and to the benefit of Landlord's successors and assigns.

(i)     Whenever the singular shall be used hereunder, it shall be deemed to include the plural (and vice-versa) and reference to one gender shall be construed to include all other genders, including neuter, whenever the context of this Guaranty so requires.  Section captions or headings used in the Guaranty are for convenience and reference only, and shall not affect the construction thereof.

(j)     The obligations of Guarantors under this Guaranty are joint and several.

*[Signatures and acknowledgment follows.]*

8

*Signature Page to*
*Lease Guaranty*
*(Sublessees - Coronado)*

GUARANTORS:

Arrowhead Operator, LLC,
Chase County Operator, LLC,
Downs Operator, LLC,
Parkway Operator, LLC,
Kaw River Operator, LLC,
Edwardsville Operator, LLC,
El Dorado Operator, LLC,
Eskridge Operator, LLC,
Lansing Operator, LLC,
Neodesha Operator, LLC,
Pittsburg Operator, LLC,
Spring Hill Operator, LLC,
Wakefield Operator, LLC,
Wellington Operator, LLC,
Wichita Operator, LLC, and
Wilson Operator, LLC,
each a Florida limited liability company


By: _____
Name:  Stuart Lindeman
Title:   President and Chief Executive Officer

Signature Page 1of 1

***Exhibit A to***
***Lease Guaranty***
***(Sublessees - Coronado)***

List of Guarantors

1.      Arrowhead Operator, LLC

2.      Chase County Operator, LLC

3.      Downs Operator, LLC

4.      Parkway Operator, LLC

5.      Kaw River Operator, LLC

6.      Edwardsville Operator, LLC

7.      El Dorado Operator, LLC

8.      Eskridge Operator, LLC

9.      Lansing Operator, LLC

10.     Neodesha Operator, LLC,

11.     Pittsburg Operator, LLC

12.     Spring Hill Operator, LLC

13.     Wakefield Operator, LLC

14.     Wellington Operator, LLC

15.     Wichita Operator, LLC

16.     Wilson Operator, LLC

Exhibit A – Page 1of 1

*Exhibit B to*
*Lease Guaranty*
*(Sublessees - Coronado)*

List of Landlords

MICH 16 ARROWHEAD LLC, a Georgia limited liability company
MICH 16 CHASE LLC, a Kansas limited liability company
MICH 16 DOWNS LLC, a Kansas limited liability company
MICH 16 EDWARDSVILLE LLC, a Kansas limited liability company
MICH 16 EL DORADO LLC, a Kansas limited liability company
MICH 16 ESKRIDGELLC, a Kansas limited liability company
MICH 16 KAW LLC, a Kansas limited liability company
MICH 16 LANSING LLC, a Kansas limited liability company
MICH 16 NEODESHA LLC, a Kansas limited liability company
MICH 16 PARKWAY LLC, a Kansas limited liability company
MICH 16 PITTSBURG LLC, a Kansas limited liability company
MICH 16 SPRING HILL LLC, a Kansas limited liability company
MICH 16 WAKEFIELD LLC, a Kansas limited liability company
MICH 16 WELLINGTON LLC, a Kansas limited liability company
MICH 16 LINCOLN LLC, a Kansas limited liability company and
MICH 16 WILSON LLC, a Kansas limited liability company

140109.00416/127071129v.3

## **SCHEDULE 1.1(c)**

## **LIST OF LOAN DOCUMENTS**

All Loan Documents (as defined in that certain Term Loan and Security Agreement dated as of April 28, 2022, between  Oxford Finance, LLC, a Delaware limited liability company, as agent for the benefit of various financial institutions identified in the Term Loan and Security Agreement and each of the Lessors (as defined in this Lease) as well as other borrowers.

<u>**SCHEDULE 1.1(f)**</u>

List of Subtenants

| Facility Name and Address | Name of Subtenant |
|---|---|
| Lansing Care and Rehabilitation Center<br>210 Plaza Lane<br>Lansing, Kansas | Lansing Operator, LLC |
| Chase County Care and Rehabilitation Center<br>612 Walnut Street<br>Cottonwood Falls, Kansas | Chase County Operator, LLC |
| Downs Care and Rehabilitation Center<br>1218 Kansas Street<br>Downs, Kansas | Downs Operator, LLC |
| Spring Hill Care and Rehabilitation Center<br>251 East Wilson Avenue<br>Spring Hill, Kansas | Spring Hill Operator, LLC |
| El Dorado Care and Rehabilitation Center<br>900 Country Club Lane<br>El Dorado, Kansas | El Dorado Operator, LLC |
| Neodesha Care and Rehabilitation Center<br>1626 North Eight Street<br>Neodesha, Kansas | Neodesha Operator, LLC |
| Wellington Care and Rehabilitation Center<br>102 West Botkin Street<br>Wellington, Kansas | Wellington Operator, LLC |
| Wilson Care and Rehabilitation Center<br>611 31st Street,<br>P.O. Box 160<br>Wilson, Kansas | Wilson Operator, LLC |
| Parkway Care and Rehabilitation Center<br>749 Blake Street<br>Edwardsville, Kansas | Parkway Operator, LLC |
| Kaw River Care and Rehabilitation Center<br>750 Blake Street<br>Edwardsville, Kansas | Kaw River Operator, LLC |
| Edwardsville Care and Rehabilitation Center<br>751 Blake Street<br>Edwardsville, Kansas | Edwardsville Operator, LLC |
| Wakefield Care and Rehabilitation Center<br>509 Grove Street<br>Wakefield, Kansas | Wakefield Operator, LLC |
| Eskridge Care and Rehabilitation Center<br>505 North Main Street<br>Eskridge, Kansas | Eskridge Operator, LLC |

| Facility Name and Address | Name of Subtenant |
|---|---|
| Pittsburg Care and Rehabilitation Center<br>1005 East Centennial Drive<br>Pittsburg, Kansas | Pittsburg Operator, LLC |
| Wichita Care and Rehabilitation Center<br>4007 East Lincoln Street<br>Wichita, Kansas | Wichita Operator, LLC |
| Arrowhead Health and Rehabilitation Center<br>239 Arrowhead Boulevard<br>Jonesboro, Georgia | Arrowhead Operator, LLC |

## SCHEDULE 4.1

Base Rent Schedule

Lessee shall pay an annual minimum "Base Rent" for the period from the Commencement Date through April30, 2023, equal to $5,000,000.00.

Starting with May 1, 2023, and on each year thereafter the annual minimum Base Rent will increase by two percent (2.5%) per annum. The table below illustrates the Base Rent for each month of the Lease.

| From | To | Annual Base Rent |
|------|-----|------------------|
| Commencement Date | April 30, 2023 | $5,000,000.00 |
| May 1, 2023 | April 30, 2024 | $5,125,000.00 |
| May 1, 2024 | April 30, 2025 | $5,253,125.00 |
| May 1, 2025 | April 30, 2026 | $5,384,453.00 |
| May 1, 2026 | April 30, 2027 | $5,519,064.00 |
| May 1, 2027 | April 30, 2028 | $5,657,041.00 |
| May 1, 2028 | April 30, 2029 | $5,798,467.00 |
| May 1, 2029 | April 30, 2030 | $5,943,429.00 |
| May 1, 2030 | April 30, 2032 | $6,092,015.00 |
| May 1, 2031 | April 30, 2032 | $6,244,315.00 |

Lessee shall pay Rent either by ACH or wire transfer, to the following account:

_____ Bank
[City and State]
ABA No.:
For credit to the account of _____
Account No.: _____

Anything herein to the contrary notwithstanding, if and to the extent that Lessors make an "Earn Out Payment" to an affiliate of Lessee pursuant to the terms and conditions of Section 2.3(b) of that certain purchase and sale agreement dated as of November 22, 2021, as amended, by and between Lessors, as purchaser (as successor in interest to KSGA 16 LLC), and certain entities affiliated with Lessee, as seller, then the foregoing Annual Base Rent shall be supplemented on a prospective basis by an amount equal to 9.30% of the amount of the "Earn Out Payment", which amount shall increase on a fiscal year basis by two and one-half percent (2.5%).  Solely for purposes of an example, if the earn out payment equaled $6,000,000 and was paid on April 30, 2025, then annual rent for May 1, 2025, through April 30, 2026, be $558,000, payable in monthly installments of $46,500, and annual rent would increase annually on a fiscal year basis by two and one-half percent (2.5%) (i.e., to $571,950 for the following year), through the end of the Initial Term and any Renewal Term.

**SCHEDULE 8.3**

**FACILITY INFORMATION; LICENSED BEDS**

| Facility | Licensed Beds |
|---|---|
| Lansing Care and Rehabilitation Center<br>210 Plaza Lane<br>Lansing, Kansas | 58 |
| Chase County Care and Rehabilitation Center<br>612 Walnut Street<br>Cottonwood Falls, Kansas | 45 |
| Downs Care and Rehabilitation Center<br>1218 Kansas Street<br>Downs, Kansas | 45 |
| Spring Hill Care and Rehabilitation Center<br>251 East Wilson Avenue<br>Spring Hill, Kansas | 45 |
| El Dorado Care and Rehabilitation Center<br>900 Country Club Lane<br>El Dorado, Kansas | 50 |
| Neodesha Care and Rehabilitation Center<br>1626 North Eight Street<br>Neodesha, Kansas | 45 |
| Wellington Care and Rehabilitation Center<br>102 West Botkin Street<br>Wellington, Kansas | 45 |
| Wilson Care and Rehabilitation Center<br>611 31st Street,<br>P.O. Box 160<br>Wilson, Kansas | 40 |
| Parkway Care and Rehabilitation Center<br>749 Blake Street<br>Edwardsville, Kansas | 45 |
| Kaw River Care and Rehabilitation Center<br>750 Blake Street<br>Edwardsville, Kansas | 45 |
| Edwardsville Care and Rehabilitation Center<br>751 Blake Street<br>Edwardsville, Kansas | 102 |
| Wakefield Care and Rehabilitation Center<br>509 Grove Street<br>Wakefield, Kansas | 45<br><br>(Note that this facility also has 10 independent living units) |
| Eskridge Care and Rehabilitation Center<br>505 North Main Street<br>Eskridge, Kansas | 60 |
| Pittsburg Care and Rehabilitation Center<br>1005 East Centennial Drive<br>Pittsburg, Kansas | 86 |
| Wichita Care and Rehabilitation Center<br>4007 East Lincoln Street<br>Wichita, Kansas | 50 |

| | |
|---|---|
| Arrowhead Health and Rehabilitation Center<br>239 Arrowhead Boulevard<br>Jonesboro, Georgia | 116 |

## SCHEDULE 18.2

**OWNERSHIP OF LESSEE**

**(Direct and Indirect)**

**CURIS HOLDINGS, LLC ORGANIZATIONAL CHART**



CONFIDENTIAL

# EXHIBIT C

| | |
|---|---|
| **From:** | Comisky, Matthew |
| **Sent:** | Tuesday, April 15, 2025 4:54 PM |
| **To:** | Israel Appel |
| **Cc:** | eli@michcapital.com; barry@michcapital.com |
| **Subject:** | RE: Follow Up -- Black Stag/KSGA 16 Earn Out |
| **Attachments:** | SHR CURIS EARNOUT - SCHEDULE 2.3(b).xlsx; Authorized Rep's Certificate-041525(153762909.2).pdf |

Izzy: good afternoon.  I am sending this email to you as a follow up to my email below from March 27.

As previously discussed, and as you are aware, the "Mich 16 Purchasers" (i.e., Mich 16 Chase LLC, Mich 16 Downs LLC, Mich 16 Edwardsville LLC, Mich 16 El Dorado LLC, Mich 16 Eskridge LLC, Mich 16 Kaw LLC, Mich 16 Lansing LLC, Mich 16 Neodesha LLC, Mich 16 Parkway LLC, Mich 16 Pittsburg LLC, Mich 16 Spring Hill LLC, Mich 16 Wakefield LLC, Mich 16 Wellington LLC, Mich 16 Lincoln LLC, and Mich 16 Wilson LLC) and the "Coronado and Arrowhead Sellers" (i.e., Arrowhead Property, LLC, Chase County Property LLC, Downs Property LLC, Edwardsville Property LLC, SHR El Dorado Property LLC, Eskridge Property LLC, Kaw River Property LLC, Lansing Property LLC, Neodesha Property LLC, Parkway Property LLC, Pittsburg Property LLC, Spring Hill Property LLC, Wakefield Property LLC, Wellington Property LLC, Wichita Property LLC, Wilson Property LLC) entered into a certain Purchase and Sale Agreement dated as of November 22, 2021, as amended (the "PSA").  Section 2.3(b) of the PSA specifically provides for the Mich 16 Purchasers to pay an earn-out payment to the Coronado and Arrowhead Sellers upon the occurrence of an "Earn Out Trigger Event" (which based upon the current facts will occur on April 29, 2025).

Section 2.3(b) of the PSA requires the delivery to the Mich 16 Purchasers of a certificate calculating the EBITDAR in the form attached as Schedule 2.3(b) to the PSA, with the Mich 16 Purchasers having the right to ask for back-up information to support the EBITDAR calculation, and that would support the payment of the applicable Earn Out Payment.

So as to comply with the foregoing, the Coronado and Arrowhead Sellers have prepared and I have attached a certificate and an Excel spreadsheet which complies with all requirements under Section 2.3(b). The foregoing confirm that the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000).

As a result, this email shall constitute the demand of the Coronado and Arrowhead Sellers for payment by April 29, 2025, of the earn out equal to Six Million Dollar ($6,000,000).

Pursuant to Section 13.3 of the PSA, we will also be sending a copy of this email by overnight mail to:

KSGA 16 LLC
c/o Black Stag LLC
46 Washington Avenue
Suffern, New York 10901
Attention: Eliyahu Konovitch, CFO

We will not be sending a copy to Ed Burnbaum since he no longer represents the purchasers and you have been acting as counsel.

**Matthew J. Comisky** | BLANK**ROME**
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103-6998
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875
Email: matthew.comisky@blankrome.com

---

**From:** Comisky, Matthew <matthew.comisky@blankrome.com>
**Sent:** Thursday, March 27, 2025 12:09 PM
**To:** Israel Appel <iappel@appelpc.com>
**Cc:** eli@michcapital.com; barry@michcapital.com
**Subject:** Follow Up -- Black Stag/KSGA 16 Earn Out

Izzy: good afternoon. The following is a trailing 8-month calculation of EBITDAR through February 2025 to determine what the Mission Health/Coronado operator needs to achieve in monthly EBITDAR for March 2025 to hit the Earn Out amounts based upon March being the last month of the calculation based on the April 29 Trigger Event. The Mission Health/Coronado operator can achieve **negative EBITDAR** of ($1,722,559.61) in March to earn the $3,000,000 Earn Out Payment or can achieve negative EBITDAR of ($972,559.61) in March to earn the $6,000,000 Earn Out Payment.  With monthly **positive EBITDAR** averaging over $960,000 for each of the past six months, we are confident that the final calculation will not be negative and which will result in Mich 16 being obligated to pay the $6,000,000 Earn Out Payment.

| One Month Forward View | |
|---|---|
| T9 Target for $3,000,000 Bonus | $ |
| T9 Target for $6,000,000 Bonus | $ |
| | |
| | |
| | |
| Net Income | $ |
| | |
| *Plus / (Less):* Interest expense / (income) | $ |
| *Plus / (Less):* Income tax expense / (income) | $ |
| *Plus:* Depreciation & amortization | $ |
| *EBITDA* | $ |
| | |
| *Plus:* Fees and expenses related to preparation of the Earn-Out Statement | $ |
| *Plus:* Legal and accounting fees in connection with the Transaction not being amortized | $ |
| *Plus:* Rent expense of the Facilities | $ |
| *Plus:* Additional costs incurred at the direction of Buyer | $ |
| *Plus/(Less):* Extraordinary losses / (gains) recorded | $ |
| | |
| *Earn-Out EBITDAR* | $ |
| | |
| Required Next month for $3,000,000 Earn-out | $ |
| Required Next month for $6,000,000 Earn-out | $ |

Pursuant to Section 2.3(b)(ii) of the Purchase and Sale Agreement, the Coronado seller will prepare and deliver a formal certificate on or about April 15 to support the $6,000,000 payment.

We are sending this in advance to manage expectations, to avoid any surprises and to prepare Mich 16 so that it will wire transfer the $6,000,000 Earn Out payment to the Coronado seller by no later than the due date of April 29, 2025.

Should you have any questions, please let me know.

Thanks.

Matt

**Matthew J. Comisky** | BLANKROME
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875 |
Email: matthew.comisky@blankrome.com

# EXHIBIT D

| | |
|---|---|
| **From:** | Comisky, Matthew |
| **Sent:** | Tuesday, April 15, 2025 4:54 PM |
| **To:** | Israel Appel |
| **Cc:** | eli@michcapital.com; barry@michcapital.com |
| **Subject:** | RE: Follow Up -- Black Stag/KSGA 16 Earn Out |
| **Attachments:** | SHR CURIS EARNOUT - SCHEDULE 2.3(b).xlsx; Authorized Rep's Certificate-041525(153762909.2).pdf |

Izzy: good afternoon.  I am sending this email to you as a follow up to my email below from March 27.

As previously discussed, and as you are aware, the "Mich 16 Purchasers" (i.e., Mich 16 Chase LLC, Mich 16 Downs LLC, Mich 16 Edwardsville LLC, Mich 16 El Dorado LLC, Mich 16 Eskridge LLC, Mich 16 Kaw LLC, Mich 16 Lansing LLC, Mich 16 Neodesha LLC, Mich 16 Parkway LLC, Mich 16 Pittsburg LLC, Mich 16 Spring Hill LLC, Mich 16 Wakefield LLC, Mich 16 Wellington LLC, Mich 16 Lincoln LLC, and Mich 16 Wilson LLC) and the "Coronado and Arrowhead Sellers" (i.e., Arrowhead Property, LLC, Chase County Property LLC, Downs Property LLC, Edwardsville Property LLC, SHR El Dorado Property LLC, Eskridge Property LLC, Kaw River Property LLC, Lansing Property LLC, Neodesha Property LLC, Parkway Property LLC, Pittsburg Property LLC, Spring Hill Property LLC, Wakefield Property LLC, Wellington Property LLC, Wichita Property LLC, Wilson Property LLC) entered into a certain Purchase and Sale Agreement dated as of November 22, 2021, as amended (the "PSA").  Section 2.3(b) of the PSA specifically provides for the Mich 16 Purchasers to pay an earn-out payment to the Coronado and Arrowhead Sellers upon the occurrence of an "Earn Out Trigger Event" (which based upon the current facts will occur on April 29, 2025).

Section 2.3(b) of the PSA requires the delivery to the Mich 16 Purchasers of a certificate calculating the EBITDAR in the form attached as Schedule 2.3(b) to the PSA, with the Mich 16 Purchasers having the right to ask for back-up information to support the EBITDAR calculation, and that would support the payment of the applicable Earn Out Payment.

So as to comply with the foregoing, the Coronado and Arrowhead Sellers have prepared and I have attached a certificate and an Excel spreadsheet which complies with all requirements under Section 2.3(b). The foregoing confirm that the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000).

As a result, this email shall constitute the demand of the Coronado and Arrowhead Sellers for payment by April 29, 2025, of the earn out equal to Six Million Dollar ($6,000,000).

Pursuant to Section 13.3 of the PSA, we will also be sending a copy of this email by overnight mail to:

KSGA 16 LLC
c/o Black Stag LLC
46 Washington Avenue
Suffern, New York 10901
Attention: Eliyahu Konovitch, CFO

We will not be sending a copy to Ed Burnbaum since he no longer represents the purchasers and you have been acting as counsel.

**Matthew J. Comisky** | BLANK**ROME**
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103-6998
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875
Email: matthew.comisky@blankrome.com

---

**From:** Comisky, Matthew <matthew.comisky@blankrome.com>
**Sent:** Thursday, March 27, 2025 12:09 PM
**To:** Israel Appel <iappel@appelpc.com>
**Cc:** eli@michcapital.com; barry@michcapital.com
**Subject:** Follow Up -- Black Stag/KSGA 16 Earn Out

Izzy: good afternoon. The following is a trailing 8-month calculation of EBITDAR through February 2025 to determine what the Mission Health/Coronado operator needs to achieve in monthly EBITDAR for March 2025 to hit the Earn Out amounts based upon March being the last month of the calculation based on the April 29 Trigger Event. The Mission Health/Coronado operator can achieve **negative EBITDAR** of ($1,722,559.61) in March to earn the $3,000,000 Earn Out Payment or can achieve negative EBITDAR of ($972,559.61) in March to earn the $6,000,000 Earn Out Payment.  With monthly **positive EBITDAR** averaging over $960,000 for each of the past six months, we are confident that the final calculation will not be negative and which will result in Mich 16 being obligated to pay the $6,000,000 Earn Out Payment.

| One Month Forward View | |
|---|---|
| T9 Target for $3,000,000 Bonus | $ |
| T9 Target for $6,000,000 Bonus | $ |
| | |
| | |
| | |
| Net Income | $ |
| | |
| *Plus / (Less):* Interest expense / (income) | $ |
| *Plus / (Less):* Income tax expense / (income) | $ |
| *Plus:* Depreciation & amortization | $ |
| *EBITDA* | $ |
| | |
| *Plus:* Fees and expenses related to preparation of the Earn-Out Statement | $ |
| *Plus:* Legal and accounting fees in connection with the Transaction not being amortized | $ |
| *Plus:* Rent expense of the Facilities | $ |
| *Plus:* Additional costs incurred at the direction of Buyer | $ |
| *Plus/(Less):* Extraordinary losses / (gains) recorded | $ |
| | |
| *Earn-Out EBITDAR* | $ |
| | |
| Required Next month for $3,000,000 Earn-out | $ |
| Required Next month for $6,000,000 Earn-out | $ |

Pursuant to Section 2.3(b)(ii) of the Purchase and Sale Agreement, the Coronado seller will prepare and deliver a formal certificate on or about April 15 to support the $6,000,000 payment.

We are sending this in advance to manage expectations, to avoid any surprises and to prepare Mich 16 so that it will wire transfer the $6,000,000 Earn Out payment to the Coronado seller by no later than the due date of April 29, 2025.

Should you have any questions, please let me know.

Thanks.

Matt

**Matthew J. Comisky** | BLANK**ROME**
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875 |
Email: matthew.comisky@blankrome.com

# EXHIBIT E

## <u>AUTHORIZED REPRESENTATIVE'S CERTIFICATE</u>

April 15, 2025

The undersigned, Arrowhead Property, LLC, Chase County Property LLC, Downs Property LLC, Edwardsville Property LLC, SHR El Dorado Property LLC, Eskridge Property LLC, Kaw River Property LLC, Lansing Property LLC, Neodesha Property LLC, Parkway Property LLC, Pittsburg Property LLC, Spring Hill Property LLC, Wakefield Property LLC, Wellington Property LLC, Wichita Property LLC, Wilson Property LLC, each a Florida limited liability company (collectively, the "Seller") and KSGA 16 LLC, a Delaware limited liability company ("Original Purchaser"), are parties to a certain Purchase and Sale Agreement dated as of November 22, 2021, as amended (the "PSA"). Closing under the PSA occurred on April 29, 2022, and each of the sixteen (16) properties were deeded to Original Buyer's designees: Mich 16 Chase LLC, Mich 16 Downs LLC, Mich 16 Edwardsville LLC, Mich 16 El Dorado LLC, Mich 16 Eskridge LLC, Mich 16 Kaw LLC, Mich 16 Lansing LLC, Mich 16 Neodesha LLC, Mich 16 Parkway LLC, Mich 16 Pittsburg LLC, Mich 16 Spring Hill LLC, Mich 16 Wakefield LLC, Mich 16 Wellington LLC, Mich 16 Lincoln LLC, and Mich 16 Wilson LLC, each a Kansas limited liability company, and Mich 16 Arrowhead LLC, a Georgia limited liability company (the "Ultimate Purchaser", collectively with the Original Purchaser, the "Purchaser").

Section 2.3(b) of the PSA provided for the payment of an "Earn Out Payment" upon the occurrence of an "Earn Out Trigger Event" (as such terms are defined in the PSA). As the Earn-Out Trigger Event will occur on April 29, 2025 (the "Earn Out Date), Seller is delivering the attached certificate to confirm that that the annualized EBITDAR for the properties subject to the PSA for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000), which results in Purchaser's obligation to pay to Seller the sum of Six Million Dollars ($6,000,000) as of April 29, 2025.

**[SIGNATURE PAGE FOLLOWS]**

*Signature page to Authorized Representative's Certificate*

IN WITNESS WHEREOF, intending to be legally bound, Seller has executed this certificate as of the date first written above.

ARROWHEAD PROPERTY, LLC,
CHASE COUNTY PROPERTY LLC,
DOWNS PROPERTY LLC,
EDWARDSVILLE PROPERTY LLC,
SHR EL DORADO PROPERTY LLC,
ESKRIDGE PROPERTY LLC,
KAW RIVER PROPERTY LLC,
LANSING PROPERTY LLC,
NEODESHA PROPERTY LLC,
PARKWAY PROPERTY LLC,
PITTSBURG PROPERTY LLC,
SPRING HILL PROPERTY LLC,
WAKEFIELD PROPERTY LLC,
WELLINGTON PROPERTY LLC,
WICHITA PROPERTY LLC,
WILSON PROPERTY LLC,
each a Florida limited liability company

By: _____
Name: SCOTT FEUER
Title: CEO

INFORMATION ON
CERTIFICATE CONFIRMED:

CORONADO OPERATOR, LLC,
a Florida limited liability company

By: _____
Name: Stuart Lindenmuth
Title: CEO

# EXHIBIT F

PURCHASE AND SALE AGREEMENT
(*Mission - KS/GA Portfolio* )

SCHEDULE 2.3(b)

WORKSHEET FOR CALCULATION

| | | 9 Month Period ended |
|---|---|---:|
| Net Income | $ | 2,910,359.58 |
| | | |
| *Plus / (Less):* Interest expense / (income) | $ | 470,938.13 |
| *Plus / (Less):* Income tax expense / (income) | $ | - |
| *Plus:* Depreciation & amortization | $ | 525,058.71 |
| *EBITDA* | $ | 3,906,356.42 |
| | | |
| *Plus:* Fees and expenses related to preparation of the Earn-Out Statement | $ | - |
| *Plus:* Legal and accounting fees in connection with the Transaction not being amortized | $ | - |
| *Plus:* Rent expense of the Facilities | $ | 4,176,669.87 |
| *Plus:* Additional costs incurred at the direction of Buyer | $ | - |
| *Plus/(Less):* Extraordinary losses / (gains) recorded | $ | - |
| | | |
| *Earn-Out EBITDAR* | $ | 8,083,026.29 |

**Earn-out Calculation**

1.    $    6,000,000

The sale of the Seller's Assets, a recapitalization of Seller's Assets (i.e., a replacement of equity through a debt refinance, infusion of new and/or additional equity or other method), and/or a refinance of Seller's Assets prior to April 29, 2025.

2.    $    6,000,000

No sale of the Seller's Assets, recapitalization of Seller's Assets and/or refinance of Seller's Assets occurs prior to the third anniversary of the Closing Date, then the earn out payment shall either be: (1) Six Million Dollars ($6,000,000) if the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000), or (2) Three Million Dollars ($3,000,000) if the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Seven Million Five Hundred Thousand Dollars ($7,500,000) but is less than Eight Million Five Hundred Thousand Dollars ($8,500,000)

# EXHIBIT G

**From:** McUmber, Maegan
**Sent:** Tuesday, April 29, 2025 2:19 PM
**To:** McUmber, Maegan
**Subject:** FW: Your shipment was delivered 287603828188

**From:** FedEx Tracking <TrackingUpdates@fedex.com>
**Sent:** Wednesday, April 16, 2025 9:36 AM
**To:** Comisky, Matthew <matthew.comisky@blankrome.com>
**Subject:** Your shipment was delivered 287603828188

We've included the delivery details for you



# Your shipment was delivered.

**Delivery Date**

Wed, 04/16/2025
9:32am

**Delivered to**

46 WASHINGTON AVE, SUFFERN, NY 10901

**Received by**

K.Sg

**Report missing package**

# How was your delivery?

    

# Personal message

PSShip eMail Notification

# Tracking details

| | |
|---|---|
| **Tracking ID** | 287603828188 |
| **From** | Blank Rome LLP<br>130 N. 18th street<br>Philadelphia, PA, US<br>19103 |
| **To** | KSGA 16 LLC c/o Black Stag LLC<br>46 WASHINGTON AVE<br>SUFFERN, NY, US<br>10901 |
| **Ship date** | Tue 4/15/2025 05:18 PM |
| **Number of pieces** | 1 |
| **Total shipment weight** | 2.00 LB |
| **Service** | FedEx Priority Overnight® |
| **Reference** | 140109.00002-00718 |
| **Shipper reference** | 140109.00002-00718 |

**TRACK SHIPMENT**



# Easier Tracking, better security, and more control

Enroll for free and get more visibility and control for your deliveries from start to finish. And if you need to make a return, our network of 10,000+ locations makes drop off easy.

**ENROLL NOW**

## This tracking update has been requested by:

| | |
|---|---|
| **Company name** | Blank Rome LLP |
| **Name** | Matthew Comisky |
| **Email** | matthew.comisky@blankrome.com |

⌨ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:36 AM CDT 04/16/2025.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2025 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our Privacy Notice. All rights reserved.

Thank you for your business.

ID  1026

# EXHIBIT H

| | |
|---|---|
| **From:** | Comisky, Matthew |
| **Sent:** | Monday, April 21, 2025 2:44 PM |
| **To:** | Israel Appel |
| **Subject:** | FW: Follow Up -- Black Stag/KSGA 16 Earn Out |
| **Attachments:** | SHR CURIS EARNOUT - SCHEDULE 2.3(b).xlsx; Authorized Rep's Certificate-041525(153762909.2).pdf |

Izzy: Any response on the earnout.

**Matthew J. Comisky** | BLANKROME
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103-6998
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875
Email: matthew.comisky@blankrome.com

**From:** Comisky, Matthew
**Sent:** Tuesday, April 15, 2025 4:54 PM
**To:** Israel Appel <iappel@appelpc.com>
**Cc:** eli@michcapital.com; barry@michcapital.com
**Subject:** RE: Follow Up -- Black Stag/KSGA 16 Earn Out

Izzy: good afternoon.  I am sending this email to you as a follow up to my email below from March 27.

As previously discussed, and as you are aware, the "Mich 16 Purchasers" (i.e., Mich 16 Chase LLC, Mich 16 Downs LLC, Mich 16 Edwardsville LLC, Mich 16 El Dorado LLC, Mich 16 Eskridge LLC, Mich 16 Kaw LLC, Mich 16 Lansing LLC, Mich 16 Neodesha LLC, Mich 16 Parkway LLC, Mich 16 Pittsburg LLC, Mich 16 Spring Hill LLC, Mich 16 Wakefield LLC, Mich 16 Wellington LLC, Mich 16 Lincoln LLC, and Mich 16 Wilson LLC) and the "Coronado and Arrowhead Sellers" (i.e., Arrowhead Property, LLC, Chase County Property LLC, Downs Property LLC, Edwardsville Property LLC, SHR El Dorado Property LLC, Eskridge Property LLC, Kaw River Property LLC, Lansing Property LLC, Neodesha Property LLC, Parkway Property LLC, Pittsburg Property LLC, Spring Hill Property LLC, Wakefield Property LLC, Wellington Property LLC, Wichita Property LLC, Wilson Property LLC) entered into a certain Purchase and Sale Agreement dated as of November 22, 2021, as amended (the "PSA").  Section 2.3(b) of the PSA specifically provides for the Mich 16 Purchasers to pay an earn-out payment to the Coronado and Arrowhead Sellers upon the occurrence of an "Earn Out Trigger Event" (which based upon the current facts will occur on April 29, 2025).

Section 2.3(b) of the PSA requires the delivery to the Mich 16 Purchasers of a certificate calculating the EBITDAR in the form attached as Schedule 2.3(b) to the PSA, with the Mich 16 Purchasers having the right to ask for back-up information to support the EBITDAR calculation, and that would support the payment of the applicable Earn Out Payment.

So as to comply with the foregoing, the Coronado and Arrowhead Sellers have prepared and I have attached a certificate and an Excel spreadsheet which complies with all requirements under Section 2.3(b). The foregoing confirm that the annualized EBITDAR for the nine (9) month period preceding the Earn Out Date equals or exceeds Eight Million Five Hundred Thousand Dollars ($8,500,000).

As a result, this email shall constitute the demand of the Coronado and Arrowhead Sellers for payment by April 29, 2025, of the earn out equal to Six Million Dollar ($6,000,000).

Pursuant to Section 13.3 of the PSA, we will also be sending a copy of this email by overnight mail to:

KSGA 16 LLC
c/o Black Stag LLC
46 Washington Avenue
Suffern, New York 10901
Attention: Eliyahu Konovitch, CFO

We will not be sending a copy to Ed Burnbaum since he no longer represents the purchasers and you have been acting as counsel.

**Matthew J. Comisky** | BLANKROME
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103-6998
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875
Email: matthew.comisky@blankrome.com

---

**From:** Comisky, Matthew <matthew.comisky@blankrome.com>
**Sent:** Thursday, March 27, 2025 12:09 PM
**To:** Israel Appel <iappel@appelpc.com>
**Cc:** eli@michcapital.com; barry@michcapital.com
**Subject:** Follow Up -- Black Stag/KSGA 16 Earn Out

Izzy: good afternoon. The following is a trailing 8-month calculation of EBITDAR through February 2025 to determine what the Mission Health/Coronado operator needs to achieve in monthly EBITDAR for March 2025 to hit the Earn Out amounts based upon March being the last month of the calculation based on the April 29 Trigger Event. The Mission Health/Coronado operator can achieve **negative EBITDAR** of ($1,722,559.61) in March to earn the $3,000,000 Earn Out Payment or can achieve negative EBITDAR of ($972,559.61) in March to earn the $6,000,000 Earn Out Payment.  With monthly **positive EBITDAR** averaging over $960,000 for each of the past six months, we are confident that the final calculation will not be negative and which will result in Mich 16 being obligated to pay the $6,000,000 Earn Out Payment.

**One Month Forward View**

|  |  |
|---|---|
| T9 Target for $3,000,000 Bonus | $ |
| T9 Target for $6,000,000 Bonus | $ |
|  |  |
|  |  |
|  |  |
| Net Income | $ |
|  |  |
| *Plus / (Less):* Interest expense / (income) | $ |
| *Plus / (Less):* Income tax expense / (income) | $ |
| *Plus:* Depreciation & amortization | $ |
| *EBITDA* | $ |
|  |  |
| *Plus:* Fees and expenses related to preparation of the Earn-Out Statement | $ |
| *Plus:* Legal and accounting fees in connection with the Transaction not being amortized | $ |
| *Plus:* Rent expense of the Facilities | $ |
| *Plus:* Additional costs incurred at the direction of Buyer | $ |
| *Plus/(Less):* Extraordinary losses / (gains) recorded | $ |
|  |  |
| *Earn-Out EBITDAR* | $ |
|  |  |
| Required Next month for $3,000,000 Earn-out | $ |
| Required Next month for $6,000,000 Earn-out | $ |

Pursuant to Section 2.3(b)(ii) of the Purchase and Sale Agreement, the Coronado seller will prepare and deliver a formal certificate on or about April 15 to support the $6,000,000 payment.

We are sending this in advance to manage expectations, to avoid any surprises and to prepare Mich 16 so that it will wire transfer the $6,000,000 Earn Out payment to the Coronado seller by no later than the due date of April 29, 2025.

Should you have any questions, please let me know.

Thanks.

Matt

**Matthew J. Comisky** | BLANKROME
One Logan Square | 130 North 18th Street | Philadelphia, PA 19103
O: 215.569.5678 | F: 215.832.5678 | M: 267.230.3875 |
Email: matthew.comisky@blankrome.com